ACCEPTED
05-15-00031-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
4/23/2015 9:21:53 AM
LISA MATZ
CLERK

NO. 05-15-00031-CV

_____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
4/23/2015 9:21:53 AM
LISA MATZ
Clerk

In the Texas Court of Appeals
Fifth Judicial District at Dallas

_____

## Robert Phalen,

### Appellant,

## v.

## Michael Mauceli, Reef Oil & Gas Partners, L.P. (f/k/a Reef Oil & Gas Partners, LLC), Reef Securities, Inc. (f/k/a Western American Securities Corp.), Reef Exploration, LP, and Paul Mauceli,

## Appellees.

_____

Appeal from the 298th Judicial District of Dallas County, Texas
Cause No. DC-13-06137-M

_____

## APPELLEES' BRIEF

_____

Charles "Chad" Baruch
Texas Bar No. 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
Telephone: (972) 412-7192
Facsimile:  (972) 412-4028
Email: baruchesq@aol.com

Elizabeth L. Yingling
Texas Bar. No. 16935975
BAKER & MCKENZIE, LLP
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Telephone: (214) 978-3000
Facsimile: (214) 978-3099
Email: elizabeth.yingling@
bakermckenzie.com

*Counsel for Appellees*

ORAL ARGUMENT CONDITIONALLY REQUESTED

**Identity of Parties and Counsel**

**Appellant Robert Phalen**

Steven E. Aldous
Texas Bar No. 00982100
FORSHEY PROSOTK, LLP
500 Crescent Court, Suite 240
Dallas, Texas 75201
saldous@forsheyprostok.com

**Appellees Michael Mauceli, Reef Oil & Gas Partners, L.P. (f/k/a Reef Oil & Gas Partners, LLC), Reef Securities, Inc. (f/k/a Western American Securities Corp.), Reef Exploration, LP, and Paul Mauceli**

Appellate Counsel
Charles "Chad" Baruch
Texas Bar Number 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
baruchesq@aol.com

Trial and Appellate Counsel
Elizabeth L. Yingling
Texas Bar. No. 16935975
BAKER & MCKENZIE, LLP
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Email: elizabeth.yingling@bakermckenzie.com

# Table of Contents

Identity of Parties and Counsel ...................................................................................i

Table of Contents...................................................................................................ii

Index of Authorities ...............................................................................................iv

Statement of the Case............................................................................................ 1

Statement Regarding Oral Argument ...................................................................... 1

Statement of Issues ............................................................................................... 1

Statement of Facts................................................................................................. 2

Summary of the Argument...................................................................................... 5

Argument ............................................................................................................. 6

    1. Phelan does not challenge the summary judgment on his claims for
       negligent misrepresentation, securities violations, or civil theft................7

    2. Phalen waived error concerning all Appellees but Reef Oil & Gas ............9

    3. The summary judgment should be affirmed based on Phalen's lack
       of standing................................................................................................ 11

    4. The summary judgment should be affirmed due to Phalen's
       reliance on his broker .............................................................................. 13

    5. The trial court's judgment should be affirmed based on the
       governing statutes of limitation and repose ............................................. 15

      A. Even with application of the discovery rule, summary
         judgment was appropriate on the claims for securities act
         violations, negligent misrepresentation, and civil theft ...................... 17

      B. Phelan did not plead the discovery rule.............................................18

      C. Phalen fails to establish applicability of the discovery rule ................ 19

D. The trial court properly concluded that Phalen's claims relating to misrepresentation of the investment prospects are not subject to the discovery rule ..................................................20

Prayer ..................................................................................................23

Certificate of Compliance.....................................................................24

Certificate of Service ...........................................................................24

Appendix:

1. Phalen Petition

2. Stevenson Petition

# Index of Authorities

## Cases

*Am. Petrofina, Inc. v. Allen*,
887 S.W.2d 829 (Tex. 1994)...................................................................................15

*Armstrong v. Benavides*,
180 S.W.3d 359 (Tex. App.—Dallas 2005, no pet.) ............................................14

*Brock v. Sutker*,
215 S.W.3d 927 (Tex. App.—Dallas 2007, no pet.) ............................................10

*Burns v. Thomas*,
786 S.W.2d 266 (Tex. 1990)...................................................................................16

*Computer Assocs., Int'l v. Altai, Inc.*,
918 S.W.2d 453 (Tex. 1996) ...................................................................................16

*City of Houston v. Clear Creek Basin Auth.*,
589 S.W.2d 671 (Tex. 1979) ...............................................................................6, 9

*Dolenz v. Dallas Cent. Appraisal Dist.*,
293 S.W.3d 920 (Tex. App.—Dallas 2009, pet. denied) .......................................8

*Hall v. Douglas*,
380 S.W.3d 860 (Tex. App.—Dallas 2012, no pet.)............................................13

*Hendricks v. Thornton*,
973 S.W.2d 348 (Tex. App.—Beaumont 1998, pet. denied) ..............................17

*Hunton v. Guardian Life Ins. Co. of Am.*,
243 F. Supp. 2d 686 (S.D. Tex. 2001), *aff'd*, 71 F. App'x 441 (5th Cir. 21-222003) (per curiam) ..............................................................................................21-22

*Jones v. Blume*,
196 S.W.3d 440 (Tex. App.—Dallas 2006, pet. denied) .....................................10

*KPMG Peat Marwick v. Harrison County Housing Finance Corp.*,
 9815-168 S.W.2d 746 (Tex. 1999)..................................................................... 15-16

*McGill v. Goff*,
 17 F.3d 729 (5th Cir. 1994), *overruled on other grounds by Kansa Reinsurance
 Co. v. Congressional Mortg. Co.*, 20 F.3d 1362 (5th Cir. 1994) ...............................23

*Nickerson v. TDCJ-ID*,
 No. 09-10-00091-CV, 2011 WL 2732605 (Tex. App.—Beaumont July 14,
 2011, no pet.) (mem. op.) ........................................................................................17

*Skiles v. Jack in the Box, Inc.*,
 170 S.W.3d 173 (Tex. App.—Dallas 2005), *rev'd on other grounds*, 221
 S.W.3d 566 (Tex. 2007) ...........................................................................................7

*T.O. Stanley Boot Co. v. Bank of El Paso*,
 847 S.W.2d 218 (Tex. 1992) ...................................................................................10

*Travelers Ins. Co. v. Joachim*,
 315 S.W.3d 860 (Tex. 2010) .....................................................................................6

*Valero Marketing & Supply Co. v. Kalama Int'l*,
 51 S.W.3d 345 (Tex. App.—Houston [1st Dist.] 2001, no pet.) ..........................10

*Valence Operating Co. v. Dorsett*,
 164 S.W.3d 656 (Tex. 2005).....................................................................................6

*Via Net v. TIG Ins. Co.*,
 211 S.W.3d 310 (Tex. 2006) (per curiam) .........................................................19-20

*W. Invs., Inc. v. Urena*,
 162 S.W.3d 547 (Tex. 2005).....................................................................................7

*Woods v. William M. Mercer, Inc.*,
 769 S.W.2d 515 (Tex. 1988) ...................................................................................16

## Statutes and Rules

TEX. R. APP. P. 38.1 ................................................................................................ 10

TEX. R. CIV. P. 63 ................................................................................................... 13

TEX. R. CIV. P. 166a .................................................................................................. 6

TEX. REV. CIV. STAT. ANN. art. 581-33(H)(2) (West 2010) ................................... 17

## Statement of the Case

Robert Phalen intervened in a lawsuit concerning oil and gas investments.[1] The trial court granted summary judgment for defendants.[2] Phalen appeals.[3]

## Statement Regarding Oral Argument

Appellees do not believe oral argument would materially assist the Court. The issues are straightforward and can be resolved based on the briefs. But if the Court sets oral argument, Appellees ask to participate.

## Statement of Issues

1.      Should the trial court's summary judgment on Phalen's claims for securities violations, civil theft, and negligent misrepresentation be affirmed based on his failure to challenge the judgment as to those claims?

2.      Has Phalen waived error as to all Appellees other than Reef Oil & Gas by permitting a ground for summary judgment to go unchallenged on appeal?

3.      Did the trial court properly grant summary judgment based on lack of standing where the evidence proves that Phalen did not invest in any of the funds on which he bases his legal claims?

---

[1] C.R. 7-12.
[2] C.R. 175.
[3] C.R. 200-01.

4. Did the trial court properly grant summary judgment based on lack of reliance where the summary judgment evidence establishes that Phalen invested based on advice from a third party?

5. Did the trial court properly grant summary judgment based on limitations where Phalen never asserted the discovery rule and, in any event, that rule does not apply to his claims?

**Statement of Facts**

This appeal concerns claims by Robert Phalen against Michael Mauceli, Paul Mauceli, Reef Oil & Gas Partners, L.P.,[4] Reef Securities, Inc.,[5] and Reef Exploration, LP. But it arises out of another lawsuit filed by many other plaintiffs against many other defendants.

*Phalen invests in a Reef limited partnership.*

In May 2007, Phalen purchased 2.5 units of partnership interest in the Reef Oil & Gas Income and Development Fund II, L.P. (Income Fund II). Phalen did not invest in any other Reef partnership.[6] Phalen made the investment through his broker, Curtis Sathre III of WFP Securities, Inc.[7]

---

[4] Formerly known as Reef Oil & Gas Partners, LLC.
[5] Formerly known as Western American Securities Corp.
[6] C.R. 77.
[7] C.R. 54.

In April 2009, Phalen filed an arbitration proceeding against Sathre and WFP based, in part, on the Income Fund II investment. In his arbitration pleading, Phalen admitted investing in Income Fund II "[a]t Sathre's recommendation"[8] and stated that he "*completely* trusted in and *relied on*" Sathre in making investments.[9]

In August 2009, Phalen wrote to Reef Oil & Gas requesting redemption of his investment. Phalen claimed that Sathre had made an "inappropriate investment recommendation." Phalen raised no other complaint about the investment.[10]

*Phalen intervenes in a lawsuit*
*over other Reef investments.*

In January 2012, Frank Stevenson and other plaintiffs filed suit in Dallas County against the Maucelis, the Reef entities involved in this appeal, a series of Reef-affiliated limited partnerships (but *not* Income Fund II), and others.[11] The Stevenson plaintiffs alleged claims for fraud and fraud in the inducement, violations of the Texas Securities Act, breach of fiduciary duty, breach of contract, civil theft, and negligent misrepresentation.

---

[8] C.R. 60.
[9] C.R. 59 (emphasis added).
[10] C.R. 161.
[11] C.R. 13-24.

In September 2012, Phalen intervened in the Stevenson lawsuit. By his petition, Phalen asserted claims against the Maucelis, Reef Oil & Gas, Reef Securities, Reef Exploration, and a series of Reef limited partnerships and affiliated entities.

Phalen alleged investor status based on his investment in Income Fund II.[12] Phalen's petition did not recount any other facts, nor did it assert any causes of action. Instead, under the heading "Background Facts and Causes of Action," Phalen "adopt[ed] and incorporate[ed] for all purposes the allegations, background facts and causes of action as set forth in [Stevenson's] Sixth Amended Original Petition . . . ."[13]

*The trial court grants summary judgment.*

After the trial court severed Phalen's claims into a separate lawsuit,[14] he non-suited all defendants except Appellees,[15] who sought traditional summary judgment—supported by affidavits and other documents—on the following grounds:

- Phalen's claims were barred by the applicable statutes of limitations and repose,

---

[12] C.R. 9.
[13] C.R. 9.
[14] C.R. 5-36.
[15] C.R. 40, 170-74.

- Phalen lacked standing because he did not invest in the limited partnerships giving rise to the legal claims,

- no Appellee had any contractual or business relationship with Phalen or made any representation to him, and

- Phalen invested in Income Fund II based on advice from Sathre.[16]

Phalen never tendered any controverting summary judgment evidence. Instead, he filed a continuance motion that included a one-page argument on the merits of the summary judgment motion. This argument addressed only the limitations issue; he did not mention any of the other grounds for summary judgment.[17]

The trial court granted summary judgment to all remaining defendants without specifying the grounds for its ruling.[18]

## Summary of the Argument

The trial court's summary judgment should be affirmed because—

- Phalen does not challenge (or waives appeal of) the trial court's judgment as to the claims for securities act violations, negligent misrepresentation, and civil theft, meaning the judgment should be affirmed on those claims;

- Phalen's explicitly limits his challenge on an independent ground for judgment to Reef Oil & Gas, meaning the

---

[16] C.R. 44-164.
[17] C.R. 164-69.
[18] C.R. 175.

judgment should be affirmed as to all claims against the other four Appellees;

- Phalen adopted the Stevenson petition's causes of action—which all were based on partnerships in which Phalen never invested;

- Phalen's own admissions constitute more than a scintilla of evidence that  he invested in Income Fund II based solely on advice from his broker; and

- Phalen's claims are barred by limitations, and he neither asserted the discovery rule in the trial court nor establishes its applicability to his injuries in his appellate brief (and, in fact, it does not apply to those injuries).

## Argument

Texas appellate courts review summary judgments using a *de novo* standard of review. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *see also City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). The court takes as true all evidence favorable to the nonmovant and indulges every reasonable in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

Where a motion for summary judgment is based on several different grounds and the order granting the motion fails to specify its basis, the appellant must show that each ground alleged in the motion is insufficient to support summary judgment. *Skiles v. Jack in the Box, Inc.,* 170 S.W.3d 173, 178 (Tex. App.—Dallas 2005), *rev'd on other grounds*, 221 S.W.3d 566 (Tex. 2007). The trial court's judgment will be affirmed if any asserted ground for summary judgment is meritorious. *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

**1.  Phalen does not challenge the summary judgment on his claims for negligent misrepresentation, securities violations, or civil theft.**

Phalen's first issue on appeal concerns the trial court's grant of summary judgment based on the affirmative defense of limitations. Phalen says in passing that the trial court's order must be reversed as to "all" claims. But he limits his argument on this issue to the claims for breach of contract, breach of fiduciary duty, and fraud. These are the only claims for which Phalen provides any legal authority, and the only claims to which he contends the discovery rule applies.[19] Phalen makes no argument, cites no facts or legal authorities, and does not even refer to his claims for securities

---

[19] Appellant's Brief at 11 ("The discovery rule applies to breach of contract, breach of fiduciary duty and fraud claims").

violations, civil theft, or negligent misrepresentation in connection with the limitations issue.

Indeed, even Phalen's reference to "all" claims makes clear he bases it only on the other three claims:

> Appellees failed to produce any evidence as to when Phalen discovered, or in the exercise or reasonable diligence, should have discovered the facts establishing his *fraud, breach of fiduciary duty, and breach of contract claims.* As a result, the trial court's order granting summary judgment as to *all of Phalen's claims* must be reversed . . . .[20]

It is unclear whether Phalen's failure to argue (or even mention) his claims for violations of the Texas Securities Act, civil theft, or negligent misrepresentation results from an intent not to challenge judgment as to these claims. If not, it constitutes briefing waiver of such a challenge. His apparent reference to them is, at best, "conclusory and inadequately briefed." *See Dolenz v. Dallas Cent. Appraisal Dist.*, 293 S.W.3d 920, 923 (Tex. App.—Dallas 2009, pet. denied) (citation omitted).

Due to Phalen's failure to raise any issue or make any argument concerning his claims for securities violations, civil theft, and negligent

---

[20] Appellant's Brief at 11 (emphasis added).

misrepresentation, the trial court's grant of summary judgment on these claims should be affirmed based on limitations.

**2.      Phalen waived error concerning all Appellees but Reef Oil & Gas.**

Appellees sought summary judgment on all claims based, in part, on their argument that Paul Mauceli, Michael Mauceli, Reef Securities, and Reef Exploration never had any contract or relationship with, or made any representation to, Phalen.[21] Appellees supported this argument with the Maucelis' affidavit testimony.[22]

Phalen did not respond to these arguments in the trial court. As a result, he can challenge these grounds on appeal only for legal sufficiency. *Clear Creek*, 589 S.W.2d at 678. But in his appellate brief, Phalen explicitly limits his challenge concerning the summary judgment evidence to Reef Oil & Gas; his argument header states that: "Appellees Failed to Meet Their Burden to Completely Negate an Element of Phalen's Causes of Action *Against ROGP*."[23] Likewise, in the body of his argument, Phalen says nothing about the Maucelis' affidavit testimony concerning themselves, Reef Securities, or Reef Exploration.

---

[21] C.R. 49-50.
[22] C.R. 73-78.
[23] Appellant's Brief at 12 (emphasis added).

Phalen's failure to assign error to this basis for summary judgment or make any argument concerning it constitutes briefing waiver of this issue. *See* TEX. R. APP. P. 38.1(i); *see, e.g., Brock v. Sutker*, 215 S.W.3d 927, 929 (Tex. App.—Dallas 2007, no pet.). Having failed to respond to this ground for summary judgment in the trial court or address the sufficiency of this evidence in his appellate brief, Phalen has waived error concerning these Appellees.

Independently, a legal sufficiency challenge fails on this record as to the claims for breach of contract, breach of fiduciary duty, and fraud. The Maucelis' testimony that neither they nor Reef Securities or Reef Exploration had any contractual relationship with Phalen destroys the breach of contract claim as to these parties. *Valero Marketing & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.). Their testimony that none of these parties had any business or other relationship with Phalen destroys the breach of fiduciary duty claim. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). Their testimony that none of these parties had dealings with, or made any representation to, Phalen destroys the fraud claim. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992).

For both reasons, the trial court's judgment dismissing all claims against Paul Mauceli, Michael Mauceli, Reef Securities, and Reef Exploration should be affirmed.

**3.      The summary judgment should be affirmed based on Phalen's lack of standing.**

In his petition, Phalen adopted "the allegations, background facts and causes of action" of the Stevenson petition.[24] The Stevenson petition lists the Reef offerings purchased by the Stevenson plaintiffs.[25] In paragraph 57 of its factual recitation, before asserting any legal claims, the Stevenson petition defines "the Projects" to mean *those specific investments*—which do not include Income Fund II, invested in by Phalen.[26]

The Stevenson petition bases its claims for fraud, violations of the Texas Securities Act, breach of contract, and negligent misrepresentation solely and explicitly on allegations concerning actions taken in connection with "the Projects." The Stevenson petition makes no claim under these causes of action for any conduct not related to "the Projects." And even the

---

[24] C.R. 9.
[25] C.R. 20-23.
[26] C.R. 23.

other two claims, for breach of fiduciary duty and civil theft, are based on funds paid and actions taken in connection with these same investments.[27]

Phalen never invested in any of "the Projects." He invested only in Income Fund II—an offering not at issue in the Stevenson petition. As a result, the trial court properly granted summary judgment that Phalen lacked standing to pursue the legal claims he adopted from the Stevenson petition.

Having failed to respond to this argument in the trial court, Phalen now attempts to rely on general statements made in the Stevenson petition's recitation of facts. But the Stevenson petition's assertion of the causes of action states explicitly that they are based on the Projects—not allegations concerning other investments. And Phalen did not invest in the Projects. The Stevenson petition asserts specific causes of action based—*explicitly based*—on specified investments by specified investors. When Phalen adopted these causes of action, he apparently failed to realize that his investment was not among "the Projects."

Phalen argues that Appellees failed to file any special exception and, in any event, he should have been given an opportunity to amend his petition. But Appellees do not assert a pleading defect; they allege a lack of standing.

---

[27] C.R. 24-31.

This was a matter of subject matter jurisdiction, not pleading. *See Hall v. Douglas*, 380 S.W.3d 860, 872-73 (Tex. App.—Dallas 2012, no pet.).

In any event, Phalen never sought leave to amend his petition. *See* TEX. R. CIV. P. 63. The trial court had no duty to suggest or order an amendment no one sought. Of course, Phalen cannot establish harmful error from denial of an amendment anyway. Nothing in the record indicates that Phalen could or would have amended his petition to cure his lack of standing. No evidence indicates that: (1) Phalen invested in the specific offerings referenced by the Stevenson petition, or (2) any Appellee committed any actionable conduct with respect to Phalen's investment. These are the only two ways Phalen could have cured the problem, and nothing suggests his ability to do so.

**4. The summary judgment should be affirmed due to Phalen's reliance on his broker.**

Appellees sought summary judgment based on Phalen's admission that he invested in Income Fund II based on the advice of his broker rather than any Appellee. Because Phalen failed to address this issue in the trial court, his challenge on appeal is limited to legal sufficiency. A legal sufficiency challenge fails where more than scintilla of evidence supports the

trial court's judgment. *Armstrong v. Benavides*, 180 S.W.3d 359, 362 (Tex. App.—Dallas 2005, no pet.).

Appellees tendered summary judgment evidence establishing that Phalen invested based on the advice of his broker, Sathre. Phalen concedes this reliance but contends that evidence of it is not evidence of reliance "to the exclusion of all others and particularly ROGP."[28] This is Phalen's sole argument concerning this ground for summary judgment; he waives all others. *See* TEX. R. APP. P. 38.1(i).

Appellees tendered the arbitration pleading containing Phalen's claims against Sathre. In it, Phalen states repeatedly that he relied on Sathre in making the Reef investment. The pleading says that "Phalen *completely* trusted in and *relied on* the expertise of Sathre" in investing. It refers to "Sathre's recommended investment plan" and says that Phalen followed "Sathre's advice." Finally, the pleading states that Phalen's investment in Income Fund II was "[a]t Sahtre's recommendation."[29] At no point does the pleading mention Phalen's reliance on *anyone* but Sathre.

Appellees also tendered Phalen's letter demanding redemption of his investment. In it, Phalen referred to the Reef investment as recommended by

---

[28] Appellant's Brief at 14.
[29] C.R. 59-60.

Sathre: "The investments *recommended by my broker*, including this investment in Reef, have left me in a position of financial ruin . . . ."[30] Again, the letter makes no mention of reliance on anyone but Sathre.

Phalen's repeated statements of reliance on Sathre, combined with the conspicuous absence of reference to reliance on anyone else, constitute more than a scintilla of evidence supporting the trial court's summary judgment based on lack of reliance upon any statement by Appellees.

5.    **The trial court's judgment should be affirmed based on the governing statutes of limitation and repose.**

Phalen invested in Income Fund II in May 2007, but did not intervene in the Stevenson lawsuit until September 2012. Absent some savings doctrine, Phalen's claims are barred by limitations.

In attempting to overcome limitations, Phalen relies on the doctrines of fraudulent concealment and the discovery rule. But fraudulent concealment is in the nature of an "affirmative defense" to the adverse party's plea of limitations. *Am. Petrofina, Inc. v. Allen*, 887 S.W.2d 829, 830 (Tex. 1994). The party asserting fraudulent concealment must raise it in response to the summary judgment motion and come forward with evidence supporting it. *Id.*; *see also KPMG Peat Marwick v. Harrison County Housing*

---

[30] C.R. 161 (emphasis added).

*Finance Corp.*, 988 S.W.2d 746, 749 (Tex. 1999). Phelan's failure to tender any evidence precludes his reliance on fraudulent concealment.

"The discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Computer Assocs., Int'l v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) (citations omitted). The discovery rule is a very limited exception to statutes of limitation. *Id.* It is applicable only in cases "where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Id.* at 456.

A party seeking to avail itself of the discovery rule must plead the rule or otherwise raise it in response to a defendant's assertion of limitations as a matter in avoidance. *KPMG Peat Marwick*, 988 S.W.2d at 748; *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 518 (Tex. 1988). When the plaintiff has pleaded the discovery rule, the defendant must negate the rule by proving as a matter of law that there is no genuine issue of fact about when the plaintiff discovered or should have discovered the nature of the injury. *Burns v. Thomas*, 786 S.W.2d 266, 267 (Tex. 1990) (citation omitted). But the burden is the opposite for fraudulent concealment.

**A.** **Even with application of the discovery rule, summary judgment was appropriate on the claims for securities act violations, negligent misrepresentation, and civil theft.**

Phalen's claims for negligent misrepresentation and theft liability are subject to two-years limitations periods. *Hendricks v. Thornton*, 973 S.W.2d 348, 364 & n.19 (Tex. App.—Beaumont 1998, pet. denied) (negligent misrepresentation); *Nickerson v. TDCJ-ID*, No. 09-10-00091-CV, 2011 WL 2732605, at *2 (Tex. App.—Beaumont July 14, 2011, no pet.) (mem. op.) (theft liability).

Appellees' evidence concerning Phalen's demand for redemption in August of 2009, and his arbitration claims earlier that same year against his broker based in part on that investment, constitute more than a scintilla of evidence concerning discovery of the claims sufficient to trigger these limitations periods. Because Phalen did not intervene until September 2012, these claims are time-barred even using the discovery rule.

Similarly, the Texas Securities Act imposes a five-year statute of repose for the claims asserted by Phalen. TEX. REV. CIV. STAT. ANN. art. 581-33H(2) (West 2010) (Texas Securities Act §§ 33A(2), 33F(1), and 33F(2) claims). Because Phalen did not intervene until more than five years

after his purchase, these claims are barred by the statute of repose—again without regard to any issue raised by Phalen's brief.

## B. Phalen did not assert the discovery rule.

Phalen's sole argument on limitations is that he invoked the discovery rule and Appellees failed to negate it. But Phalen never raised the discovery rule in his petition. That petition did not adopt the entirety of Stevenson's sixth amended petition; it adopted only "the allegations, background facts and causes of action." Critically, Phalen did not adopt the Stevenson petition's assertion of the discovery rule.

In their petition, the Stevenson plaintiffs allege that the statute of limitations was tolled by the doctrine of fraudulent concealment and the discovery rule. The Stevenson petition does this in two separately titled sections entitled, respectively, "Fraudulent Concealment" and "Discovery Rule."[31] These sections follow and are separate from other sections entitled "Background Facts" and "Causes of Action."[32]

Phalen adopted only "the allegations, background facts and causes of action" of the Stevenson petition.[33] The Stevenson petition's assertion of the legal doctrines of fraudulent concealment and the discovery rule is not

---

[31] C.R. 31-32.
[32] C.R. 17, 24.
[33] C.R. 9.

18

part of its allegations, background facts, or causes of action. It is, just like the damages section that follows it, a separate—and separately titled—section. As if to make this point perfectly, Phalen did not adopt the Stevenson petition's sections on damages or exemplary damages; Phalen made his own assertion of actual and exemplary damages. These, like the fraudulent concealment and discovery rules sections, are portions of the Stevenson petition not incorporated by Phalen in his petition.

Phalen simply never asserted the discovery rule. As a result, Appellees had no burden (or reason) to negate it—and the trial court properly granted summary judgment based on the applicable periods of limitations and repose.

## C. Phalen fails to establish applicability of the discovery rule.

Phalen mistakenly assumes that determining applicability of the discovery rule turns on the cause of action asserted. He assumes that because courts have held the discovery rule applicable to some types of injuries under the claims he asserts, this necessarily means the discovery rule always applies to such claims. But categorical applicability of the discovery rule actually is "focused on types of injury, not causes of action." *Via Net, U.S. v. TIG Ins. Co.*, 211 S.W.3d 310, 314-15 (Tex. 2006) (per curiam). Thus, for

example, the discovery rule does not apply to most breach of contract cases—but may apply to some. *Id*. at 313, 314.

Phalen's argument concerning applicability of the discovery rule to his claims is entirely conclusory. Without any supporting analysis, Phalen states simply that: "The discovery rule applies to breach of contract, breach of fiduciary duty, and fraud claims."[34] He cites cases. But he provides no hint as to why the discovery rule applies to these claims in the context of ***this case***—why does it apply to his particular injuries?

Specifically, Phalen never explains how or why his injuries were inherently undiscoverable or how the evidence of his injury is objectively verifiable. *See Altai*, 918 S.W.2d at 456. It may well be that Phalen ***can*** show these things. But his failure to do so constitutes briefing waiver of this issue due to his abject failure to provide even the most abbreviated analysis as to why the discovery rule should apply in the fact-specific context of this case.

### D.     The trial court properly concluded that Phalen's claims are not subject to the discovery rule.

The overwhelming majority of the Stevenson petition's allegations relate to representations about the likely success of Reef investments. The Stevenson petition claims investors were told, by way of example, that the

---

[34] Appellant's Brief at 11 (citations omitted).

investments were a "can't miss" that would "hit on everything."[35] These types of representations concerning the prospects for success lie at the heart of all claims asserted by the Stevenson petition.

Any falsity in these representations was discoverable by Phalen at the time he received the private placement memorandum. That document made exceptionally clear, the moment Phalen received it, that any representations or predictions about likely investment returns were false. The memorandum advised Phalen that his investment was risky and that no guarantee of performance existed or could be made.[36] Courts have held that, in this scenario, the falsity of representations is discoverable at the time they are made and the discovery rule therefore does not apply.

In *Hunton v. Guardian Life Ins. Co. of Am.*, 243 F. Supp. 2d 686, 698-702 (S.D. Tex. 2001), *aff'd*, 71 F. App'x 441 (5th Cir. 2003), a federal court analyzed the Texas discovery rule in connection with a fraud claim arising from an insurance investment. The plaintiffs complained of various misrepresentations including guaranteed payment of dividends without regard to performance. *Id.* at 692-94. The court held that "even a cursory review of the Policy and Application informs Plaintiffs that [the agent's] oral

---

[35] C.R. 18.
[36] C.R. 104.

representations did not accurately reflect the written Policy. The Policy terms thus are easily discoverable." *Id.* at 700. The court found that the plaintiffs failed to meet their burden to produce evidence that the misrepresentations were inherently undiscoverable and that they exercised reasonable diligence to discover the harm. *Id.* at 700 n.19.

With respect to the duty to exercise reasonable diligence, specifically, the court reiterated the well-settled principle that "[i]nvestment decisions inherently require that the investor exercise diligence rather than relying on any oral representations." *Id.* at 701 (citations omitted). The court found the plaintiffs' reliance on oral representations to be unreasonable and contrary to the written documents, rendering any such guarantees by the sales agent and ensuing fraud "easily discoverable." *Id.* at 699, 700 n.24. The court concluded that where a cause of action for misrepresentation relates to the purchase of a financial instrument, and the "financial instrument contains terms that are clearly contrary to the alleged misrepresentation, the cause of action accrues at the time the instrument is purchased." *Id.* at 700 n.27 (citation omitted).

Similarly, the Fifth Circuit has held that where parties received a copy of their joint venture agreement, which contained terms 'so contrary to

[their] alleged understanding of the deal that upon review of the document, [they] would have been put on notice of [the defendant's] alleged fraud,'" limitations began to run at the time of the investment. *McGill v. Goff*, 17 F.3d 729 (5th Cir. 1994), *overruled on other grounds by Kansa Reinsurance Co. v. Congressional Mortg. Co.*, 20 F.3d 1362, 1373-74 (5th Cir. 1994).

As a result, even if Phalen was induced to invest based on false representations of guaranteed, "can't-miss" returns, the documents he received when investing clearly put him on notice that these representations were false. Nothing suggests that the falsity was inherently undiscoverable. The discovery rule simply does not apply to Phalen's claims.

### Prayer

The trial court properly granted summary judgment on a variety of grounds. The judgment should be affirmed.

Respectfully submitted,

/s/Charles "Chad" Baruch
Texas Bar Number 01864300
THE LAW OFFICE OF CHAD BARUCH
3201 Main Street
Rowlett, Texas 75088
Telephone: (972) 412-7192
Facsimile: (972) 412-4028
Email: baruchesq@aol.com

Elizabeth L. Yingling
Texas Bar Number 16935975
BAKER & MCKENZIE, LLP
2001 Ross Avenue, Suite 2300
Dallas, Texas 75201
Telephone: (214) 214? 978-3000
Facsimile: (214) 978-3099
Email: elizabeth.yingling@
bakermckenzie.com

*Counsel for Appellees*

## Certificate of Compliance

This brief was prepared using Microsoft Word for Mac. Relying on the word count function in that software, I certify that this brief contains 4,419 words (excluding the cover, tables, signature block, and certificates).

/s/Charles "Chad" Baruch

## Certificate of Service

The undersigned certifies that a true and correct copy of this instrument was served this 23rd day of April, 2015, by efiling and email, upon the following counsel of record for appellant:

Steven E. Aldous
Texas Bar No. 00982100
FORSHEY PROSOTK, LLP
500 Crescent Court, Suite 240
Dallas, Texas 75201
By email to: saldous@forsheyprostok.com

/s/Charles "Chad" Baruch

24

1

| | | |
|---|---|---|
| FRANK STEVENSON, On Behalf of | § | IN THE DISTRICT COURT |
| And in His Custodial Capacity | § | |
| For IRA RESOURCES, INC. NO.XXX22 | § | |
| F/B/O FRANK STEVENSON, et al, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | 191st JUDICIAL DISTRICT |
| | § | |
| V. | § | |
| | § | |
| WAYNE KIRK, et al, | § | |
| | § | |
| Defendants, Jointly and Severally | § | DALLAS COUNTY, TEXAS |

## ORIGINAL PETITION IN INTERVENTION

TO THE HONORABLE JUDGE OF SAID COURT:

Comes now ROBERT C. PHALEN, Intervenor, and files this his Original Petition in Intervention complaining of Defendants Wayne Kirk, Michael J. Mauceli, Reef Global Energy Ventures II, L.P., Reef Global Energy Ventures V, L.P., Reef Global Energy Ventures VI, L.P., Reef Global Energy Ventures VII, L.P., Reef Oil & Gas Income and Development Fund, L.P., Reef Oil & Gas Partners, L.P., Reef-Gumbo II, Sweet Bay, Grand Lake Joint Venture, L.P., Reef Oil & Gas Partners, L.P., Reef Private Drilling Venture 2006 IV Joint Venture, Reef Energy Partners, G.P., a Nevada Partnership, Reef Energy Partners, L.P., a

---

a Texas limited partnership, Reef Oil & Gas Companies, a Texas corporation, Reef Oil & Gas Partners, P.P. Backridge Infield Drilling Joint Venture I, Reef Oil & Gas Partners, l.P. Bell City South Infield Development Joint Venture, Reef Oil & Gas Partners, L.P. Corpus Christi Bay Joint Venture, Reef Oil & Gas Partners, L.P. East Euterpe & Gumbo Infield Joint Venture, Reef Oil & Gas Partners, L.P. North Gata Prospect Joint Venture, Reef Oil & Gas Partners, L.P. White Castle Field 2007-I Joint Venture, Reef Oil & Gas Partners, L. P. South Central 3 Well Infield Development Joint Venture, Reef Oil & Gas Partners, L.P. Treasure Isle & Hog Island Infield Joint Venture, Reef Securities, Inc.., Reef Partners, LLC, Reef Partners - 2000- A Income Fund Joint Venture, Reef Exploration, LP, Reef Oil & Gas Income Fund IX, LP, Reef Partners Income Fund, a Texas entity, Reef Oil & Gas Partners, LLC, Reef Exploration, Inc. - Baton Rouge Infield Development Fund Joint Venture, Reef Global Energy Ventures, a Texas entity, Reef Global Energy Ventures I, Reef Global Energy Ventures IV, and Paul F. Mauceli, Jr., and for such cause of action would respectfully show the Court and Jury the following:

I.

## Discovery Control Plan

Discovery will be conducted pursuant to the Court's Docket Control and Scheduling Order.

## II.

## Parties

Intervening Plaintiff Robert C. Phalen is a resident of the State of California.

Defendants have appeared and answered herein. Accordingly, service may be had on their respective attorneys of record.

## III.

## Background Facts and Causes of Action

Intervenor adopts and incorporates herein for all purposes the allegations, background facts and causes of action as set forth in Plaintiffs' Sixth Amended Original Petition filed herein on or about January 24, 2012, as fully as though set out *in haec verba*.

Furthermore, Intervenor Phalen made the following investment: 2.5 units in the Reef Oil & Gas Income and Development Fun II, L.P. (the "partnership"), whose general partner is Reef Oil & Gas Partners, L.P., for a total purchase price of Two Hundred Fifty Thousand Dollars ($250,000.00).

## IV.

## Damages

As a direct and proximate result of the conduct as set forth in the Plaintiffs' Sixth Amended Original Petition, Intervenor Robert C. Phalen has sustained damages in excess of the minimum jurisdictional limits of the Court.

---

Petition in Intervention <span style="float:right">Page 3</span>

## V.

## Exemplary Damages

Intervenor is entitled to recover, in addition to his actual damages, punitive and exemplary damages as a result of the Defendants' fraud, breach of fiduciary duty and wanton and wilful conduct.

## VI.

## Attorney's Fees

Intervenor is entitled to recover his reasonable and necessary attorney's fees pursuant to the Texas Securities Act, Vernon's Ann.Civ.Stat. art. 581-33 (2001), *et.seq.*, and Section 38.001 of the Texas Civil Practices and Remedies Code.

## VII.

## Prayer for Relief

Wherefore, premises considered, Intervenor prays that upon final hearing, he have and recover from the Defendants, jointly and severally, his actual damages of $250,000.00, exemplary damages in an amount to be determined by the jury, reasonable and necessary attorney's fees, rescission of the transaction, interest on the investment from date of purchase to date of judgment, all court costs, and for such other and further relief to which he may be justly entitled.

Respectfully submitted,

LAW OFFICE OF RICHARD ELLIOTT

Richard H. Elliott
402 West Main Street
Fredericksburg, Texas 78624
Telephone: (830) 997-7715
Facsimile: (830) 997-7013
Bar Card No. 06549500
*Attorney for Robert C. Phalen*

## Certificate of Service

This is to certify that a true and correct copy of the above and foregoing Original Petition in Intervention of Robert C. Phalen has been mailed, certified mail, return receipt requested, to all known counsel of record as follows:

Dena Mathis, Esq.
KYLE, MATHIS & LEWIS, LLP
8226 Douglas Avenue
Suite 450
Dallas, Texas 75225
*Attorney for Reef Global Energy, II., L.P., et al*

Elizabeth Yingling, Esq.
BAKER & McKENZIE, LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, Texas 75201
*Attorney for Reef Oil & Gas Partners LP South Central 3
Infield Development Joint Venture*

Martha Hardwick Hofmeister, Esq.
SHECKLEFORD MELTON McKINLEY, LLP
3333 Lee Parkway
Tenth Floor
Dallas, Texas 75219
*Attorney for Wayne Kirk*

and

Mark L. Taylor, Esq.
POWERS TAYLOR, LLP
Campbell Centre II
8150 North Central Expressway
Suite 1575
Dallas, Texas 75206
*Attorney for Plaintiffs*

on this ____ day of September, 2012.

_____
Richard Elliott

2

CAUSE NO. 10-10647

| | |
|---|---|
| FRANK STEVENSON ON BEHALF OF, § | IN THE DISTRICT COURT |
| AND IN HIS CUSTODIAL CAPACITY § | |
| FOR IRA RESOURCES, INC. NO. XXX22 § | |
| F/B/O FRANK STEVENSON, et al. § | |
| § | |
| Plaintiffs, § | |
| § | 191st JUDICIAL DISTRICT |
| § | |
| v. § | |
| § | |
| WAYNE KIRK, et al. § | |
| § | |
| Defendants, Jointly & Severally. § | DALLAS COUNTY, TEXAS |

## PLAINTIFFS' SIXTH AMENDED ORIGINAL PETITION

Plaintiffs, files this their Sixth Amended Original Petition complaining of the Defendants and in support, Plaintiffs respectfully show the Court the following:

### DISCOVERY CONTROL PLAN

1. Unless modified by the Court, discovery in this lawsuit will be conducted according to Discovery Control Plan – Level 3.

### PARTIES AND SERVICE

2. Plaintiff, Frank Stevenson on Behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. XXX22, f/b/o Frank Stevenson, is a resident of Kansas.

3. Plaintiffs, Frank and Donna Stevenson as Joint Tenants with Rights of Survivorship, are residents of Kansas.

4. Plaintiff, Donna Stevenson on Behalf of, and in her Custodial Capacity for IRA Resources, Inc. No. XXX23, f/b/o Donna Stevenson, is a resident of Kansas.

5. Plaintiffs, James and Carol Estle as Joint Tenants With Rights of Survivorship, are residents of Colorado.

13

6.      Plaintiff, James Estle on Behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. XXX56, f/b/o James Estle, is a resident of Colorado.

7.      Plaintiff, Carol Estle on Behalf of, and in her Custodial Capacity of IRA Resources, Inc. XXX55, f/b/o Carol Estle, is a resident of Colorado.

8.      Plaintiff, Nancy Thurmond as Trustee for the Nancy Lola Thurmond Revocable Trust, is a resident of Florida.

9.      Plaintiff, Jaimie A. Davis is an individual and a resident of California.

10.     Defendant, Wayne Kirk ("Kirk") has appeared and subjected himself to this court's jurisdiction.

11.     Defendant, Michael J. Mauceli has appeared and subjected himself to this court's jurisdiction.

12.     Defendant, Reef Global Energy Ventures II, L.P. has appeared and subjected itself to this court's jurisdiction.

13.     Defendant, Reef Global Energy Ventures V, L.P., has appeared and subjected itself to this court's jurisdiction.

14.     Defendant, Reef Global Energy Ventures VI, L.P., has appeared and subjected itself to this court's jurisdiction.

15.     Defendant, Reef Global Energy Ventures VII, L.P., has appeared and subjected itself to this court's jurisdiction.

16.     Defendant, Reef Oil & Gas Income and Development Fund, L.P., has appeared and subjected itself to this court's jurisdiction.

17.     Defendant, Reef Oil & Gas Partners, L.P., .has appeared and subjected itself to this court's jurisdiction.

18. Defendant, Reef Oil & Gas Partners, L.P. Reef-Gumbo II, Sweet Bay, Grand Lake Joint Venture, L.P., has appeared and subjected itself to this court's jurisdiction.

19. Defendant, Reef Oil & Gas Partners, L.P. Reef Private Drilling Venture 2006 IV Joint Venture, has appeared and subjected itself to this court's jurisdiction.

20. Defendant, Reef Energy Partners, G.P., is a Nevada general partnership, and no citation is necessary at this time.

21. Defendant, Reef Energy Partners, L.P., is a Texas limited partnership, and no citation is necessary at this time.

22. Defendant, Reef Oil & Gas Companies, is a Texas corporation, and no citation is necessary at this time.

23. Defendant, Reef Oil & Gas Partners, L.P. Backridge Infield Drilling Joint Venture I, has appeared and subjected itself to this court's jurisdiction.

24. Defendant, Reef Oil & Gas Partners, L.P. Bell City South Infield Development Joint Venture, has appeared and subjected itself to this court's jurisdiction.

25. Defendant, Reef Oil & Gas Partners, L.P. Corpus Christi Bay Joint Venture, has appeared and subjected itself to this court's jurisdiction.

26. Defendant, Reef Oil & Gas Partners, L.P. East Euterpe & Gumbo Infield Joint Venture, has appeared and subjected itself to this court's jurisdiction.

27. Defendant, Reef Oil & Gas Partners, L.P. North Gata Prospect Joint Venture, has appeared and subjected itself to this court's jurisdiction.

28. Defendant, Reef Oil & Gas Partners, L.P. Reef White Castle Field 2007-I Joint Venture, has appeared and subjected itself to this court's jurisdiction.

29. Defendant, Reef Oil & Gas Partners, L.P. South Central 3 Well Infield Development Joint Venture, has appeared and subjected itself to this court's jurisdiction.

30. Defendant, Reef Oil & Gas Partners, L.P. Treasure Isle & Hog Island Infield Joint Venture, has appeared and subjected itself to this court's jurisdiction.

31. Defendant, Reef Securities, Inc., has appeared and subjected itself to this court's jurisdiction.

32. Defendant, Reef Partners, LLC, has appeared and subjected itself to this court's jurisdiction.

33. Defendant, Reef Partners - 2000 - A Income Fund Joint Venture has appeared and subjected itself to this court's jurisdiction.

34. Defendant, Reef Exploration, LP, has appeared and subjected itself to this court's jurisdiction.

35. Defendant, Reef Oil & Gas Income Fund IX, LP., has appeared and subjected itself to this court's jurisdiction.

36. Defendant, Reef Partners Income Fund is a Texas entity, and no citation is necessary at this time.

37. Defendant, Reef Oil & Gas Partners, LLC, has appeared and subjected itself to this court's jurisdiction.

38. Defendant, Reef Exploration, Inc. - Baton Rouge Infield Development Joint Venture, has appeared and subjected itself to this court's jurisdiction.

39. Defendant, Reef Global Energy Ventures is a Texas entity and no citation is necessary at this time.

40. Defendant, Reef Global Energy Ventures I has appeared and subjected itself to this court's jurisdiction.

41. Defendant, Reef Global Energy Ventures IV has appeared and subjected itself to this court's jurisdiction.

42. Defendant, Paul F. Mauceli, Jr. has appeared and subjected himself to this court's jurisdiction.

## Venue

43. Venue is proper in Dallas County, Texas under Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code. Dallas County is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred.

## BACKGROUND FACTS

44. Defendants are in the business of offering oil and gas securities to the public and operating the oil and gas wells related to such securities. Upon information and belief, Defendants are primarily engaged in schemes whereby they fraudulently induce investors to purchase interests in oil and gas projects, fail to properly select or operate the wells related to those projects, divert investor funds for their own use or for use on other projects, charge grossly excessive fees for the drilling, operation and maintenance of the projects and then return little or nothing to the investor. In connection with their schemes, Defendants offered oil and gas securities for sale to the Plaintiffs.

45. In order to induce Plaintiffs to invest in Defendants' oil and gas securities, Defendants Wayne Kirk, Michael Mauceli, Paul Mauceli, Reef Securities, Inc., Reef Exploration, L.P. and Reef Oil and Gas Partners, L.P. (hereafter, the "Reef Defendants") made numerous material misrepresentations and omissions, both orally and in the offering documents. For example, and without limitation, the Reef Defendants misrepresented the benefits of investing in the Projects, the return Plaintiffs would receive on the investments, and how Plaintiffs' cash would be allocated. These Defendants also failed to state or misrepresented the annual returns on their programs, the actual use of investment proceeds, the allocation of costs, expenses and deductions, the accounting for costs, expenses and deductions, and their track

record on prior wells. Additionally, the Reef Defendants failed to disclose to Plaintiffs that the Reef Defendants' intent was to misapply and misallocate the funds received from Plaintiffs, and use large amounts of these funds for the Reef Defendants' own expenses. The Reef Defendants also represented to Plaintiffs that the securities were excellent investments with low risk, when they were in fact very high risk and fraudulent. Other examples of the Reef Defendants' false representations include the following:

a.    Defendant Kirk represented to Plaintiffs Frank and Donna Stevenson that they could not lose the money they would invest in Defendants' securities; they would be re-paid their investments within 18 months; Defendants "hit on everything"; the investments are a "can't miss"; and "if you invest you will make a lot of money."

b.    Defendant Kirk misrepresented to Plaintiffs James and Carol Estle that Defendants have had great success; two wells were bigger than Defendants thought; the wells will "absolutely" be bigger than Defendants thought; there is no way that you can go wrong by investing in Global Energy projects; and Global Energy is going to make a lot of money as it is the "neatest thing" Defendants have seen. Defendant Kirk also told the Estles that he had his own money invested into various of Defendants' joint ventures.

c.    Defendant Kirk misrepresented to Plaintiff Thurmond that investing in Defendants' "Income Fund" was a safe investment, that her investment in "Treasure Isle & Hog Island" would be a good investment with her revenues to be several thousand dollars per month; that the well in the East Euterpe and Gumbo Infield "was really going to be big" and that the other investments with Defendants would have little risk and pay her even more money.

d.    Curtis Sathre, a sales agent for Reef Oil & Gas Income and Development Fund, L.P, misrepresented to Plaintiff Jamie Davis that the well in this "Fund" was very

profitable and that he had invested in the "Fund." Sathre also misrepresented to Plaintiff Davis that her investment would provide for substantial annual income.

By means of material false representations and omissions made by Defendants to Plaintiffs, including but not limited to the material false representations and omissions described in this paragraph, the Reef Defendants fraudulently induced Plaintiffs to invest in Defendants' oil and gas securities as described in Paragraphs 48-55 *infra.*

46.    Upon information and belief, as well as documentation Defendants provided to Plaintiffs, Defendants Kirk, Michael Mauceli, and Paul Mauceli manage, operate, and/or control the various entities and/or projects which Defendants offered for sale to Plaintiffs. Kirk represented to Plaintiffs Frank and Donna Stevenson that he controls much of the information for the projects in which Plaintiffs invested. In addition, Paul Mauceli is the founder and CEO of Reef Oil & Gas Companies, and is therefore a control person as defined in the Texas Securities Act.

47.    Defendant Reef Securities, Inc., together with Defendants Reef Exploration, L.P. and Reef Oil & Gas Partners, L.P., served as the broker-dealer for Defendants offerings to Plaintiffs. Upon information and belief, these oil and gas projects constitute unregistered securities offered without the benefit of any exemption from registration. The projects have been offered by general telephone solicitation to the public (including Plaintiffs) and upon information and belief, do not qualify for the exemption provisions of the Texas Securities Act, and Regulation D, Rule 502(c) of the Securities Act of 1933. In addition, upon information and belief, the projects also constitute unregistered securities, without benefit of exemption from registration, in the states where the various Plaintiffs resided at the time Defendants offered such securities to Plaintiffs by telephone.

48. Defendants, through Defendant Kirk, sold securities to Plaintiffs Frank and Donna Stevenson as Joint Tenants with Rights of Survivorship. These sales were related to alleged oil and gas projects identified as:

a. Reef Global Energy II, L.P.; Invested on 11/7/2003; No Reg D on File;

b. Reef Backridge Infield Development #1 Joint Venture; Invested on 11/7/2003; Reg D on File;

c. Reef Treasure Isle & Hog Island Infield Joint Venture; Invested on 3/24/2005; Reg D on File;

d. Reef East Euterpe & Gumbo Infield Joint Venture; Invested on 5/13/2005; Reg D on File;

e. Reef South Central 3 Well Infield Development Joint Venture; Invested on 10/25/2005; No Reg D on File;

f. Reef Bell City South Infield Development Joint Venture; Invested on 12/15/2005; No Reg D on File;

g. Reef Global Energy VII, L.P.; Invested on 3/21/2006; No Reg D on File;

h. Reef North Gata Prospect Joint Venture; Invested on 5/4/2006; No Reg D on File;

i. Reef Gumbo II, Sweet Bay, Grand Lake Joint Venture; Invested on 8/29/2006; Reg D on File;

j. Reef Private Drilling Venture 2006-IV Joint Venture; Invested on 2/12/2007; Reg D on File;

k. Reef White Castle Field 2007-I Joint Venture; Invested on 6/25/2007; Reg D on File; and

l.  Reef Oil & Gas Partners, LP Corpus Christi Bay Joint Venture; Invested on 2/2/2006; Reg D on File.

49.  Defendants, through Defendant Kirk, sold securities to Plaintiff Frank Stevenson on behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. XXX22 f/b/o Frank Stevenson. These sales were related to alleged oil and gas projects identified as:

a.  Reef Oil and Gas Partners, L.P. Corpus Christi Bay Joint Venture: Invested on 2/2/2005; Reg D on File;

b.  Reef Global Energy V; Invested on 12/28/2004; No Reg D on File;

c.  Reef Global Energy VI; Invested on 7/22/2005; No Reg D on File; and

d.  Reef Oil & Gas Income and Development Fund, LP; Invested on 9/22/2006; No Reg D on File.

50.  Defendants, through Defendant Kirk, sold securities to Plaintiff Donna Stevenson on behalf of, and in her Custodial Capacity for IRA Resources, Inc. No. XXX23 f/b/o Donna Stevenson. These sales were related to an alleged oil and gas project identified as:

a.  Reef Global Energy VI, L.P; Invested on 7/22/2005; No Reg D on File.

51.  Defendants, through Defendants Kirk and Michael Mauceli, sold securities to Plaintiffs James and Carol Estle as Joint Tenants with Rights of Survivorship. These sales were related to alleged oil and gas projects identified as:

a.  Reef Partners-2000 A Income Joint Venture; Invested on 12/18/2000; No Reg D on File.

b.  Reef Global Energy I, L.P.; Invested on 11/1/2002; No Reg D on File;

c.  Reef Global Energy II, L.P.; Invested on 9/29/2003; No Reg D on File; and

d.  Reef Global Energy IV, L.P. Invested on 11/9/2004; No Reg D on File.

52.     Defendants, through Defendants Kirk and Michael Mauceli, sold securities to Plaintiff James Estle on behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. XXX56 f/b/o James Estle. These sales were related to alleged oil and gas projects identified as:

   a.     Reef Global Energy VI, L.P.; Invested on 9/23/2005; No Reg D on File; and

   b.     Reef Partners-2000 A Income Joint Venture; Invested on 12/18/2000; No Reg D on File.

53.     Defendants, through Defendants Kirk and Michael Mauceli, sold securities to Plaintiff, Carol Estle on Behalf of, and in her Custodial Capacity for IRA Resources, Inc. No. XXX55 f/b/o Carol Estle. These sales were related to alleged oil and gas projects identified as:

   a.     Reef Global Energy VI, L.P.; Invested on 9/23/2005; No Reg D on File; and

   b.     Reef Partners-2000 A Income Joint Venture; Invested on 12/18/2000; No Reg D on File.

54.     Defendants, through Defendant Kirk, sold securities to Plaintiff Nancy Thurmond as Trustee for the Nancy Lola Thurmond Revocable Trust. These sales were related to alleged oil and gas projects identified as:

   a.     Reef Oil & Gas Partners, L.P. Treasure Isle & Hog Island Infield Joint Venture; Invested on 3/28/2005; Reg D on File;

   b.     Reef Oil & Gas Partners, L.P. Reef Gumbo II, Sweet Bay, Grand Lake Joint Venture; Invested on 9/5/2006; Reg D on File;

   c.     Reef Oil & Gas Income Fund IX, L.P.; Invested on 2/24/2005; No Reg D on File;

d. Reef Oil & Gas Partners, L.P. East Euterpe & Gumbo Infield Joint Venture; Invested on 5/18/2005; Reg D on File;

e. · Reef Global Energy VI, L.P.; Invested on 10/4/2005; No Reg D on File; and

f. Reef Exploration, Inc. Baton Rouge Infield Development Joint Venture; Invested on 7/15/2005; No Reg D on File.

55. Defendants sold securities to Plaintiff, Jaimie Davis. These sales were related to an alleged oil and gas project identified as:

a. Reef Oil & Gas Income and Development Fund, L.P.; Invested on 8/31/2005 and 3/21/2006; Reg D on File.

56. In total, Plaintiffs (in their individual and custodial capacities) invested approximately the following amounts in Defendants' oil and gas securities offerings:

a. Plaintiffs Frank and Donna Stevenson -- $1,418,350.00;

b. Plaintiffs James and Carol Estle -- $ 189,521.00;

c. Plaintiff Nancy Thurmond -- $ 396,262.00; and

d. Plaintiff Jamie Davis -- $ 200,000.00.

57. After investing in the alleged oil and gas projects referenced in paragraphs 48-55 above (hereafter collectively referred to as the "Projects"), Plaintiffs discovered to their great dismay that the Projects failed to perform anything like what Defendants had represented. In fact, the wells allegedly drilled by Defendants in connection with the Projects produced such a small amount of oil or gas that they failed even to return Plaintiffs' initial investment, much less return a profit.

58. Further, even after Plaintiffs made their investments, the Reef Defendants continued their pattern of making misrepresentations and omissions to Plaintiffs. From the time

Plaintiffs invested in the various Projects, the Reef Defendants have misstated the status of operations of such Projects, the allocation of the funds Plaintiffs invested, and the application of revenues generated through production of the wells. Upon information and belief, these Defendants have wrongfully and illegally misallocated costs, expenses and deductions, moving them from certain oil and gas projects to other projects for which the costs, expenses and deductions did not actually occur, all for the purpose of defrauding Plaintiffs and other investors. In short, the Reef Defendants utilized the entity Defendants as a means to defraud Plaintiffs.

59. In addition, the Reef Defendants have used investor funds, including those of Plaintiffs, in material contravention of the terms of the private placement memoranda and related agreements provided to Plaintiffs. For example, and without limitation, the expenses associated with the Projects are grossly excessive and not in accordance with industry standards as promised in the offering literature. Upon information and belief, Defendants have charged excessive expenses to Plaintiffs that were not actually incurred and either applied the funds to other projects or for Defendants' personal use.

60. Despite repeated requests from Plaintiff, Defendants have not provided any reasonable accounting as to what happened to the money Plaintiffs invested in the Projects. By now, it is clear that Defendants have defrauded Plaintiffs. The funds in which Plaintiffs invested have not even produced enough return to cover Plaintiffs' original investment.

## CAUSES OF ACTION

### Fraud and Fraud in the Inducement

61. Plaintiffs incorporate by reference paragraphs 1-60 as if fully stated herein.

62. In order to induce Plaintiffs to invest in the Projects, the Reef Defendants made false, material misrepresentations to the Plaintiffs regarding the Projects. Also in order to induce Plaintiffs to invest in the Projects, the Reef Defendants failed to disclose material facts to

Plaintiffs regarding the Projects. As broker-dealers, sales agents and/or controlling persons, the Reef Defendants had a fiduciary duty to make such disclosures.

63. The representations and omissions made by the Reef Defendants include, but are not limited to, the following:

a. Representing that the Projects were excellent investments that would produce large returns, when in fact the investments were fraudulent;

b. Representing that Defendants were competent to find, drill and operate oil and gas projects, when they were not;

c. Representing that the purpose of the Projects was to produce large financial returns on the money Plaintiffs invested with Defendants, when a major purpose was to provide cash for Defendant's personal use and for other projects not invested in by Plaintiffs;

d. Representing that Defendants had a proven track record of success in the oil and gas industry, when they did not;

e. Misrepresenting the benefits of investing in the Projects, the return Plaintiffs would receive, and how Plaintiffs' investment proceeds would be used;

f. Misstating or failing to disclose the status of the operation of the Projects, how Plaintiffs' funds were actually allocated, and how revenues generated from the Projects were actually applied;

g. Upon information and belief, failing to disclose to Plaintiffs at the time of sale that the Projects constituted unregistered securities under the Securities Act of 1933, the Texas Securities Act and the states in which

Plaintiffs resided, and did not have the benefit of any exemption from registration under these laws;

h. Upon information and belief, misallocating or misapplying costs, expenses and deductions to Projects other than those in which Plaintiffs actually invested, and failing to disclose such misallocation or misapplication to Plaintiffs; and

i. Using Plaintiffs' funds in material contravention of the terms of private placement memoranda and other offering materials that Defendants provided to Plaintiffs, and failing to disclose such use.

64. As noted above, once Plaintiffs had invested in the Projects, the Reef Defendants continued their pattern of making misrepresentations and omissions to Plaintiffs.

65. When the Reef Defendants made the misrepresentations to Plaintiffs concerning the Projects, they knew the representations were false or made the representations recklessly, as a positive assertion, and without knowledge of their truth. When the Reef Defendants omitted to state material facts relating to the Projects, they knew that Plaintiffs were ignorant of the facts that they failed to disclose relating to the Projects, and that Plaintiffs did not have an opportunity to discover such facts.

66. The Reef Defendants made the misrepresentations and omissions with the intent that Plaintiffs act upon them and invest in the Projects. Plaintiffs would not have invested in the Projects had they known the true facts. After Plaintiffs invested in the Projects, Defendants continued making misrepresentations and omissions with the intent of preventing Plaintiffs from knowing the true facts about the Projects, and what Defendants were doing with Plainitffs' money. Had Plaintiffs known the truth, they would have demanded recission and other relief previously.

67. Plaintiffs relied upon those misrepresentations and omissions and suffered economic injury within the jurisdictional limits of this Court as a result.

### Suit for Rescission Under the Texas Securities Act

68. Plaintiffs incorporate by reference paragraphs 1-67 as if fully stated herein.

69. Article 581, Section 33A(2) of the Texas Securities Act provides, "A person who offers or sells a security (whether or not the security or transaction is exempt under Sections 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission. . .".

70. As stated in paragraphs 61-67 above, in connection with the offering for sale and sale of the Projects to Plaintiffs, the Reef Defendants made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. Based on the above referenced provision of the Texas Securities Act, the following Plaintiffs seek, inter alia, rescission of the following investments, pre-judgment interest at the maximum legal rate on such investments and reasonable and necessary attorneys' fees, all as provided for by Texas Revised Civil Statutes Article 581, § 33(D):

     a.    Frank and Donna Stevenson:

- Bell City South Infield Development Joint Venture
- Gumbo II, Sweet Bay, Grand Lake Joint Venture
- North Gata Prospect Joint Venture
- Reef Global Energy Ventures VII
- Reef Private Drilling Venture 2006 IV
- Reef White Castle Field 2007-1 JV
- South Central 3 Well Infield Development JV

b. Frank and Donna Stevenson IRA:

- Reef Oil & Gas Income and Development Fund

c. Jim Estle IRA:

- Reef Global Energy Ventures VI

d. Carol Estle IRA:

- Reef Global Energy Ventures VI

e. Nancy Thurmond:

- Gumbo II, Sweet Bay, Grand Lake Joint Venture

### Suit Against Control Persons and Aiders Under the Texas Securities Act

71. Plaintiffs incorporate by reference paragraphs 1-70 as if fully stated herein.

72. Under Texas Revised Civil Statutes Article 581, Section 33F(1), "A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A ... jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

73. Under Texas Revised Civil Statutes Article 581, Section 33F(2), "A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A [. . .] jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer."

74. Defendants Paul Mauceli, Michael Mauceli and Wayne Kirk are jointly and severally liable to Plaintiffs because they indirectly or directly manage, operate and/or control

Reef Oil and Gas Partners, L.P., Reef Securities, Inc., Reef Exploration, L.P., and other Reef entities, as well as the various Defendant entities and/or projects in which Plaintiffs invested. Further, these Defendants are jointly and severally liable to Plaintiffs because they provided material aid to Reef Oil and Gas Partners, L.P., Reef Securities, Inc., Reef Exploration, L.P., and other Reef entities with intent to deceive or defraud or with reckless disregard for the truth or the law.

75. Based on the above referenced provision of the Texas Securities Act, the following Plaintiffs seek, inter alia, rescission of the following investments, pre-judgment interest at the maximum legal rate on such investments and reasonable and necessary attorneys' fees, all as provided for by Texas Revised Civil Statutes Article 581, § 33(D):

    a. Frank and Donna Stevenson:

- Bell City South Infield Development Joint Venture
- Gumbo II, Sweet Bay, Grand Lake Joint Venture
- North Gata Prospect Joint Venture
- Reef Global Energy Ventures VII
- Reef Private Drilling Venture 2006 IV
- Reef White Castle Field 2007-1 JV
- South Central 3 Well Infield Development JV

    b. Frank and Donna Stevenson IRA:

- Reef Oil & Gas Income and Development Fund

    c. Jim Estle IRA:

- Reef Global Energy Ventures VI

    d. Carol Estle IRA:

- Reef Global Energy Ventures VI

    e. Nancy Thurmond:

- Gumbo II, Sweet Bay, Grand Lake Joint Venture

## Breach of Fiduciary Duty

76.     Plaintiffs incorporate by reference paragraphs 1-75 as if fully stated herein.

77.     As a result of the Defendants' relationship with Plaintiffs and possession of Plaintiffs' funds, Defendants owed a fiduciary duty to Plaintiffs. In committing the acts and omissions described above, Defendants breached their fiduciary duties to Plaintiffs, including but not limited to their duties of loyalty and utmost good faith, duty of candor, duty to refrain from self dealing, duty to act with integrity of the strictest kind, duty of fair and honest dealing and duty of full foreclosure. As demonstrated in this Petition, Defendants breached their fiduciary duty to Plaintiffs.

78.     Defendants' breach of fiduciary duty resulted in damages to Plaintiffs. Plaintiffs are entitled to and request recovery of such damages, including economic damages, pre and post-judgment interest, costs, expenses, and attorneys' fees.

## Breach of Contract

79.     Plaintiffs incorporate by reference paragraphs 1-78 as if fully stated herein.

80.     By virtue of private placement memorandums and related agreements for each Project, the Defendant entities obligated themselves to certain contractual duties. Certain of the Defendant entities' actions, including but not limited to the use of Project funds for purposes other than those set forth in the placement memoranda and related agreements, and the failure to accurately account for revenues, costs, expenses and deductions, constitute breaches of those contractual duties.

81.     Plaintiffs have suffered substantial financial injury as a result of the Defendant entities' contractual breaches, which is well in excess of the minimum jurisdictional levels of this court. In addition to general damages, Plaintiffs are entitled to recover consequential, incidental and special damages, lost profits and other economic damages.

## Civil Theft

82. Plaintiffs incorporate by reference paragraphs 1-81 as if fully stated herein.

83. Plaintiffs had a possessory right to the funds which they invested with Defendants. By taking Plaintiffs' funds for their own use, Defendants appropriated such funds by taking them without Plaintiffs' effective consent. Additionally, Defendants appropriated the funds by taking them with the intent to deprive Plaintiffs of the funds.

84. The actions of Defendants as described above in appropriating Plaintiffs' funds for Defendants' own use constitute civil theft. As a result of Defendants' taking of Plaintiffs' funds, Plaintiffs have sustained actual damages well in excess of the minimum jurisdiction of this court, which Plaintiffs are entitled to recover. Additionally, Plaintiffs are entitled to recover up to $1000.00 in additional damages under the Theft Liability Act.

## Negligent Misrepresentation

85. Plaintiffs incorporate by reference paragraphs 1-84 as if fully stated herein.

86. As set forth above, Defendants made numerous misrepresentations, misstatements and omissions to Plaintiffs in connection with Plaintiffs purchase of interests in the Projects. In making these misrepresentations, Defendants failed to exercise reasonable care or competence in communicating information to Plaintiffs.

87. Plaintiffs justifiably relied on Defendants' misrepresentations, and suffered injury as a proximate result. Defendants are liable to Plaintiffs for their pecuniary losses suffered because of their justifiable reliance.

## Fraudulent Concealment

88. Plaintiffs incorporate by reference paragraphs 1-87 as if fully stated herein.

89. As shown above, Defendants induced Plaintiffs to invest in the Project by fraudulent means. After Plaintiffs invested in the Projects, Defendants engaged in wrongful

conduct in connection with the Projects. Such wrongful conduct includes, but is not limited to the following:

    a.    Misallocation and conversion of Plaintiffs' investment funds;

    b.    Misallocation of costs, expenses and deductions for the Projects;

    c.    Application of Plaintiffs' funds in direct and material contravention of the terms of the private placement memoranda and other documents related to the Projects; and

    d.    Incompetently managing and operating the Projects.

The Defendants engaged in this wrongful conduct for the purpose of defrauding Plaintiffs of their invested funds.

90.    Defendants concealed the above referenced wrongdoing by making oral and written misrepresentations to Plaintiffs regarding the Projects, and failing to disclose information which would have informed Plaintiffs of the true status of the Projects. Defendants had a duty to disclose because of their fiduciary duty to Plaintiffs.

91.    Plaintiffs relied on Defendants misrepresentations and failures to disclose, all to Plaintiffs' detriment.

92.    Because of Defendants' fraudulent concealment, the statute of limitations tolls the statute of limitations for all causes of action in this case.

### Discovery Rule

93.    Plaintiffs incorporate by reference paragraphs 1-92 as if fully stated herein.

94.    Plaintiffs affirmatively plead that the discovery rule tolls the statute of limitations for all causes of action in this case. The injuries to Plaintiffs resulting from Defendants' actions as set forth in this Petition are both inherently undiscoverable and objectively verifiable.

## Conditions Precedent

95.    Plaintiffs incorporate by reference paragraphs 1-94 as if fully stated herein.

96.    All conditions precedent to Plaintiffs' recovery in this action have occurred or have been satisfied.

## Attorneys' Fees

97.    Plaintiffs incorporate by reference paragraphs 1-96 as if fully stated herein.

98.    Plaintiffs seek as damages its reasonable and necessary attorneys' fees pursuant to the Texas Securities Act and Section 38.001 of the Texas Civil Practices and Remedies Act.

## Damages

99.    Plaintiffs incorporate by reference paragraphs 1-98 as if fully stated herein.

100.    Each of the acts and omissions singularly or in combination with others, as described above, constitute fraud, unjust enrichment, negligent misrepresentation, breach of fiduciary duty, violation of the Texas Securities Act, and other conduct. As a proximate result of such conduct, Plaintiff suffered damages in excess of the minimum jurisdiction of this Court, and are entitled to recover their actual damages, pre-judgment and post-judgment interest, costs, expenses and attorneys' fees.

## Exemplary Damages

101.    Plaintiffs incorporate by reference paragraphs 1-100 as if fully stated herein.

102.    Plaintiffs seek exemplary damages from defendants under Chapter 41 of the Texas Civil Practice and Remedies Code as a result of defendants' fraud and breaches of fiduciary duty.

## Prayer for Relief

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request from Defendants the following relief:

PLAINTIFFS' SIXTH AMENDED ORIGINAL PETITION                      PAGE 21

1. Frank Stevenson on Behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. xxx22 f/b/o Frank Stevenson - actual damages in the amount of its investment ($249,350.00), plus exemplary damages of $75,000.00;

2. Frank Stevenson and Donna Stevenson as Joint Tenants with Rights of Survivorship - actual damages in the amount of their investment ($1,144,000.00) plus exemplary damages of $300,000.00;

3. Donna Stevenson on Behalf of, and in her Custodial Capacity for IRA Resources, Inc. No. xxx23, f/b/o Donna S. Stevenson - actual damages in the amount of its investment ($25,000.00) plus exemplary damages of $7,500.00;

4. James Estle and Carol Estle as Joint Tenants with Rights of Survivorship - actual damages in the amount of their investment ($118,997.00) plus exemplary damages of $35,000.00;

5. James Estle on Behalf of, and in his Custodial Capacity for IRA Resources, Inc. No. Xxx56 f/b/o James Estle - actual damages in the amount of their investment ($17,490.00) plus exemplary damages of $5,500.00;

6. Carol Estle on Behalf of, and in her Custodial Capacity for IRA Resources, Inc. No. xxx55 f/b/o Carol Estle - actual damages in the amount of its investment ($53,034.00); plus exemplary damages of $17,000.00.

7. Nancy Thurmond as Trustee for the Nancy Lola Thurmond Revocable Trust - actual damages in the amount of her investment ($396,262.50) plus exemplary damages of $120,000.00;

8. Jaimie A. Davis - actual damages in the amount of her investment ($200,000.00) plus exemplary damages of $60,000.00;

9. Attorneys' fees;

10. Prejudgment and post-judgment interest;

11. costs of Court; and

12. Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted

**MARK A. ALEXANDER, P.C.**

By: _____
Mark Alexander
Texas State Bar No. 01007500

5080 Spectrum Drive
Suite 850E
Addison, TX 75001
Telephone: 972-364-9700
Facsimile: 972-239-2244

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I certify that on January 24th, 2012, a true and correct copy of the foregoing document was served via facsimile on all counsel of record consistent with Rule 21a.

*SENT VIA FACSIMILE*
Laura J. O'Rourke
Baker & McKenzie LLP
2300 Trammell Crow Center
2001 Ross Avenue
Dallas, TX 75201

*SENT VIA FACSIMILE*
Martha Hardwick Hofmeister
Sheckleford Melton McKinley, LLP
3333 Lee Parkway, Tenth Floor
Dallas, Texas 75219

*SENT VIA FACSIMILE*
Dena Mathis
Kyle Mathis & Lewis, LLP
8226 Douglas Avenue, Suite 450
Dallas, Texas 75225

*SENT VIA FACSIMILE*
David Sloan Vassar
Nesbitt, Vassar & McCown, L.L.P.
15851 Dallas Parkway, Suite 830
Addison, Texas 75001

_____
Mark Alexander

918 S.W.2d 453 (Tex. 1996), 94-0433, Computer Associates Intern., Inc. v. Altai, Inc.

Page 453

**918 S.W.2d 453 (Tex. 1996)**

**COMPUTER ASSOCIATES INTERNATIONAL, INC., Appellant,**

**v.**

**ALTAI, INC., Appellee.**

**No. 94-0433.**

**Supreme Court of Texas.**

**March 14, 1996**

Page 454

Argued Sept. 22, 1994.

Concurring Opinion of Justice Owen March 14, 1996.

Stephen D. Kahn, Katherine J. Daniels, New York City, Ralph I. Miller, Stephen Cormac Carlin, Dallas, for appellant.

Susan G. Braden, Washington, DC, William Powers, Jr., Austin, Rueben B. Robertson, Neal Goldfarb, Washington, DC, for appellee.

ENOCH, Justice, delivered the opinion of the Court on Motion for Rehearing, in which PHILLIPS, C.J., and GONZALEZ, HECHT, CORNYN, SPECTOR and BAKER, JJ., join.

The motion for rehearing is overruled. Our opinion of June 8, 1995, is withdrawn and the following is substituted in its place.

This case comes to us on certified questions from the *United States Court of Appeals for the Second Circuit. Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 22 F.3d 32 (2d Cir.1994). [1] We are asked to decide two issues: (1) whether the discovery rule exception to section 16.003(a) of the Texas Civil Practice and Remedies Code applies to claims for misappropriation of trade secrets; and if not, (2) whether the application to such claims of the two-year limitations period provided by section 16.003(a) contravenes the "open courts" provision of Article I, Section 13 of the Texas Constitution. We hold that the discovery rule exception does not apply to the claim for misappropriation of trade secrets and that application of section 16.003(a) does not violate the Texas Constitution.

I

Claude Arney, a developer of computer software, was employed by Computer Associates International, Inc., in its Dallas office from 1978 until January 1984. During his employment, Arney signed an employment agreement which prohibited him from retaining or divulging Computer Associates' trade secrets. In January 1984, Arney left Computer Associates to accept employment at Altai, Inc. In an exit interview, Arney represented that he retained no proprietary information of Computer Associates and would not divulge Computer Associates' trade secrets to any third party. However, when Arney left Computer Associates he took copies of the computer source code for two versions of ADAPTER. ADAPTER is an operating system compatibility component of CA-SCHEDULER, which is a job scheduling program for IBM mainframe computers. ADAPTER connects CA-SCHEDULER with the three different operating systems used on IBM mainframe computers and enables CA-SCHEDULER to run on any of the IBM operating systems. ADAPTER

was also used with a group of Computer Associates' programs called the DYNAM line. However, ADAPTER is not a separate product and is not capable of operating as an independent product. Before Arney left Computer Associates, Altai developed ZEKE, a job scheduling program for IBM mainframe computers which was similar to CA-SCHEDULER. In early 1984, Arney copied approximately thirty percent of the ADAPTER source code to write OSCAR 3.4 for Altai. It is undisputed that no one at Altai (other than Arney) knew that Arney possessed the ADAPTER source code or that Arney had copied portions of the source code when he created OSCAR 3.4. OSCAR 3.4 is Altai's operating system compatibility component which was used in several of Altai's programs, including ZEKE. Like ADAPTER, OSCAR 3.4 is not a separate product and is not capable of operating as an independent product. From 1985 to August

Page 455

1988, Altai used OSCAR 3.4 as a component of several of its computer programs that competed with several of Computer Associates' programs.

In July 1988, Computer Associates first discovered that Altai had copied and used the ADAPTER source code in several of its computer programs. In August 1988, Computer Associates sued Altai in federal district court for misappropriation of trade secrets and copyright infringement. Among other things, the federal district court determined that Computer Associates' action for misappropriation of trade secrets under Texas law was preempted by the federal copyright act. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 775 F.Supp. 544, 563-66 (E.D.N.Y.1991). The United States Court of Appeals reversed and remanded for further consideration of Computer Associates' misappropriation claims. *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 720-21 (2d Cir.1992). On remand, the district court determined that the discovery rule exception did not apply and that Computer Associates' action for misappropriation of trade secrets was barred by section 16.003(a) of the *Texas Civil Practice and Remedies Code. Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 832 F.Supp. 50, 51-52 (E.D.N.Y.1993). Subsequently, the United States Court of Appeals certified the questions to this *Court. Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 22 F.3d 32 (2d Cir.1994).

II

Computer Associates argues that the discovery rule exception to the two-year statute of limitations should apply to a claim of misappropriation of trade secrets. A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. *Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 776, cert. denied, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) (quoting RESTATEMENT OF TORTS § 757 (1939)). A cause of action for misappropriation of trade secrets accrues when the trade secret is actually used. Id., 314 S.W.2d at 769. The parties do not contest that, upon accrual, section 16.003(a) of the Texas Civil Practice and Remedies Code establishes a two-year statute of limitations for injury to the property of another or conversion of the property of another. In this case, Altai first used the source code in 1985. Not until 1988 did Computer Associates file its suit. Altai concedes that Computer Associates did not know about the use of the source code until 1988. The question is whether we should permit the discovery rule exception in these circumstances.

To answer this question, we must understand the objective of statutes of limitations. The purpose of statutes of limitations is to compel the assertion of claims within a reasonable period while the evidence is fresh in the minds of the parties and witnesses. *Price v. Estate of Anderson,* 522 S.W.2d 690, 692 (Tex.1975); *Gaddis v. Smith,* 417 S.W.2d 577, 578 (Tex.1967). "Society's interest in repose is to have disputes either settled or barred within a reasonable time. It is based on the theory that the uncertainty and insecurity caused by unsettled claims hinder the flow of commerce." *Safeway Stores, Inc. v. Certainteed Corp.,* 710 S.W.2d 544, 545 (Tex.1986). The discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action. *Trinity River Auth. v. URS Consultants,* 889 S.W.2d 259, 262 (Tex.1994); *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). The discovery rule, in application, proves to be a very limited exception to statutes of limitations.

Similar to the discovery rule exception, where fraud is alleged, we have granted the claimant the benefit of deferring the cause of action until the claimant discovered or should have discovered the fraud. *Ruebeck v. Hunt,* 142 Tex. 167, 176 S.W.2d 738, 739 (1943); *Quinn v. Press,* 135 Tex. 60, 140 S.W.2d 438, 440 (1940). We have also permitted claimants to receive the benefit of deferring the accrual of a cause of action in cases where the facts forming the basis of an injury were concealed. *Estate of Stonecipher v. Estate of Butts,* 591 S.W.2d 806, 809 (Tex.1979); *Owen v. King,* 130 Tex. 614, 111 S.W.2d 695, 697 (1938). In short, we have said: "[F]raud

Page 456

vitiates whatever it touches, *Morris v. House,* 32 Tex. 492 (1870), and ... limitations begin to run from the time the fraud is discovered or could have been discovered by the defrauded party by exercise of reasonable diligence." Estate of Stonecipher, 591 S.W.2d at 809. Although similar in effect, the discovery rule exception and deferral based on fraud or concealment exist for different reasons. Unlike the discovery rule exception, deferral in the context of fraud or concealment resembles equitable estoppel. "[F]raudulent concealment estops the defendant from relying on the statute of limitations as an affirmative defense to [the] plaintiff's claim." *Borderlon v. Peck,* 661 S.W.2d 907, 908 (Tex.1983).

Unrelated to fraud or concealment, this Court has permitted the discovery rule exception in certain limited circumstances. From these cases, we can glean a unifying principle which facilitates balancing those factors that are considered before this Court has permitted application of the discovery rule exception to the statute of limitations. Generally, application has been permitted in those cases where the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable. The requirement of inherent undiscoverability recognizes that the discovery rule exception should be permitted only in circumstances where "it is difficult for the injured party to learn of the negligent act or omission." *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988); see *Kelley v. Rinkle,* 532 S.W.2d 947, 949 (Tex.1976) ("A person will not ordinarily have any reason to suspect that he has been defamed by the publication of a false credit report to a credit agency until he makes application for credit...."); *Hays v. Hall,* 488 S.W.2d 412, 414 (Tex.1972) ("One who undergoes a vasectomy operation, and then after tests is told that he is sterile, cannot know that he is still fertile, if that be the case, until either his wife becomes

pregnant or he is shown to be fertile by further testing."); Gaddis, 417 S.W.2d at 580 ("It is a virtual certainty that the patient has no knowledge on the day following surgery--nor for a long time thereafter--that a foreign object was left in the incision.").

We note that, in Willis, we also relied on the fiduciary relationship obligating an attorney to "render a full and fair disclosure of facts material to the client's representation." 760 S.W.2d at 645. We stated that "[f]acts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved," and that absent the discovery rule exception the client "would have to hire a second attorney to observe the work of the first." Id. at 645-46. But the fiduciary rationale is, in reality, a variation on the inherently undiscoverable element. Fiduciaries are presumed to possess superior knowledge, meaning the injured party, the client, is presumed to possess less information than the fiduciary. Consequently, in the fiduciary context, it may be said that the nature of the injury is presumed to be inherently undiscoverable, although a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs. *Courseview, Inc. v. Phillips Petroleum Co.,* 158 Tex. 397, 312 S.W.2d 197, 205 (Tex.1957).

We now consider whether to permit the application of the discovery rule exception to the statute of limitations in misappropriation of trade secret cases in light of the unifying principle: (1) whether the injury is inherently undiscoverable; and (2) whether evidence of the injury is objectively verifiable. Computer Associates asserts that it could not have reasonably discovered the theft of its trade secret within two years after Altai's first actual use. Therefore, Computer Associates argues that its cause of action was inherently undiscoverable. It bolsters its contention by focusing on Altai's oral stipulation which states that Computer Associates did not know or have reason to know of Altai's alleged misappropriation within the two-year statute of limitations. Computer Associates misconstrues the meaning of "inherently undiscoverable." Inherently undiscoverable encompasses the requirement that the existence of the injury is not ordinarily discoverable, even though due diligence has been used.

In this age of technological innovation, intellectual property, including trade secrets, is a jealously guarded commodity. Extensive

Page 457

precautions are taken to prevent and eliminate trade secret misappropriations, the intention being to promote the rapid detection of misappropriation. See generally 3 MILGRIM ON TRADE SECRETS § 13.04 (1993) (identifying only forty-three out of a reported six-thousand trade secret misappropriation cases--less than one percent--that implicated the statute of limitations). While some trade secret misappropriations might not be quickly discovered, this isolated fact does not alter the reality that, in most cases, trade secret misappropriation generally is capable of detection within the time allotted for bringing such suits. Id. In the present case, Arney misappropriated Computer Associates' source code by absconding with a stack of "greenbar" computer paper upon which the code was printed when he left the company. As Altai points out, Computer Associates could have detected Arney's theft by using document control logs--a common practice among high technology companies dependent upon trade secrets. See generally DORR & MUNCH, PROTECTING TRADE SECRETS, PATENTS, COPYRIGHTS, AND TRADEMARKS §§ 1.9-1.17, at 11-29 (1990); THE LAW AND BUSINESS OF COMPUTER SOFTWARE § 3.05[b], at 3-12 to 3-

17, §§ 4.00-.09, at 4-1 to 4-21 (D.C. Toedt ed., 1990); EPSTEIN, MODERN INTELLECTUAL PROPERTY 212.1-216 (1988); POOLEY, TRADE SECRETS: HOW TO PROTECT YOUR IDEAS AND ASSETS (1982).

Additionally, we live in a world of high employee mobility and easy transportability of information. Under these circumstances, it is not unexpected that a former employee will go to work for a competitor and that the competitor might thereby acquire trade secrets. DORR & MUNCH, at xiii; EPSTEIN, at 84-84.1; SEIDEL, WHAT THE GENERAL PRACTITIONER SHOULD KNOW ABOUT TRADE SECRETS AND EMPLOYMENT AGREEMENTS § 3.01, at 21-22 (2d ed. 1984). This reality is reflected in the confidentiality agreement requested of and exit interview given to Arney by Computer Associates. Vigilance in the area of trade secrets is required, particularly because once a trade secret is made public all ownership is lost. See, e.g., *Luccous v. J.C. Kinley Co.,* 376 S.W.2d 336, 338 (Tex.1964) ("It is self-evident that the subject matter of a trade secret must be kept secret."); see also *Schalk v. State,* 823 S.W.2d 633, 638-44 (Tex.Crim.App.1991), cert. denied, 503 U.S. 1006, 112 S.Ct. 1763, 118 L.Ed.2d 425 (1992) (discussing various measures taken to insure secrecy). High employee mobility and critical interest in maintaining a proprietary interest in a trade secret are endemic to the computer software industry. Suspicions should abound when a competitor markets a product similar to that previously developed by a former employer after one of the former employer's employees begins work for the competitor.

In the past, this Court has noted the "shocking results" of barring a plaintiff's suit before the injury has even been discovered. See Gaddis, 417 S.W.2d at 581; Hays, 488 S.W.2d at 414. This rationale offers no principled basis for distinguishing between cases in which the rule applies and those in which it does not. If carried to its logical conclusion, the rationale mandates applying the discovery rule exception to every case, thus eviscerating the whole notion of an absolute time bar to litigation. It is clear that "preclusion of a legal remedy alone is not enough to justify a judicial exception to the statute. The primary purpose of limitations, to prevent litigation of stale or fraudulent claims, must be kept in mind." *Robinson v. Weaver,* 550 S.W.2d 18, 20 (Tex.1977). The discovery rule is a limited exception to strict compliance with the statute of limitations. See Trinity River Auth., 889 S.W.2d at 262. Because misappropriation of trade secrets is not a cause of action that is inherently undiscoverable, permitting application of the discovery rule exception in these cases would do no more than permit the litigation of stale claims.

Before concluding, we note that the principle we have applied has two elements. The second element is that the alleged injury be objectively verifiable. See e.g., Gaddis, 417 S.W.2d at 581 ("[T]his is a peculiar type of case [leaving sponge in patient] which is not particularly susceptible to fraudulent prosecution."). Requiring objective verifiability assures that the policy underpinnings of statutes of limitations are met--balancing the possibility of stale or fraudulent claims against individual injustice. We relied heavily

Page 458

on this element in deciding not to extend the discovery rule exception to cases of medical misdiagnoses: "Unlike Gaddis v. Smith there exists in the present case no physical evidence which in-and-of-itself establishes the negligence of some person." Robinson, 550 S.W.2d at 21.

And we considered this element in at least one other case. See Kelley, 532 S.W.2d at 949. Because trade secret misappropriation claims are not inherently undiscoverable, it is not necessary for us to reach the question of whether such misappropriations may be verified by objective evidence. [2]

Finally, we recognize that thirty-nine states and the District of Columbia have adopted the Uniform Trade Secrets Act, which provides a discovery rule exception that tolls the statute of limitations in misappropriation of trade secret cases. See UNIF. TRADE SECRETS ACT § 6, 14 U.L.A. 462 (1990) (citing laws of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Colombia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, Washington, West Virginia and Wisconsin). No state supreme court, however, has yet adopted the discovery rule exception for trade secret cases as an exercise of its common law jurisdiction. See Pilkington Bros., P.L.C. v. Guardian Indus. Corp., 230 U.S.P.Q. (BNA) 300, 301, 1986 WL 9876 (E.D.Mich.1986) (holding that determination of applicability of discovery rule exception is a question of federal common law); Anaconda Co. v. Metric Tool, 485 F.Supp. 410, 425 (E.D.Pa.1980) (noting no reported Pennsylvania cases). We decline to be the first. We will not overlay section 16.003(a) with the discovery rule exception for misappropriation of trade secret causes of action.

III

Having determined that the discovery rule exception does not apply in this case, we must address Computer Associates' challenge to the two-year statute of limitations period provided by section 16.003(a) as violating the "open courts" provision of Article I, Section 13 of the Texas Constitution. It does not. The "open courts" provision guarantees that "meaningful remedies must be afforded, 'so that the legislature may not abrogate the right to assert a well-established common law cause of action unless the reason for its action outweighs the litigants' constitutional right of redress.' " Trinity River Auth., 889 S.W.2d at 261 (quoting Texas Ass'n of Business v. Texas Air Control Bd., 852 S.W.2d 440, 448 (Tex.1993)). Therefore, a litigant alleging a violation of this guarantee must first show the abrogation of a cognizable common law cause of action and second, that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. Sax v. Votteler, 648 S.W.2d 661, 666 (Tex.1983).

The traditional rule in Texas is that a cause of action accrues and the two-year limitations period begins to run as soon as the owner suffers some injury, regardless of when the injury becomes discoverable. Trinity River Auth., 889 S.W.2d at 262. Failure to permit a discovery rule exception to this traditional rule does not abrogate a common law right. Id. Even assuming that section 16.003(a) is legislative action which affects a common law cause of action for purposes of "open courts" analysis, application of a two-year statute of limitations without a discovery rule exception is not unreasonable or arbitrary when balanced against the purpose of the statute. As we explained above, a significant purpose of statutes of limitations is to prevent the litigation of stale and fraudulent claims. This policy, combined with the nature of trade secret property rights, which requires an owner to vigilantly guard the secret from the world in order to preserve its rights,

makes application of the two-year statute of limitations reasonable under the circumstances.

IV

We answer the questions certified to us as follows: (1) a discovery rule exception to

Page 459

section 16.003(a) of the Texas Civil Practice and Remedies Code does not apply to claims for misappropriation of trade secrets; and (2) application of the two-year limitations period provided by section 16.003(a) does not contravene the "open courts" provision of Article I, Section 13 of the Texas Constitution.

APPENDIX

United States Court of Appeals for the Second Circuit

Docket No. 93-7957

Computer Associates International, Inc., Plaintiff-Appellant,

-against--

Altai, Inc., Defendant-Appellee.

Certificate to the Supreme Court of Texas pursuant to Tex.R.App.P. 114(a) (West 1993) (permitting certification of questions of state law for which there is no controlling precedent in the decisions of the Supreme Court of Texas).

In January 1984, Claude F. Arney, III left the Texas offices of his employer of five years, Computer Associates International, Inc. ("CA"), a developer of computer software, to go to work for a competitor, Altai, Inc. ("Altai"). See *Computer Assocs. Int'l v. Altai, Inc.,* 775 F.Supp. 544, 553 (E.D.N.Y.1991) ("Altai I"), aff'd in part, vacated in part, and remanded, 982 F.2d 693 (2d Cir.1992). When Arney left, he took with him copies of the computer source code [1] listings for two versions of a CA program known as ADAPTER (a component of another CA program called CA-SCHEDULER), in knowing violation of a CA employment agreement which he had signed that prohibited the retention of such materials. Id. at 552-53. Arney then undertook to write a program for Altai known as OSCAR. The first version of this program, which performs a task similar to CA's ADAPTER, was designated OSCAR 3.4. Arney copied approximately thirty percent of the source code comprising OSCAR 3.4 from the source code of ADAPTER. Id. at 552. Other than Arney, no one at Altai knew that Arney possessed the ADAPTER source code or that he had copied that code in creating OSCAR 3.4. Id. at 554. From 1985 to August 1988, Altai used OSCAR 3.4 in several of its computer programs that competed with CA-SCHEDULER. Id. at 552, 554.

In late July 1988, CA first learned that Altai might have copied the ADAPTER program. Id. at 554. After confirming its suspicions, CA secured copyrights on versions 2.1 and 7.0 of CA-SCHEDULER. Id. In August 1988, CA brought suit against Altai in federal district court, invoking diversity jurisdiction. [2] See 28 U.S.C. § 1332 (1988). CA alleged that Altai had infringed CA's copyright in ADAPTER and had misappropriated CA's trade secrets. Altai I, 775 F.Supp. at 554. Upon receiving CA's complaint, Altai immediately investigated the allegations and learned that Arney had copied portions of the ADAPTER code. Id. James P. Williams, an employee of Altai who became its president on October 31, 1988, reviewed with Arney which portions of OSCAR Arney had copied and which he had developed independently. In conducting this review, Arney again consulted the ADAPTER code, but neither Williams nor any of Altai's other programmers

ever examined the ADAPTER code, which was locked away before Altai began rewriting OSCAR. Id.

After consulting counsel about how to proceed, Williams organized an operation to rewrite the OSCAR program. Working primarily from a different Altai program, Williams wrote descriptions of various services that the rewritten OSCAR would perform.

Page 460

Id. Williams then instructed Altai's programmers, none of whom had worked on OSCAR 3.4, to write appropriate code to obtain those services. In doing so, the programmers were forbidden to contact Arney or to refer to OSCAR 3.4. Id. The resulting program was designated OSCAR 3.5. Upon its completion, Altai shipped OSCAR 3.5 to its new customers, and also provided OSCAR 3.5 as a "free upgrade" to all customers who had purchased OSCAR 3.4. Id.

After a bench trial, the district court found that Altai's OSCAR 3.4 computer program had infringed the ADAPTER component of CA's copyrighted computer program CA-SCHEDULER. Id. at 558. The court awarded CA a total of $364,444 in actual damages and apportioned profits on copyright claims stemming from OSCAR 3.4. Id. at 572. The district court also determined, however, that OSCAR 3.5 was neither substantially similar to nor copied from ADAPTER, and accordingly denied CA relief on its copyright claims regarding that version of Altai's program. Id. at 561-62. Finally, although noting that Texas state law would govern CA's trade secret misappropriation claim, id. at 566, the district court concluded that CA's misappropriation claim against Altai had been preempted by the federal Copyright Act. Id. at 563-66. While recognizing that the torts of misappropriation and copyright infringement might be distinct in some cases, the district court reasoned that on the facts of this case, the claims "boil[ed] down to the same thing--a right of action for the unauthorized reproduction of, and preparation of derivative works based on, ADAPTER." Id. at 564. Because both claims involved a copyrightable work, the district court concluded that "all claims concerning copying [are] governed, exclusively, by federal [copyright] law." Id. at 565.

Altai did not perfect an appeal from the award of damages with respect to OSCAR 3.4, but CA appealed the denial of relief with respect to OSCAR 3.5. See *Computer Assocs. Int'l v. Altai, Inc.,* 982 F.2d 693, 696-97 (2d Cir.1992) ("Altai II "). We affirmed the district court's ruling that OSCAR 3.5 did not infringe CA's copyright in ADAPTER, id. at 714-15, and also agreed with the district court that Texas law would govern CA's trade secret misappropriation claims (if they were not preempted by federal law). Id. at 718. As to preemption, we noted that if CA's misappropriation claims involved an "extra element" that was not included in its copyright claims and rendered the misappropriation claims "qualitatively different" from the copyright claim, the misappropriation claims would not be preempted. See id. at 716. Concluding that such an element, beyond mere copying, might be established on the basis that Altai had constructive notice of misappropriation with respect to OSCAR 3.4, see id. at 718-19, or that Altai's conceded knowledge of misappropriation when it developed OSCAR 3.5 may have resulted in the embodiment of CA trade secrets therein despite the preventive measures taken by Altai, see id. at 719-21, we remanded for further consideration of CA's misappropriation claims. Id. at 720-21.

On remand, the parties briefed the trade secret issues under Texas law. Altai also asserted

the affirmative defense, first invoked in its answer and also presented in its post-trial memorandum, that CA's claims were barred by the applicable Texas statute of limitations, Texas Civil Practice & Remedies Code Ann. § 16.003(a) (Vernon 1986). [3]

Page 461

*See Computer Assocs. Int'l v. Altai, Inc.,* 832 F.Supp. 50, 51-52 (E.D.N.Y.1993) ("Altai III "). That provision states, in pertinent part:

A person must bring suit for trespass for injury to the estate or to the property of another, conversion of personal property, [or] taking or detaining the personal property of another ... not later than two years after the day the cause of action accrues.

The Texas Court of Civil Appeals (now designated the Court of Appeals) has applied article 5526 of the Texas Civil Statutes, the forerunner of § 16.003, to claims involving the misappropriation of trade secrets. See *Reynolds-Southwestern Corp. v. Dresser Indus.,* 438 S.W.2d 135, 140 (Tex.Civ.App.1969) (applying art. 5526 to trade secret claim); see also *Coastal Distrib. Co. v. NGK Spark Plug Co.,* 779 F.2d 1033, 1038 (5th Cir.1986) (same) (collecting cases).

Under Texas law, the statute of limitations on tort claims generally begins to run when "the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). This general rule of accrual applies unless modified by the "discovery rule," which, when applicable, provides that the period of limitations for a tort action "run[s] from the date the plaintiff discovers or should have discovered, in the exercise of reasonable care and diligence, the nature of the injury." *Willis v. Maverick,* 760 S.W.2d 642, 644 (Tex.1988) (citing *Gaddis v. Smith,* 417 S.W.2d 577, 578 (Tex.1967)).

The district court declined to address the merits of CA's misappropriation claims on remand, instead dismissing them as barred under § 16.003(a). Although the district court had earlier opined that CA's claims for misappropriation of trade secrets would be subject to the discovery rule under Texas law, see Altai I, 775 F.Supp. at 566, after further consideration upon remand, the court declined to apply the discovery rule in this case. The court noted that no Texas court had unambiguously applied the discovery rule to claims involving the misappropriation of trade secrets. Altai III, 832 F.Supp. at 53. Because the Supreme Court of Texas had applied the rule only under limited circumstances, each time emphasizing the special policy considerations warranting application of the rule in the case at hand, the district court "decline[d] to make an unprecedented expansion of the discovery rule by applying it to the facts of this case." Id. at 54. The court also noted, however, its inability under Texas R.App.P. 114(a) to certify this issue to the Supreme Court of Texas, id. at 53-54, and added: "If this matter comes to the attention of the second circuit, they may feel it appropriate to certify the question to the Texas Supreme Court for an authoritative disposition of the issue." Id. at 54.

Altai conceded at trial that CA did not know or have reason to know of Altai's alleged misappropriation until 1988. Thus, if the discovery rule applied in this case, CA's misappropriation claims would be timely under Texas law. However, the district court concluded that because the discovery rule did not apply, and because the allegedly wrongful act occurred in 1984 (four years before CA filed suit) when Arney began copying CA's ADAPTER codes into OSCAR 3.4, the statute of limitations had run and CA's claim was barred. Id. at 52, 54.

On appeal, CA contends that the district court erred in declining to apply the discovery rule in this case. CA argues that: (1) the Texas Court of Civil Appeals applied the discovery rule to a claim arising from the misappropriation of trade secrets in Reynolds-Southwestern Corp., 438 S.W.2d at 140; (2) precedent of the Supreme Court of Texas

supports extension of the discovery rule in this instance because the misappropriation of trade secrets is inherently difficult for a potential plaintiff to discover, see Willis, 760 S.W.2d at 645 ("This court has adopted the discovery rule in cases ... in which it is difficult for the injured party to learn of the negligent act or omission.") (collecting cases); (3) the Supreme Court of Texas presumably would follow the lead of the vast majority of states by adopting the discovery rule for trade secrets; and (4) those Texas cases that do not apply the discovery rule are distinguishable because they involved different contexts and policy considerations from those implicated by claims for the misappropriation of trade secrets. See, e.g., *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d at 354-55 (wrongful death); *Seibert v. General Motors Corp.,* 853 S.W.2d 773, 776 (Tex.Ct.App.1993) (physical injuries). Finally, CA also argues that any construction of § 16.003(a) to bar misappropriation claims before they become discoverable would contravene the "open courts" provision of the Texas Constitution, Tex. Const. art. I, § 13 (Vernon 1984), which has been interpreted to prohibit statutes of limitations that require "a person whose injuries are not immediately discoverable" to sue "during the period of undiscoverability." *Nelson v. Krusen,* 678 S.W.2d 918, 923 (Tex.1984).

Altai responds that: (1) Reynolds-Southwestern, which is in any event not a dispositive statement of Texas law, is distinguishable because, unlike this case, Reynolds-Southwestern involved a claim of fraud that overlapped the claim for misappropriation of trade secrets; (2) the discovery rule has primarily been applied by Texas courts to breaches of fiduciary duty by licensed professionals; (3) its application in other cases has been limited to more inherently undiscoverable wrongs than the alleged misappropriation of ADAPTER; and (4) CA's failure to discover the alleged misappropriation resulted from its own laxity in safeguarding its trade secrets. Altai also points out that the "open courts" constitutional provision has only been invoked in Nelson and other Texas cases to invalidate a specific medical malpractice limitations provision that provided an inflexible two-year limitations period regardless of the discoverability of the injury inflicted by malpractice.

The decision to extend the discovery rule to a type of claim to which it has not previously been applied by the Supreme Court of Texas requires "careful[ ] consider[ation of] opposing policy considerations," *Kelley v. Rinkle,* 532 S.W.2d 947, 949 (Tex.1976), weighing concerns regarding "the assertion of claims within a reasonable period," id., against general considerations of justice. Resolution of this issue thus calls for particular sensitivity to state policy concerns and special expertise in Texas law. Accordingly, we conclude that this decision is best left to the *Supreme Court of Texas. Cf. Tennimon v. Bell Helicopter Textron, Inc.,* 823 F.2d 68, 72 (5th Cir.1987) (per curiam) ("[I]f any court were to hold that the discovery rule is an exception to this seemingly unambiguous declaration of the Texas Legislature, it should be a Texas court in the first instance, not a federal court sitting in a diversity case.") (discussing § 16.003(b)).

Accordingly, because CA's claims raise unsettled and significant questions of Texas law that control the outcome of this case, see 2d Cir.R. § 0.27, we certify the following questions of law to the Supreme Court of Texas:

1. Does the discovery rule exception to § 16.003(a) apply to claims for misappropriation of trade secrets?

2. If not, would the application to such claims of the two-year limitations period provided by § 16.003(a) contravene the "open courts" provision of article I, § 13 of the Texas Constitution?

The foregoing is hereby certified to the Supreme Court of Texas pursuant to Tex.R.App.P. 114(a) as ordered by the United States Court of Appeals for the Second Circuit.

Dated at New York, New York, this __ day of April, 1994.

George Lange, III

Clerk, United States Court of

Appeals for the Second Circuit

By: /s/ Carolyn Clark Campbell

Carolyn Clark Campbell

Chief Deputy Clerk

Page 463

Concurring opinion by OWEN, Justice, in which ABBOTT, Justice, joins.

I concur in the judgment of the Court. I write separately because the Court's opinion does not make it clear that the test of "inherently undiscoverable" and "objectively verifiable" is not determinative in every case. There may be instances where these elements are present, but limitations should not be deferred because of other considerations. Conversely, there will be instances where the running of limitations should be deferred even though the injury is not "inherently undiscoverable" or "objectively verifiable", such as some cases where fraud, fraudulent concealment, fiduciary duty or other special relationships are implicated.

The Court's formulation of a two-step inquiry should not be read as the acid test whenever the discovery rule is invoked.

I

It could be inferred from today's decision that if the injury is inherently undiscoverable and objectively verifiable, no other factors are to be considered. The discovery rule will apply. However, in certain circumstances, the injury may be inherently undiscoverable and objectively verifiable, yet there are valid reasons to refrain from applying the discovery rule.

This may arise in a trade secret case. The Court defines "inherently undiscoverable" as "not ordinarily discoverable, even though due diligence has been used." 918 S.W.2d at 456. A company with hundreds or thousands of employees and dozens of competitors may not have any means of keeping track of where its former employees find other positions. Would a misappropriation by a former employee under such circumstances be "ordinarily discoverable"? Not in every case. Does "due diligence" require such an employer constantly to monitor and attempt to reverse engineer all of the products of all of its competitors to ferret out misappropriation of trade secrets? It is obvious the answer is no. Nevertheless, the discovery rule should not be applied in such cases, even though the injury is inherently undiscoverable, because

there are other considerations mitigating against its application. The Court relies on those considerations in its decision. See id. at 455.

The Court concludes that the owner of a trade secret is in the best position to guard against theft of the information in the first place and should be required to do so. Id. at 458. The Court recognizes that many owners of intellectual property take extensive precautions to prevent the occurrence of theft or misappropriation. Id. at 456. It also acknowledges that we live in a world of high employee mobility and that the prospect of misappropriation is not a remote one. Id. at 457. The Court further concludes that vigilance in the area of trade secrets is required, particularly because all ownership of a trade secret is lost once it is made public. Id. at 457.

This case could easily have provided an example of a situation where the injury is inherently undiscoverable and objectively verifiable. The conclusion that the misappropriation was not "inherently undiscoverable" is a close call. At trial, Altai stipulated that Computer Associates did not know or have reason to know of the alleged misappropriation within the two-year period of limitations. The facts tend to bear this out. Computer Associates' former employee purloined computer source code listings. He copied approximately thirty percent of these source code listings to create an operating system compatibility component for Altai. However, this operating system compatibility component was not capable of functioning as a separate product and could not be marketed as a separate product. Rather, Altai used it to facilitate the operation of some of its computer programs. It was these programs that were in competition with Computer Associates' products. After the misappropriation was discovered by Computer Associates and suit was brought, Altai ceased using the component designed by Computer Associates' former employee. Altai nevertheless was able to create a new system compatibility component for its programs that did not use any of Computer Associates' trade secrets. These facts indicate that it would have been

Page 464

difficult, if not impossible, for Computer Associates to unearth the misappropriation simply by monitoring its competitors' products. But, regardless of whether the misappropriation of the trade secret in this case was inherently undiscoverable, I would not apply the discovery rule because of the other factors identified by the Court militating against deferring limitations.

II

The application of the "inherently undiscoverable" and "objectively verifiable" analysis also proves troublesome in cases involving a fiduciary duty or other special relationship. Indeed, even as the Court embraces its two-pronged inquiry, the Court struggles to reconcile that test with our decisions in the fiduciary arena. The Court asserts that we simply must presume the injury is inherently undiscoverable, whether it is or not, in fiduciary situations. 918 S.W.2d at 456. The Court reasons that fiduciaries are presumed to have superior knowledge and that this is only "a variation on the inherently undiscoverable element." Id. at 456. But this cannot explain some of our previous decisions where we deferred the running of limitations.

In cases where a lawyer has been sued by a client, we have not grounded our decisions on the notion that the injury was inherently undiscoverable or objectively verifiable, or even on the concept that the lawyer possessed superior knowledge. We have recognized that policy

considerations and the fiduciary obligation owed by an attorney to a client may require the deferral of the running of limitations in some cases, even where the alleged negligence was actually known or could have been discovered before the statutory period of limitations would otherwise have run.

In *Sanchez v. Hastings,* 898 S.W.2d 287 (Tex.1995), we articulated two reasons for deferring limitations, even though the client was fully aware of the alleged malpractice. 898 S.W.2d at 288. We said the client should not be forced to assert a claim against its lawyer until the litigation in which the lawyer was allegedly negligent had concluded. Id. Otherwise, the client might be required to take an inconsistent position. Id. We further recognized that requiring a client to scrutinize every stage of a case its lawyer was handling or risk losing a malpractice claim by operation of limitations would erode the trust between client and lawyer. Id. See also *Willis v. Maverick,* 760 S.W.2d 642, 645-46 (Tex.1988) (discovery rule applied even though failure to include provision in divorce settlement requiring wife's consent to sale of family home was apparent from the face of the agreement).

Finally, the analysis employed today by the Court should not govern at least some cases where fraud or fraudulent concealment is alleged. There have been no such allegations in this case, however.

III

Our Court has labored to bring clarity, consistency and predictability to our discovery rule jurisprudence, but we have not always been successful. In now articulating what we consider to be the unifying principles, we must also wrestle with some of our prior decisions in cases other than those concerning fraud, fraudulent concealment, a fiduciary duty, or other special relationship. Neither the rationale nor the results in certain of our discovery rule cases can be brought into line with the "inherently undiscoverable" and "objectively verifiable" analysis. This does not cut against utilizing this two-pronged inquiry. Generally, with the qualifications noted above, the "inherently undiscoverable" and "objectively verifiable" test is a good yardstick and should be adopted prospectively. However, we should be candid in admitting that when we apply it to some of our earlier decisions, they do not measure up.

*Weaver v. Witt,* 561 S.W.2d 792 (Tex.1977), is one such case. Weaver's nerves and muscles were damaged during a hemorrhoidectomy, and he lost control of his bowels. 561 S.W.2d at 793. He did not bring suit against the physician who performed the operation until almost five years later. Id. On appeal from a summary judgment in favor of the physician, we first held that Weaver had offered no proof of fraudulent concealment and that summary judgment was proper on that issue. Id. However, we held that summary

Page 465

judgment was not proper as to the discovery rule because the only evidence offered by the doctor was the last date of treatment. Id. at 794. If "inherently undiscoverable" were the proper inquiry in discovery rule cases, the doctor's evidence would have been enough to defeat summary judgment. Weaver certainly knew of his injury, and he knew it occurred following surgery in the same area of his body.

Similarly, in Hays v. Hall, 488 S.W.2d 412 (Tex.1972), the injury was not inherently undiscoverable, but we applied the discovery rule. 488 S.W.2d at 414. Dr. Hall performed a

vasectomy on Hays. Id. at 413. Hays learned his wife was pregnant fourteen months afterwards. Id. Dr. Hall tested Hays both before and after this pregnancy, and told Hays he was sterile. Hall's explanation of Mrs. Hays's pregnancy was that live sperm cells had been trapped in Mr. Hays's seminal tract above the vasectomy incision. Id. Mrs. Hays became pregnant yet again, and Dr. Hall conducted still another test, again informing Hays that he was sterile. Id. Hays filed suit almost three years after his operation, and the trial court sustained Dr. Hall's special exceptions and dismissed the case based on limitations. Id. We held that one who has a vasectomy and is told after tests that he is sterile, cannot know that he is still fertile until either his wife becomes pregnant or he is shown to be fertile by further testing. Id. at 414. However, competent testing easily could have revealed whether the vasectomy was successful well within the limitations period. Moreover, Mrs. Hays became pregnant within the two year limitations period. Id. at 413. The injury was not inherently undiscoverable. We nevertheless remanded the case for trial and a determination of the date Hays discovered the true facts concerning the failure of the operation or the date he should have discovered its failure in the exercise of ordinary care and diligence. Id. at 414.

In *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984), the injury was not inherently undiscoverable. Yet, we held unconstitutional an application of article 5.82, section 4 of the Insurance Code [1] which barred use of the discovery rule. 678 S.W.2d at 923. The Nelsons' first child was born with Duchenne muscular dystrophy. Id. at 919-20. When Mrs. Nelson became pregnant a second time, the Nelsons sought genetic counseling from Dr. Krusen to determine if she was a genetic carrier. Id. at 920. After conducting tests, Dr. Krusen said she was not, and the couple went forward with the pregnancy. Id. The Nelsons learned that Dr. Krusen's diagnosis was incorrect when this child was found to have muscular dystrophy just after his third birthday. Id. The Nelsons alleged that competent testing would have indicated Mrs. Nelson was a genetic carrier. See id. at 919. We therefore cannot say the injury was inherently undiscoverable.

Nelson v. Krusen also fails to meet the second prong of the test in Altai if we apply the rationale of another case decided today, S.V. v. R.V., --- S.W.2d ---- (Tex.1996). Nelson v. Krusen was a medical misdiagnosis case, requiring expert testimony to establish the negligence. Nelson, 678 S.W.2d at 919-20. Under S.V. v. R.V., this medical misdiagnosis would not be "objectively verifiable". Nelson is also at odds with one of our decisions that preceded it, *Robinson v. Weaver,* 550 S.W.2d 18 (Tex.1977) (misdiagnosis of location of herniated disc). We held in Robinson that the discovery rule does not apply in cases of medical misdiagnosis because there is no physical evidence that in and of itself establishes negligence. 550 S.W.2d at 22.

The point is that we have not been consistent in each and every one of our decisions. We should take this opportunity to inject consistency into the discovery rule area, to the extent reasonably possible, but also to recognize explicitly that the rationale of some of our earlier decisions does not fit within the analysis articulated today in Altai.

The two-part inquiry set out in Altai is not appropriate in some cases where fraud, fraudulent concealment, a fiduciary duty, or some other special relationship is implicated. In other cases the "inherently undiscoverable, objectively verifiable" analysis should be
Page 466

the threshold inquiry. Even then, the discovery rule may not apply because of other countervailing considerations. For the foregoing reasons, I concur in the judgment in this case.

---------

Notes:

[1] The certified questions are included as an appendix to the Court's opinion.

[2] See S.V. v. R.V., --- S.W.2d ---- (Tex.1996) (discussing the objectively verifiable standard).

[1] "Source code" refers to "the literal text of a [computer] program's instructions written in a particular programming language," Gates Rubber Co. v. Bando Chem. Indus., 9 F.3d 823, 835 (10th Cir.1993), such as COBAL, FORTRAN, BASIC, or EDL. Once the source code has been completed, it is translated or "compiled" into "object code," which is "the binary language comprised of zeros and ones through which the computer directly receives its instructions." Computer Assocs. Int'l v. Altai, Inc., 982 F.2d 693, 698 (2d Cir.1992).

[2] CA is a Delaware corporation with its principal place of business in Garden City, New York. Altai is a Texas corporation, and has its principal place of business in Arlington, Texas. See Altai I, 775 F.Supp. at 549.

[3] A federal court sitting in diversity applies the choice of law rules of the forum state. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941). CA originally brought this action in the United States District Court for the District of New Jersey, whence it was transferred by stipulation to the Eastern District of New York pursuant to 28 U.S.C. § 1404(a) (1988). See Altai I, 775 F.Supp. at 566. Whether such a transfer is initiated by the plaintiff or the defendant, "the transferee court must follow the choice of law rules that prevailed in the transferor court." Ferens v. John Deere Co., 494 U.S. 516, 519, 110 S.Ct. 1274, 1277, 108 L.Ed.2d 443 (1990). Thus, New Jersey's choice of law rules determine which state's statute of limitations applies. New Jersey has abandoned the prevalent rule that the statute of limitations is a procedural matter and therefore the forum state's statute of limitations is applicable, regardless of which state's substantive law applies. See Heavner v. Uniroyal, Inc., 63 N.J. 130, 305 A.2d 412, 415-18 (1973); Warner v. Auberge Gray Rocks Inn, Ltee., 827 F.2d 938, 940-41 (3d Cir.1987). Instead, New Jersey applies the interest-based test normally reserved for determining which state's substantive law will apply. See Schum v. Bailey, 578 F.2d 493, 495 (3d Cir.1978). In this case, the acts at issue occurred in Texas and involved the Texas offices of a Delaware corporation (CA) and a Texas corporation (Altai). Under these circumstances, we have little difficulty in concluding that New Jersey has no significant interest in applying its own statute of limitations, and would instead have recourse to the Texas statute of limitations. See Seals v. Langston Co., 206 N.J.Super. 408, 502 A.2d 1185, 1187-88 (Ct.App.Div.), certification denied, 104 N.J. 386, 517 A.2d 392 (1986); Washington v. Systems Maintenance Corp., 260 N.J.Super. 505, 616 A.2d 1352, 1354-56 (Ct.Law Div.1992).

[1] Acts 1975, 64th Leg., R.S., ch. 330, § 4, 1975 Tex.Gen.Laws 864, 865-66, repealed by Acts 1977, 65th Leg., R.S., ch. 817, § 41.03, 1977 Tex.Gen.Laws 2039, 2064.

---------

211 S.W.3d 310 (Tex. 2006), 05-0785, Via Net v. TIG Insurance Co.

Page 310

**211 S.W.3d 310 (Tex. 2006)**

**VIA NET, U.S. Delivery Systems, Houston, U.S. Delivery Systems, Inc. and Corporate Express, Inc., Petitioners,**

**v.**

**TIG INSURANCE COMPANY and Safety Lights Company, Respondents.**

**No. 05-0785.**

**Supreme Court of Texas**

**December 22, 2006**

On Petition for Review from the Court of Appeals for the First District of Texas

Andrew J. Mytelka, Joseph A.C. Ful-cher, Jeffrey N. Todd, David R. Clouston, Christopher Richie, Kevin A. Kinnan, for petitioners.

Mitchell D. Rose, Michael D. Patrizio, David J. Plavnicky, for respondents.

PER CURIAM

Nine months after being assured it had been added as an additional insured to a vendor's insurance policy, Safety Lights was denied coverage. After an unsuccessful suit on the policy, Safety Lights sued its vendor for breaching the promise to

provide additional-insured coverage.[1] That suit was filed less than four years after coverage was denied, but more than four years after the promise to provide coverage was breached. The trial court held the claim was barred, but the court of appeals reversed as the discovery rule might make it timely. Because the discovery rule does not apply to this type of claim, we reverse.

In early 1996, Safety Lights informed its vendors that it would no longer buy from them unless it was added as an additional insured under their commercial general liability policies. Via Net agreed to do so, and its insurance broker issued a certificate of insurance in February 1997 listing Safety Lights as "holder" and stating that "holder is added as additional insured re: General Liability." But the certificate also stated:

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

In fact, Via Net's policy with Lumbermens Mutual Casualty Company did not provide for additional-insured coverage, and no endorsement adding it as an additional insured was ever issued.

In June 1997, a Via Net employee named Guy Wright was injured when Safety Lights' employees allegedly dropped a 3000-pound steel plate on his hand. He sued three weeks later, and Safety Lights requested a defense from Lumbermens three months later. Pointing to its policy, Lumbermens denied the claim in a letter Safety Lights received on December 9, 1997.

Safety Lights settled Wright's suit in 1999 for $235,000, and sued Lumbermens and Via Net's broker for breach of contract and misrepresentation. A federal district court dismissed the

claim because (1) Lumbermens' policy did not provide coverage for additional insureds, and (2) Safety Lights' reliance on the certificate of insurance was unreasonable as it explicitly did not alter coverage. *See TIG Ins. Co. v. Sedgwick James of Washington,* 184 F.Supp. 2d 591, 598, 604 (S.D. Tex. 2001), *aff'd,* 276 F.3d 754 (5th Cir. 2002).

On December 7, 2001 (almost precisely four years after Lumbermens denied coverage), Safety Lights filed this breach of contract suit against Via Net for failing to add it as an additional insured. The parties agree that the four-year statute of limitations applies. *See* Tex. Civ. Prac. & Rem. Code § 16.004(a)(3); *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex. 2002). Via Net moved for summary judgment on the ground that more than four years had elapsed since the alleged breach of contract, and the trial court granted the motion.

The court of appeals reversed, finding the discovery rule could defer accrual until Safety Lights received Lumbermens' denial on December 9th. *See* 178 S.W.3d 10 (Tex. App.–Houston [1st Dist.] 2005). The court refused to consider whether the discovery rule might not apply, as that issue was raised not in the defendants' motion for summary judgment (which was based on limitations generally) but in the plaintiffs'

Page 313

response and the defendants' subsequent reply. *Id.* at 16 n.6.

But a defendant's motion for summary judgment based on limitations need not negate the discovery rule unless the plaintiff has pleaded it. *See In re Estate of Matejek,* 960 S.W.2d 650, 651 (Tex. 1997) (per curiam); *Woods v. William Mercer, Inc.,* 769 S.W.2d 515, 517-18 (Tex. 1988). Here, Safety Lights never did. Defendants are not required to guess what unpleaded claims might apply and negate them. *See SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 355 (Tex. 1995) ("A defendant need not, however, show that the plaintiff cannot succeed on any theory conceivable in order to obtain summary judgment; he is only required to meet the plaintiff's case as pleaded.") (internal quotation omitted).

When Safety Lights asserted the discovery rule for the first time in its summary judgment response, Via Net had two choices: it could object that the discovery rule had not been pleaded, or it could respond on the merits and try the issue by consent. *See Roark v. Stallworth Oil and Gas, Inc.,* 813 S.W.2d 492, 495 (Tex. 1991). By choosing the latter course, the discovery rule's applicability was placed squarely before the trial and appellate courts. *See* Tex. R. Civ. P. 166a(c) ("Issues not expressly presented to the trial court by written motion, *answer* or *other response* shall not be considered on appeal as grounds for reversal.") (emphasis added); *see also Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex. 1993) ("[W]e hold that a summary judgment cannot be affirmed on grounds not expressly set out in the motion *or response.*") (emphasis added). The court of appeals erred in holding otherwise.

Having determined that the issue was properly raised, we turn to whether the discovery rule applies to contract claims like the one asserted here. Normally a cause of action accrues when a wrongful act causes some legal injury. *See S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex. 1996). But accrual may be deferred if "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex. 1996). The Legislature has adopted the discovery rule in some cases. *See, e.g.,* Tex. Bus. &

Com. Code §§ 17.565 (deceptive trade practices), 24.010(b)(1) (fraudulent transfer claims by spouse, minor, or ward); Tex. Civ. Prac. & Rem. Code §§ 16.010(a) (misappropriation of trade secrets), 110.007(a) (burden on religious freedom), 143.001(b) (harmful access by computer), 171.088(b) (vacating arbitration award); Tex. Rev. Civ. Stat. art. 581-33(H)(2) (untruth or omission in securities sales). But it has specifically rejected the discovery rule in others, including contract cases involving the sale of goods. *See* Tex. Bus. & Com. Code § 2.725(b). While the Legislature's silence on accrual in most cases leaves that question to the courts, we have restricted the discovery rule to exceptional cases to avoid defeating the purposes behind the limitations statutes. *See S.V.,* 933 S.W.2d at 25 (noting that applications of the discovery rule "should be few and narrowly drawn"); *Computer Assocs.,* 918 S.W.2d at 456, 457 (noting that discovery rule is "a very limited exception to statutes of limitations" that applies "in certain limited circumstances"). Via Net does not contest that a failure to add a third party as an additional insured is objectively verifiable. But it does argue that such a failure is not inherently undiscoverable. "An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence."

Page 314

*Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 734-35 (Tex. 2001). This legal question is decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable. *Id.* at 736; *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 122 (Tex. 2001).

"It is well-settled law that a breach of contract claim accrues when the contract is breached." *Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex. 2002). We have twice refused to apply the discovery rule to defer accrual until a breach of contract is discovered. *See Wagner & Brown,* 58 S.W.3d at 737; *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 888 (Tex. 1998). In both cases, royalty owners argued the discovery rule should apply because due diligence did not require that they verify information or payments received from their lessees. We disagreed, holding that the duties the law imposes on lessees "do not dispense with the need for royalty owners to exercise due diligence in enforcing their contractual rights, express or implied, within the statutory limitations period." *HECI,* 982 S.W.2d at 887; *see also Wagner & Brown,* 58 S.W.3d at 737.

Contracting parties are generally not fiduciaries. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 177 (Tex. 1997). Thus, due diligence requires that each protect its own interests. *See Barfield v. Howard M. Smith Co. of Amarillo,* 426 S.W.2d 834, 840 (Tex. 1968) ("As a party to arm's length business transactions, respondent had a duty to use ordinary care for the protection of its own interests"). Due diligence may include asking a contract partner for information needed to verify contractual performance. *See Wagner & Brown,* 58 S.W.3d at 736; *HECI,* 982 S.W.2d at 886. If a contracting party responds to such a request with false information, accrual may be delayed for fraudulent concealment. *Wagner & Brown,* 58 S.W.3d at 737; *HECI,* 982 S.W.2d at 886. But failing to even ask for such information is not due diligence. *See Wagner & Brown,* 58 S.W.3d at 736; *HECI,* 982 S.W.2d at 886.

Safety Lights argues that it acted diligently by obtaining a certificate of insurance listing it as an additional insured. But the certificate warned that it conferred no rights and was limited by the

underlying policy. Safety Lights argues, with some force, that there is little use for certificates of insurance if contracting parties must verify them by reviewing the full policy. But the purpose of such certificates is more general, "acknowledging that an insurance policy has been written, and setting forth in general terms what the policy covers." Black's Law Dictionary 240 (8th ed. 2004). Given the numerous limitations and exclusions that often encumber such policies, those who take such certificates at face value do so at their own risk.

Moreover, in this case Safety Lights learned of the breach within a few months after it occurred. While the facts of this specific case do not govern the categorical inquiry, they are not atypical. Additional-insured status under a general liability policy generally provides coverage for personal injury and property damage claims, most of which must be brought within two years of injury. *See* Tex. Civ. Prac. & Rem. Code § 16.003. Accordingly, unless no claims are filed for a long time, breach will generally be discovered within four years.

We do not hold today that the discovery rule can never apply to breach of contract claims. Our attempts to bring predictability and consistency to discovery rule jurisprudence have focused on types of injury, not causes of action. *See, e.g., Pustejovsky v. Rapid-American Corp.,* 35 S.W.3d 643, 653 (Tex. 2000); *HECI,* 982 S.W.2d at 886;

Page 315

*Childs v. Haussecker,* 974 S.W.2d 31, 38 (Tex. 1998); *Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex. 1997). Some contract breaches may be inherently undiscoverable and objectively verifiable. But those cases should be rare, as diligent contracting parties should generally discover any breach during the relatively long four-year limitations period provided for such claims.

Accordingly, we hold that the discovery rule is inapplicable to defer accrual of the claim asserted here. We grant Via Net's petition for review, and without hearing oral argument, we reverse the court of appeals' judgment and render judgment that Safety Lights take nothing. *See* Tex. R. App. P. 59.1.

---------------

Notes

[1] The coverage suits here and in federal court were brought by TIG Insurance Co., Safety Light's insurer, in its own name and that of its insured; for ease of reference we refer to both as "Safety Lights." For the same reason we refer to the defendants as "Via Net," even though the petition for review here was filed by two of its affiliates and the style of the case lists a third.

---------------

243 F.Supp.2d 686 (S.D.Tex. 2002), Civ. A.H-01-0647, Hunton v. Guardian Life Ins. Co. of America

Page 686

**243 F.Supp.2d 686 (S.D.Tex. 2002)**

**Richard O. HUNTON and Benny Pace, Trustee of the Richard O. Hunton Irrevocable Trust, Plaintiffs,**

**v.**

**GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

**No. CIV.A.H-01-0647.**

**United States District Court, S.D. Texas, Houston Division.**

**Nov. 16, 2002**

Page 687

[Copyrighted Material Omitted]

Page 688

[Copyrighted Material Omitted]

Page 689

[Copyrighted Material Omitted]

Page 690

[Copyrighted Material Omitted]

Page 691

Kent Melvin Hanszen, Attorney at Law, R Scott Wolfrom, Attorney at Law, Houston, for Richard O Hunton, Richard O Hunton Irrevocable Trust Agreement, Benny Pace, Trustee of the Richard O Hunton Irrevocable Trust, plaintiffs.

Jeffrey A Davis, McGinnis Lochridge & Kilgore, Michael E Warrick, Hudgins Hudgins & Warrick, Houston, for the Guardian Life Insurance Company of America, Stephen L Friedman, defendants.

*MEMORANDUM AND ORDER*

ATLAS, District Judge.

Pending before the Court is Defendant the Guardian Life Insurance Company of America's Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. # 14] ("Defendant's Motion"). Plaintiffs responded and Defendant replied.[1] Plaintiffs relied in their Response on substantial material outside of the pleadings. Accordingly, the Court exercised its discretion under Rule 12 to convert Defendants' Motion to a Motion for Summary Judgment. Order, signed September 19, 2001 [Doc. # 21]. Thereafter, both parties submitted supplemental materials.[2] The Court heard oral argument on Defendant's Motion on October 12, 2001. The Court requested

Page 692

additional supplemental materials during oral argument.[3] Also pending is Plaintiff's Motion for Leave of Court to File their Amended Complaint [Doc. # 33] ("Plaintiffs' Motion"). Having considered the parties' submissions, the record, and the applicable authorities, the Court concludes that Defendant's Motion should be **granted**, and Plaintiffs' Motion should be **denied.**

**I. *BACKGROUND FACTS***

Plaintiffs Richard O. Hunton and Benny Pace, as Trustee of the Richard O. Hunton Irrevocable Trust ("Trust"), bring suit against Defendant Guardian Life Insurance Company of America ("Defendant" or "Guardian"), alleging that Guardian misrepresented the amount of premiums due under a Guardian life insurance policy they had purchased.

In 1992, Plaintiffs entered into negotiations with Stephen Friedman an employee and agent of Guardian, to obtain life insurance coverage on Hunton's life. Hunton specifically sought a policy that would require premium payments for a fixed number of years only. Friedman proposed that Plaintiffs purchase from Guardian a life insurance policy (the "Policy") that had "vanishing premiums."[4] Affidavit of Richard O. Hunton, October 8, 2001, at 2 (Exhibit A to Plaintiffs' Supplement) ("Oct. 8, 2001 Hunton Aff."). The concept was that Plaintiffs would pay premiums for a limited amount of time, after which the Policy would be fully paid ("paid up"), *i.e.,* would require no further out of pocket costs for additional premiums. *Id.* Friedman presented Plaintiffs with a "premium payment schedule" issued by Guardian as part of his marketing of the Policy. *Id.* Under the schedule, the owner of the Policy had to pay premiums for seven and a half years with a large up-front initial payment. *Id.* at 3. Friedman assured Plaintiffs that the premiums would vanish as promised because Guardian enjoyed the benefits of a "dividend stabilization fund," which would compensate for or supplement any potential fluctuations in dividends. Oct. 18, 2001 Hunton Aff., at 2; Deposition of Stephen L. Friedman, at 51 (Exhibit B to Plaintiffs' Supplement) ("Friedman Dep."). The details of that fund were not explained to Hunton. Oct. 18, 2001 Hunton Aff., at 2.

The Policy[5] states that premiums will be payable "For Life." *Id.* at 3. The terms

Page 693

of the Policy also provide that the insured will share in the proceeds of "Guardian's divisible surplus." Policy, at 6. If the sum of the cash value of the dividends and the cash value of the Policy in any year is sufficient, the insured may use this sum to pay the annual premium on the Policy. *Id.* [6] Once the Policy is fully paid-up, the insured does not need to make any additional out of pocket premium payments because the premiums will be paid from accumulated dividends. *Id.* Guardian does not state explicitly in the Policy that it will make dividend payments. *Id.* Instead, the Policy's share of dividends, "if any, is determined yearly by Guardian." *Id.* Guardian bases this determination on its "mortality, expense, and investment experience." *Id.* The dividend stabilization fund is not mentioned in the Policy.

Incorporated by reference as part of the Policy is the application for life insurance completed and signed by Hunton ("Application").[7] In the Application, Hunton checked a box indicating that he wished to pay premiums "Annually." *Id.* Under "Section E: Dividends (for participating policies only), " Hunton checked a box that indicated that he wanted the dividends to pay for "One year term insurance not to exceed Target Face Amount of $ 905,450." *Id.* In this section, Hunton did not check the box that indicated "Vanish Premium-available only if a PUA rider is requested. Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends." *Id.* The Application also contains the following language: "Upon request we will furnish illustrations of benefits, including death benefits and cash values .... It is understood that under the Variable Life Insurance Policy the amount of the death benefit ... may increase or decrease based on the investment experience of the separate account and are not guaranteed."

Application, at 3. Nowhere in the Application did Hunton write or otherwise indicate that he agreed to pay premiums for eight years only.

Plaintiffs allege that the Policy contained a two-page "premium schedule"[8] that establishes that the final premium payment would be due in the Policy's eighth year, after which the premium payments were, according to Plaintiffs, guaranteed to vanish. Plaintiffs contend that Friedman delivered the Policy to them in a folder that also contained the Illustrations and that Friedman represented that the Illustrations were part of the Policy. Oct. 8, 2001 Hunton Aff., at 2-3. However, this

Page 694

contention is contradicted, most significantly, by the terms of the Policy itself.[9] Neither the Policy's "Alphabetical Index," Policy, at 13 (following the various policy riders and a copy of the Application), nor the "Guide to Policy Provisions," Policy, at 2 (summarizing the Policy's contents), refers to these two pages. Indeed, the document is titled "Guardian/GIAC Lifeplan Illustrations" ("Illustrations"). It states that the schedules contain additional "attached sheets with important footnotes" that have not been included with Plaintiffs' exhibit. Illustrations, at 2 of 6.

Hunton consulted with his financial advisors in connection with acquiring the Policy,[10] but he is the person who made the decision to buy it. At Hunton's request, Trustee Pace purchased the Policy with Trust funds and designated the Trust as owner and beneficiary. Guardian issued the Policy on February 4, 1992. On February 13, 1992, Friedman delivered the policy to Hunton in person. Hunton and Friedman reviewed the Policy's provisions together. Hunton questioned Friedman regarding the language in the Policy that indicates that premiums are payable "For Life." Oct. 8, 2001 Hunton Aff., at 2-3. In response, Plaintiffs allege that Friedman explained that the "For Life" provision was an option available for Plaintiffs if they wished to add value to the Policy by making premium payments beyond the "vanish date." *Id.* However, Friedman also allegedly stated that, in Plaintiffs' case, the premiums payments were governed by the Illustrations and not by the "For Life" provision. *Id.*

Plaintiffs made all premium payments set forth under the Illustrations. Plaintiffs allege that Guardian continued to request premiums after the Illustrations' premium vanish date. Plaintiffs contend that, after Plaintiffs inquired about the status of the Policy in December 1997, Guardian first informed them that premiums would be required for an additional five years beyond the vanish date. Plaintiffs further allege that in May 1998 Guardian informed them that the investment component of the Policy had not generated the returns that had been originally represented to them and that they would possibly have to pay premiums for the remainder of Hunton's life.

Guardian adds to Plaintiffs' version of the facts. Beginning in 1993, Guardian contends that it sent Annual Benefit Statements ("Statements") to Plaintiff Benny Pace, owner of the Policy, and to Friedman. The Statements provided information regarding the performance of the Policy, the amount of dividend payments made by Guardian, and the Policy's cash value. Defendant has submitted three Statements dated February 14, 1997; February 4, 1996; and February 4, 1993. *See* Exhibit B to Ciotti Aff. [Doc. # 26] ("Statements").[11]

Page 695

Plaintiffs filed suit in the 127th Judicial District of Harris County, Texas on March 24, 2000,

naming both Guardian and Friedman as Defendants. On November 17, 2000, Guardian removed to federal district court.[12] The case was remanded on January 31, 2001. Plaintiffs then voluntarily dismissed Friedman on February 16, 2001. In response, on February 22, 2001, Guardian again removed the case to this Court.

On June 29, 2001, Plaintiffs filed a Second Amended Complaint, alleging five claims: (i) breach of contract, (ii) fraud and fraudulent inducement, (iii) violations of the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), T EX. BUS. & COM. CODE § 17.41 *et seq.,* (iv) violations of the Texas Insurance Code, T EX. INS. CODE art. 21.21 ("Insurance Code"), and (v) negligent misrepresentation.[13]

Guardian makes several arguments in favor of its motion for summary judgment. First, Guardian argues that Plaintiffs' claims all are barred by the applicable statutes of limitations. Second, Guardian argues that Plaintiffs' breach of contract claim fails as a matter of law because it is contradicted by the express terms of the insurance contract. Third, Guardian asserts that Plaintiffs' fraud, DTPA, and Insurance Code claims fail because Plaintiffs have not alleged justifiable reliance. Finally, Guardian argues that Plaintiffs have failed to plead their fraud, DTPA, Insurance Code, and negligent misrepresentation claims with particularity as required by F ED. R. CIV. P. 9(b). The parties have extensively briefed all issues in Guardian's motion for summary judgment and the motion is ripe for adjudication.

Page 696

## II. *SUMMARY JUDGMENT STANDARDS*

A defendant's motion for summary judgment is properly granted unless there is evidence "on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wheeler v. Miller,* 168 F.3d 241, 247 (5th Cir. 1999). Rule 56 is an integral part of the Federal Rules of Civil Procedure, recognizing a party's right to demonstrate that certain claims have no factual basis and to have those unsupported claims disposed of prior to trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant shows that there are no genuine issues of material fact, the burden is on the nonmovant to demonstrate with "significant probative evidence" that there is an issue of material fact warranting a trial. *Texas Manufactured Housing Ass'n v. Nederland,* 101 F.3d 1095, 1099 (5th Cir. 1996), *cert. denied,* 521 U.S. 1112, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). The nonmovant's burden cannot be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Doe v. Dallas Independent School Dist.,* 153 F.3d 211, 215 (5th Cir. 1998); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*).

The Court "must review all of the evidence in the record, but make no credibility determinations or weigh any evidence." *Peel & Company, Inc. v. The Rug Market,* 238 F.3d 391, 394 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105, (2000)). "In reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give

credence to the evidence favoring the nonmoving party as well as to the evidence supporting the moving party that is uncontradicted and unimpeached." *Id.*

"Material that is inadmissible will not be considered on a motion for summary judgment because it would not establish a genuine issue of material fact if offered at trial and continuing the action would be useless." *Duplantis v. Shell Offshore, Inc.,* 948 F.2d 187, 192 (5th Cir. 1991). Rumors, speculation, hearsay and other information which would be excluded at trial cannot be considered in ruling on a motion for summary judgment. *Fowler v. Smith,* 68 F.3d 124, 126 (5th Cir. 1995).

## III. *LIMITATIONS PERIODS FOR PLAINTIFFS' CLAIMS*

Guardian argues that all of Plaintiffs' claims are barred by the applicable two or four year statutes of limitations.[14] First, Guardian asserts that all Plaintiffs' claims accrued when Guardian issued the Policy in 1992. Thus, Guardian contends the limitations periods ran on Plaintiffs' claims in

Page 697

either 1994 or 1996. Alternatively, Guardian argues that the discovery rule is inapplicable to Plaintiffs' claims because Plaintiffs have failed to raise a genuine issue of fact that the alleged misrepresentations could not have been discovered through the exercise of reasonable diligence. Finally, Guardian asserts that, in any event, the two year limitations period for the DTPA, Insurance Code, and negligent misrepresentation claims expired prior to Plaintiffs filing suit in March 2000, since Plaintiffs allegedly have admitted that in December 1997 they became aware of Guardian's alleged misrepresentations on which these claims are founded.

In response, Plaintiffs argue that their causes of action did not accrue until they began to pay premiums after the vanish date in the Illustrations, which occurred in mid-1999. Plaintiffs rely on several Texas decisions to contend that a cause of action does not accrue until damages are sustained. Plaintiffs characterize their damages as being the premium payments made after the alleged vanish date. In its Reply, Guardian challenges this characterization. First, Guardian argues that the damage Plaintiffs sustained is the purchase of a Policy they would not have wanted but for Guardian's alleged misrepresentation. Thus, Guardian asserts, the limitations period for Plaintiffs began when the Policy was issued. Second, Guardian argues that, under Texas statutory law, the limitations period for the DTPA and Insurance Code claims begins to run when the alleged misrepresentation is made.

After considering the parties' arguments and the relevant law, the Court holds that the applicable statutes of limitations bar all claims that Plaintiffs allege in their Second Amended Complaint [Doc. # 11].[15]

### A. *Fraud and Fraudulent Inducement Claims*

Plaintiffs' fraud claim is barred by the statute of limitations. Plaintiffs have not adduced evidence that shows that they exercised reasonable diligence in reviewing Guardian's Policy.

Page 698

In Texas, the general rule is that a cause of action accrues and the statute of limitations begins to run when "a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all the resulting damages have not yet occurred." *Murphy v.*

*Campbell,* 964 S.W.2d 265, 270 (Tex.1997); *S.V. v. R.V.,* 933 S.W.2d 1, 4 (Tex.1996); *Roberts v. Lain,* 32 S.W.3d 264, 269 (Tex.App.-San Antonio 2000, no pet). Thus, an action for fraud accrues when the fraud is perpetrated. *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988); *Lawrence v. Lawrence,* 911 S.W.2d 443, 448 (Tex.App.-Texarkana 1995, writ denied); *accord Jackson v. Speer,* 974 F.2d 676, 679-80 (5th Cir. 1992); *Porter v. Charter Medical Corp.,* 957 F.Supp. 1427, 1434 (N.D.Tex.1997).

If the fraud is concealed from the plaintiff, however, the limitations period does not run until plaintiff discovers the fraud or should have discovered the fraud through the exercise of reasonable diligence. *Woods,* 769 S.W.2d at 517; *Lawrence,* 911 S.W.2d at 448; *Jackson,* 974 F.2d at 679-80; *Porter,* 957 F.Supp. at 1434. In this situation, Texas courts apply the discovery rule or the fraudulent concealment doctrine as exceptions to the statute of limitations.[16] *S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996); *Computer Assoc. Int'l v. Altai, Inc.,* 918 S.W.2d 453, 455-56 (Tex.1996).

The discovery rule is a "very limited exception to statutes of limitation" and only applies when (i) the nature of the injury incurred is "inherently undiscoverable" and (ii) the evidence of the injury is "objectively verifiable." *Computer Assoc.,* 918 S.W.2d at 456; *In re Coastal Plains, Inc.,* 179 F.3d 197, 214 (5th Cir. 1999); *Prieto v. John Hancock Mutual Life Ins. Co.,* 132 F.Supp.2d 506, 513 (N.D.Tex.2001). The "inherently undiscoverable" requirement is met when the injured party is unlikely to discover the injury during the limitations period despite due diligence. *S.V.,* 933 S.W.2d at 7; *Computer Assoc.,* 918 S.W.2d at 456; *Coastal Plains,* 179 F.3d at 215. The injury does not have to be impossible to discover, but a party's mere failure to discover the injury is not sufficient to meet the requirement. *S.V.,* 933 S.W.2d at 7; *Coastal Plains,* 179 F.3d at 215. To be inherently undiscoverable the wrong and the injury "must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff." *Coastal Plains,* 179 F.3d at 214-15. The requirement of "objective verifiability" requires physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim. *Id.* "An injury is 'objectively verifiable' if the presence of the injury and the producing wrongful act cannot be disputed." *Howard v. Fiesta Texas Show Park, Inc.,* 980 S.W.2d 716, 720 (Tex.App.-San Antonio 1998, pet. denied).[17]

Page 699

Similarly, the doctrine of fraudulent concealment[18] delays application of the statute of limitations. When the fraud is concealed, the doctrine tolls the limitations period "until the fraud is discovered or could have been discovered with reasonable diligence." *Velsicol,* 956 S.W.2d at 531; *Prieto,* 132 F.Supp.2d at 515. The doctrine "estops the defendant from relying on the statute of limitations as an affirmative defense to plaintiff's claim." *Computer Assoc. Int'l,* 918 S.W.2d at 456.

Plaintiffs do not raise a genuine issue of fact as to whether Guardian's alleged misrepresentations are inherently undiscoverable. Plaintiffs contend that Friedman guaranteed that the Trust would not have to pay premiums beyond the "vanish date." Plaintiffs further allege that the Policy provisions that required premium payments "For Life" do not control the Trust's payments of premiums under the Illustrations.[19] Nevertheless, even a cursory review of the

Policy and Application informs Plaintiffs that Friedman's oral representations did not accurately reflect the written Policy. The Policy terms thus are easily discoverable. Indeed, the Application, signed by Hunton before he received the Policy, provides explicitly that Friedman lacked the authority to alter *any* of the written provisions of the Application or the Policy.[20] Application, Page 700

at 4. Furthermore, the Application also states that the cash value of the Policy "may increase or decrease based on the investment experience of the separate account and are not guaranteed." *Id.* at 3. The Policy itself, which Hunton reviewed closely with Friedman, clearly states under the section heading "dividends" that the "policy's share [of the dividends], if any, is determined yearly by Guardian," and "[t]he dividend will reflect Guardian's mortality, expense, and investment experience."[21] Finally, neither the Policy nor Application mention the Illustrations as being part of the contract.[22]

Thus, a review of the Policy establishes that (i) the dividends will depend on various factors and are not guaranteed, (ii) that Friedman lacked authority to make oral representations that altered the written terms of the Policy, and (iii) that materials

Page 701

other than the Application, the printed Policy form and its riders are not part of the contract. These unequivocal provisions in the Policy render the putative fraud discoverable and sufficient to put Plaintiffs on notice that Guardian's dividend payments are variable, not guaranteed, despite any contrary understanding held by Plaintiffs from Friedman's representations or alleged implications of the Illustrations.

Plaintiffs also are not entitled to rely on the discovery rule to toll the fraud limitations period because Plaintiffs did not act with reasonable diligence to discover the alleged misrepresentations. "Investment decisions inherently require that the investor exercise diligence rather than relying on any oral representations." *Prieto,* 132 F.Supp.2d at 520; *see also Martinez Tapia v. Chase Manhattan Bank,* 149 F.3d 404, 409 (5th Cir. 1998) (in the context of the statute of limitations, "party claiming fraud and/or misrepresentation must exercise due diligence to discover the alleged fraud") (quoting *McGill v. Goff,* 17 F.3d 729, 733 (5th Cir. 1994)). Plaintiffs, according to their own testimony, did nothing regarding the Policy, except make payments according to the original premium schedule.[23] Plaintiffs easily could have checked with Guardian as to the actual status of dividends, accruals, and cash values on the Policy. It appears that Plaintiffs did not review the Statements that at least one of them likely received; nor did they request any information on the Policy account status. Plaintiffs failed to exercise reasonable diligence by relying solely on Friedman's oral statements regarding the Policy attributes.[24]

Plaintiffs also present, as evidence of their diligence, the fact that Hunton relied on the advice of an accountant in making the decision to purchase the Policy. This contention fails to create a genuine issue of fact regarding Plaintiffs' exercise of reasonable diligence. Plaintiffs do not explain in what manner their accountant participated in the decision to purchase the Policy, nor why an accountant's involvement is material. Therefore, the Court holds that Plaintiffs have failed to satisfy their burden to demonstrate tolling of the limitations period under the discovery rule or the fraudulent concealment doctrine.[25]

Plaintiffs rely on several Texas cases for the proposition that a cause of action does not accrue until damages are sustained. *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967) (a "cause of action accrues, and the statute [of limitations] begins to run, when, and only when, the damages are sustained).[26] Plaintiffs thus argue that their fraud claim did not accrue until they began making premium payments at Guardian's demand after the alleged vanish date in mid-1999. Plaintiffs' contention fails as it is founded on a misapplication of the cited cases. *Atkins* applies only to acts that do not of themselves constitute a "legal injury." The full passage on which Plaintiffs rely reads: "if the act is of itself not unlawful, and plaintiff sues to recover damages subsequently accruing from, and consequent on, the act ..., the statute begins to run, when ... the damages are sustained." *Id.* In *Atkins,* the act was a mistake made by an accountant in preparing the plaintiff's tax records. *Id.* at 150-52. Because the accountant's mistake was not in itself unlawful, the court in *Atkins* held that plaintiff's action did not accrue until a tax deficiency was assessed against the plaintiff. *Id.* at 153. Plaintiffs' claim for fraud and fraudulent inducement at bar are entirely different. Fraud is itself an actionable legal injury. The general Texas rule is that a cause of action for fraud accrues and the limitations period "begins to run when the fraud is perpetrated, or if the fraud is concealed, from the time it is discovered or could have been discovered by the exercise of reasonable diligence." *Woods,* 769 S.W.2d at 517. *Atkins* deals only with a special exception to this rule, *Atkins* is inapplicable to this case.[27]

Furthermore, to the extent Plaintiffs assert a claim for fraud in the inducement of contract, Plaintiffs' claim is that they were defrauded into buying the particular insurance policy they did. The *Atkins* court held that when the act is a wrong in itself, the "cause of action accrues and the statute begins to run from the time the act is committed, even where little, if any, actual damage occurs immediately."

417 S.W.2d at 153. For the fraud in inducement claim, Plaintiffs suffered a legal injury from their reliance on Guardian and Friedman's alleged misrepresentations because Plaintiffs would not have purchased the Guardian insurance policy but for Friedman's alleged misrepresentations. Accordingly, Plaintiffs' fraud and fraudulent inducement claims are barred by the statute of limitations.

## B. *Negligent Misrepresentation Claim*

Plaintiffs' negligent misrepresentation claim is barred by the applicable two year statute of limitations. The discovery rule does not apply to negligent misrepresentations claims, and, even if the discovery rule applied, Plaintiffs had notice of Guardian's alleged misrepresentations more than two years before the filing of this action.

In Texas, negligent misrepresentation claims sound in negligence, not fraud. *Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1371 (5th Cir. 1994); *see also Milestone Properties, Inc. v. Federated Metals Corp.,* 867 S.W.2d 113, 119 (Tex.App.-Austin 1993, no writ); *Texas Am. Corp. v. Woodbridge Joint Venture,* 809 S.W.2d 299, 302 (Tex.App.-Fort Worth 1991, writ denied). Consequently, negligent misrepresentation claims are governed by negligence rules. *Id.* at 1372. Generally, in Texas negligence actions, the limitations period runs

from "the commission of the negligent act, not the ascertainment of damages."[28] *Id.* Thus, the limitations period on Plaintiffs' negligent misrepresentation claim began to run when the Policy was issued to Plaintiffs in 1992.

Plaintiffs' claim would also be time-barred even if the discovery rule or fraudulent concealment doctrine were applied to this negligent misrepresentation action.[29] Plaintiffs admit that, at the latest, they were on notice of Guardian's alleged misrepresentation more than two years before the filing of this action; they were notified by Guardian in December 1997 that the Trust would have to pay premiums after the alleged vanish date. Thus, Plaintiffs' negligent misrepresentation claim is time-barred.

## C. *Insurance Code and DTPA Claims*

Plaintiffs also asserted DTPA and Insurance Code claims. These claims are subject to the two year limitations period that commences at the time the misrepresentation is made or after the plaintiff "discovered or in the exercise of reasonable diligence should have discovered the occurrence of the [unlawful act]." T EX. BUS. & COM. CODE § 17.565 (Vernon 1987); T EX. INS. CODE art. 21.21, § 16(d) (Vernon Supp.2001); *Gilbreath v. White,* 903 S.W.2d 851, 855 (Tex.App.-Texarkana 1995, no writ) (statute of limitations begins to run for DTPA and Insurance Code claims when the deceptive act occurred or when the plaintiff should have discovered the deceptive act with reasonable diligence);

Page 704

*Holmes v. PT Pipe & Tubing, Inc.,* 856 S.W.2d 530, 537 (Tex.App.-Houston 1993, no writ) (holding that, for DTPA claims, the statute of limitations runs from the time the deceptive act occurred or when the consumer should have learned of the deceptive act with reasonable diligence, not when the consumer incurs damages from the deceptive act). Since the alleged misrepresentations were all made in connection with Plaintiffs' decision to purchase the Policy in 1992, the DTPA and Insurance Code claims are barred by the statute of limitations unless the discovery rule applies.

The discovery rule expressed in these statutes and interpretive case law does not assist Plaintiffs. As discussed above, Plaintiffs failed to exercise reasonable diligence to discover the alleged falsity of the statements by reviewing the written Policy.[30]

Even if the discovery rule were to apply, Plaintiffs' DTPA and Insurance Code claims are time barred under the two year limitations period. Plaintiffs concede in their Complaint that they were informed by Guardian in December 1997 that they would be required to make premium payments for at least five years after the vanish date. Therefore, Plaintiffs were on notice of Guardian's alleged misrepresentations concerning the Policy premiums well more than two years before Plaintiffs commenced this action. Accordingly, Plaintiffs' DTPA and Insurance Code claims are barred by the statute of limitations.

## D. *Breach of Contract Claims*

In Texas, the general rule is that a cause of action for breach of contract accrues at the time the contract is breached. *Houston Endowment, Inc. v. Atlantic Richfield Co.,* 972 S.W.2d 156, 159 (Tex.App.-Houston [14th Dist.] 1998, no pet.); *Heron Financial Corp. v. United States Testing Company, Inc.,* 926 S.W.2d 329, 331 (Tex.App.-Austin 1996, writ denied); *Harrison v. Bass Enterprises Production Co.,* 888 S.W.2d 532, 537 (Tex.App.-Corpus Christi 1994, no writ). If the

breach is concealed from the plaintiff, Texas courts apply the discovery rule "until the plaintiff discovers or should have discovered the nature of the injury." *Houston Endowment, Inc.,* 972 S.W.2d at 159.

If the basic Texas rule is applied, Plaintiffs' breach of contract claims are time-barred. The breach occurred in 1992 when the Policy was issued without a prevision restricting premium payments to eight years, in that premiums specified in the Policy did not adopt expressly the amounts set forth on the Illustrations. Plaintiffs, in response, contend that Guardian did not breach the insurance contract until it charged premiums beyond the vanish date set forth in the Illustrations. In the alternative, Plaintiffs contend that their cause of action accrued when Guardian gave them notice of its intention to charge additional premiums in 1997, three years before Plaintiffs originally filed this action in 2000. Plaintiffs' arguments each fail.

Plaintiffs contend, first and foremost, that the Illustrations were part of their insurance contract and that, under the Illustrations, premium payments were only required for seven and a half years. The Illustrations, however, contained more than a description of premium payments: the Illustrations also contained year-by-year projections of the dividends the Policy was to earn, the Policy's projected "net cash value," the Policy's "guaranteed cash values," and the amount of the death benefit. If the Court were to

Page 705

accept Plaintiffs' position that the Illustrations were part of the parties' binding insurance contract, then Guardian would have been required to perform each year exactly according to the Illustrations. However, as shown in the Annual Benefit Statement dated February 4, 1996, the Policy was not performing according to the terms of the Illustrations.[31] Thus, under Plaintiffs' own theory, Guardian breached the parties' contract when Guardian did not pay and give Plaintiffs credit for dividends exactly as provided in the Illustrations. According to the Statements, this breach occurred more than four years before Plaintiffs brought this action on March 24, 2000.

Plaintiffs also appear to rely on the discovery rule to toll the limitations period on their contract claims. As discussed above, Plaintiffs fail to present evidence to raise a triable issue of fact that the discovery rule should apply to their contract claims. Plaintiffs' conclusory assertion that "Guardian did not provide or otherwise offer any information which would lead [Plaintiffs] to believe that [Plaintiffs] would owe any premiums other than those agreed to in the [Illustrations]" (Oct. 18, 2001 Hunton Aff., at 2) ignores the Statements directed to Pace (the Policy owner) and to Friedman.[32] Moreover, this argument ignores the common sense practice of an insurance policy owner checking periodically on the status of his policy account if he intends to rely on dividend accrual to pay premiums for the policy. The Court is not obligated in a summary judgment analysis to give weight to the non-movant's conclusory, unsubstantiated assertions that contradict admissible evidence.[33] As discussed above, Plaintiffs have not presented evidence that shows that the fact that the Policy was not performing according to projections in the Illustrations was inherently undiscoverable. Furthermore, the Plaintiffs have adduced nothing to show that they acted with reasonable diligence in monitoring the performance of the Policy.[34] Accordingly, Plaintiffs' contract claims are barred by Texas's four year statute of limitations.

Because the parties have extensively briefed the merits of the breach of contract

issues and because the issue of the statute of limitations may not be free from doubt on these claims, the interest of justice dictates that the Court address the merits of the contract claims.

## IV. *PLAINTIFFS' CONTRACT CLAIMS*

Under Texas law, the meaning of an insurance contract is to be determined under the standards applicable to contracts generally. *See Mid-Continent Cas. Co. v. Swift Energy Co.,* 206 F.3d 487, 491 (5th Cir. 2000); *Cicciarella v. Amica Mutual Insurance Co.,* 66 F.3d 764, 767-68 (5th Cir. 1995); *Barnett v. Aetna Life Insurance Co.,* 723 S.W.2d 663, 665 (Tex.1987). A court's primary concern is to give effect to the intention of the parties as expressed by the policy language. *Cicciarella,* 66 F.3d at 768; *Ideal Lease Service, Inc. v. Amoco Production Co.,* 662 S.W.2d 951, 953 (Tex.1983). "When the terms of an insurance policy are unambiguous, a court may not vary those terms." *Amica Mut. Ins. Co. v. Moak,* 55 F.3d 1093, 1095 (5th Cir. 1995); *see also Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965).

Guardian contends that Plaintiffs had a duty to read the insurance contract and are bound by all of its "clear and unambiguous" terms regardless of whether Plaintiffs received an adequate explanation of them. Second, Guardian argues that Plaintiffs' contract claims are barred by the Parol Evidence Rule. In this regard, Guardian further contends that the Policy contains a merger clause and the Illustrations and Friedman's alleged oral misrepresentations are extrinsic evidence that may not be considered when the Court examines the Policy. Third, Guardian asserts that the Statute of Frauds prevents Plaintiffs from including any of Friedman's oral statements to be part of the contract. Finally, Guardian relies on decisions in other jurisdictions addressing vanishing premium policies to support the foregoing arguments.

Plaintiffs respond with several arguments. First, Plaintiffs contend that the Policy and Illustrations must be read together because they both relate to same transaction and were executed at the same time. Next, Plaintiffs assert that the Illustrations represent a modification of the Policy that was ratified by Guardian when it accepted premium payments under the terms of the Illustrations and not the terms of the Policy. Third, Plaintiffs argue that the terms of the Policy are ambiguous and that extraneous evidence should be introduced to clarify the Policy's terms. Finally, Plaintiffs contend that the Policy should be reformed to include the Illustrations.

## A. *Plaintiffs' Duty to Read the Policy*

In Texas, an insured has a duty to read the insurance policy and is charged with knowledge of its provisions. *Ruiz v. Government Employees Ins. Co.,* 4 S.W.3d 838, 841 (Tex.App.-El Paso 1999, n.p.h.); *Pankow v. Colonial Life Ins.,* 932 S.W.2d 271, 277 (Tex.App.-Amarillo 1996, writ denied); *Amarco Petroleum, Inc. v. Texas Pacific Indemnity Co.,* 889 S.W.2d 695, 699 (Tex.App.-Houston [14th Dist.] 1994, writ denied). Accordingly, the Court deems Plaintiffs to have been on notice of all the terms of the Policy.[35] As discussed above, the Policy contains explicit language that the dividends depend on various factors and are not guaranteed, that an insurance agent such as Friedman lacks authority to make oral representations that altered the written terms of the Policy, that provisions outside the Policy, its

riders and the Application are not part of the parties' contract, and that the premium payments are

due under the Policy "For Life." The Policy also indicates that premium payments may be satisfied through dividends to the extent Guardian pays dividends. Under basic Texas law, therefore, Friedman's oral representations cannot as a matter of law override the written contract terms.

## B. *The Policy is Not Ambiguous*

The determination of whether a contract term is ambiguous is a question of law. *Cicciarella,* 66 F.3d at 768; *Yancey v. Floyd West & Co.,* 755 S.W.2d 914, 917 (Tex.App.-Fort Worth 1988, writ denied). A contract is ambiguous only "when its meaning is uncertain and doubtful or it is reasonably susceptible of more than one meaning." *Cicciarella,* 66 F.3d at 768 (quoting *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983)).

Determining whether ambiguity exists, the court must look at the contract as a whole in light of the circumstances existing at the time of execution. *Exxon Corp. v. West Tex. Gathering Co.,* 868 S.W.2d 299, 302 (Tex.1993). However, "the language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated." *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 529 (Tex.1987).

A contract is not ambiguous if its terms can be given a definite or certain legal meaning. *National Union Fire Ins. Co. v. CBI Industries,* 907 S.W.2d 517, 520 (Tex.1995). Conversely, if a contract is subject to more than one reasonable interpretation, courts must adopt the construction most favorable to the non-drafting party. *State Farm Fire and Casualty Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex.1998).

The Policy is not ambiguous because all of its terms have a definite legal meaning. First, the Policy states clearly that premiums are payable "For Life" unless and until dividend performance is sufficient to cover the premium payments.[36] Second, the Policy states unambiguously that its terms are limited to those contained in the Policy form and its riders, and the Application. Policy, at 11; Application, at 4. Third, the Policy is clear that Friedman, a mere insurance agent, did not have the authority to alter its terms. Policy, at 11; Application, at 4.

Plaintiffs contend that this Court may properly consider extrinsic evidence in determining whether the language of the Policy is ambiguous.[37] Plaintiffs rely on a decision of the Supreme Court of Texas to support their argument. *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981). *Sun Oil* does not support Plaintiffs'

Page 708

contention. Indeed, the Supreme Court of Texas in *Sun Oil* held that "parol evidence is not admissible to render a contract ambiguous, which on its face, is capable of being given a definite meaning." *Id.* at 732. The Court holds that the terms of the Policy are clear and unambiguous on their face. Accordingly, Plaintiffs may not rely on extrinsic parol evidence to alter the unambiguous terms of the parties' written agreement.

## C. *Plaintiffs' Extrinsic Evidence*

The parol evidence rule precludes consideration of extrinsic evidence to contradict, vary or add to the terms of an unambiguous written agreement absent fraud, accident or mistake. *In re H.E. Butt Grocery Co.,* 17 S.W.3d 360, 370 (Tex.App.-Houston [14th Dist.] 2000, no pet.). Parol evidence is not admissible for the purpose of creating an ambiguity. *Licata v. Licata,* 11 S.W.3d 269, 277 (Tex.App.-Houston [14th Dist.] 1999, no pet.). Only where a contract is first determined

to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument. *CBI Industries,* 907 S.W.2d at 520 (citing *Sun Oil Co. v. Madeley,* 626 S.W.2d 726, 732 (Tex.1981)); *Constitution State Ins. Co. v. Iso-Tex Inc.,* 61 F.3d 405, 408 (5th Cir. 1995). The Court, as noted above, concludes that the Policy (with its riders and the Application) is unambiguous. Accordingly, the Court will not consider Plaintiffs' proffered evidence, such as the Illustrations or Friedman's and Hunton's testimony, in interpreting the Policy terms.[38]

Under the Policy, Plaintiffs are to make premium payments "For Life" unless and until dividend performance is sufficient to cover the premium payments. Under the Policy, the payment of dividends has been left to the discretion of Guardian based upon its "mortality, expense, and investment experience." Policy, at 6. Dividend payments have not ever been guaranteed by the Policy. *See id.* at 1, 6.

Plaintiffs claim that Guardian breached the insurance contract when it required premium payments after the vanish date in the Illustrations.[39] However, as explained above, Plaintiffs have failed to demonstrate, or raise a genuine fact issue, that the Illustrations are part of the Policy or the parties' contract, that the Policy provision that premiums were due "for life" was not binding on Plaintiffs, or that Guardian guaranteed as part of its contract with Plaintiffs that premium payments would vanish. Accordingly, Plaintiffs have failed to state a claim for breach of contract. [40]

Page 709

## D. *Plaintiffs' Additional Contract Arguments*

Plaintiffs present several arguments in the alternative, in the event that the Court finds the Illustrations are not part of the Policy. These arguments are not persuasive.

## 1. Several Documents To Be Read Together

First, Plaintiffs argue that the Policy and Illustrations should be read together as one contract because they necessarily relate to the same transaction. Plaintiffs assert that the Illustrations were included in the same folder as the original Policy Guardian delivered to Plaintiffs, and that Friedman had used the Illustrations when selling and explaining the Policy. Plaintiffs rely on several Texas cases in support of their contention. *See Owen v. Hendricks,* 433 S.W.2d 164, 166 (Tex.1968); *Libby v. Noel,* 581 S.W.2d 761, 764 (Tex.Civ.App.-El Paso 1979, no writ); *Texas State Bank of Austin v. Sharp,* 506 S.W.2d 761, 763 (Tex.Civ.App.-Austin 1974, ref'd n.r.e.). Plaintiffs' reliance on these cases is unfounded.

In *Owen,* the Texas Supreme Court stated the general rule that an unsigned document may be incorporated by reference to a signed agreement if the signed agreement "plainly refers to another writing." *Owen,* 433 S.W.2d at 166. The Supreme Court of Texas expressly declined to extend this doctrine to a situation in which the two documents make no internal references to each other. *Id.* at 166-67. Instead, the Court held that "[t]he only permissible extension 'of the doctrine requiring an express reference in the signed paper is where the signed paper at the time of the signature can be shown *from its contents* to be based on an adoption of a then existing unsigned paper.' " *Id.* at 167 (emphasis added). In this case, the Illustrations were not signed. The Policy does not expressly incorporate or make any reference to the Illustrations.[41] Nor is there anything

in the Policy that shows the Policy is based on or adopts the Illustrations. To the contrary, the Policy's merger clause expressly states that the parties' contract included only the terms contained in the Policy and Application. Thus, *Owen* is inapplicable to this case.

Texas State Bank and Libby are similarly inapposite. In *Texas State Bank,* the issue was whether the payment of a promissory note was contingent upon the satisfaction of conditions precedent in a separately-executed sales agreement. The Austin Court of Appeals held in 1994 that the note and the agreement must be read together to determine whether the obligor of the note had a duty to perform: "[I]t is settled in Texas that where two or more instruments, executed contemporaneously or at different times, pertain to the same transaction, the instruments will be read together even though they do not expressly refer to each other." *Texas State Bank,* 506 S.W.2d at 763. In *Libby,* the El Paso Court of Appeals held in 1979 that a purchase

Page 710

agreement and promissory note--each executed by one or both parties--can be construed together for the purposes of an action for specific performance, if the two documents make reference to the subject matter of the transaction, were both executed, and one document describes the other in detail. *Libby,* 581 S.W.2d at 764. In the instant case, in contrast, the Illustrations were not executed by either party, the Policy does not refer to the Illustrations, and the Policy expressly limits the terms of the insurance contract to the Policy, its riders the and Application. Accordingly, these cases provide no support for the Court to read the Illustrations into the Policy.

## 2. Modifications of the Initial Contract

Plaintiffs alternatively contend that the parties modified the terms of the Policy to include the Illustrations because Plaintiffs allegedly made premium payments under the terms of the Illustrations and not the Policy. Plaintiffs made an initial payment of $129,830.00 to Guardian. Plaintiffs contend that this payment was made according to the Illustrations, not the Policy, which they suggest did not require such a large initial payment. Thus, Plaintiffs submit that the Illustrations were a modification of the Policy that Guardian ratified when it accepted the initial payment.

Guardian responds, correctly, that these premium payments were made in accordance with the Policy. Guardian draws the Court's attention to page three of the Policy, which lists the various initial payments due under the Policy. The sum of these payments is $129,830.00.[42] Plaintiffs do not present any evidence that Guardian's explanation of the sums listed in the Illustrations is incorrect. Accordingly, Plaintiffs have failed to raise an issue of fact that the written terms of the Policy were modified as Plaintiffs suggest after Plaintiffs initially entered the agreement.

## 3. Reformation of Contract Based on Mistake

Plaintiffs next argue that the Policy should be reformed. Plaintiffs assume that the Illustrations are not part of the Policy for the purposes of this argument. Instead, they argue that Plaintiffs incorrectly believed that the Illustrations were part of the Policy as a result of Guardian's misrepresentations. Furthermore, Plaintiffs allege that Guardian was aware of Plaintiffs' mistake. Plaintiffs argue that Texas law supports the reformation of a contract when one party makes a mistake and the other party acts inequitably by knowingly failing to reveal the error to the innocent party. Plaintiffs rely on *Hill v. Spencer & Son, Inc.,* 973 S.W.2d 772, 775 (Tex.App.-Texarkana

1998, no pet.), and *Hamberlin v. Longview Bank and Trust Co.,* 770 S.W.2d 12, 14 (Tex.App.-Texarkana 1989, writ denied).

*Hill* and *Hamberlin* do not assist Plaintiffs. In *Hill,* the Texarkana Court of Appeals, citing *Hamberlin* (an earlier decision by the same court), stated that "a mistake by one party must be coupled with

Page 711

fraud or inequitable conduct by the other party to support reformation." *Hill,* 973 S.W.2d at 775.[43] "Knowledge of the mistake by one party and his failure to reveal it to the other party amounts to such inequitable conduct as will justify reformation." *Id.*

However, the circumstances under which the *Hill* and *Hamberlin* courts granted reformation were materially different from the circumstances in the present case. First, this Court would have to find that Guardian initially agreed to the terms of the Illustrations as a contract.[44] Nothing in the Application reasonably suggests that Plaintiffs could reasonably assume that Guardian had *agreed* that the Illustrations, which contained projections extending forty-seven years into the future, were offered as a binding part of the proposed insurance contract. Second, the nature of the putative "mistake" made by Plaintiffs in this case fundamentally differs from the error made by the plaintiff in *Hlll.* In *Hill,* the plaintiff overlooked a typographical error as to the length of the contract. All parties agreed that the contract was to be for a different time period. *Hill,* 973 S.W.2d at 774. The jury found the defendant knew of the error in the document and intentionally failed to disclose the mistake to the plaintiff in order to gain an extended contract term. In contrast, in the case at bar, Plaintiffs claim they failed to notice several express terms, some of which appear on the first pages of the Policy. These provisions should have immediately alerted Plaintiffs that the terms of the insurance contract were materially different from their understanding,

Page 712

which was contrary to longstanding insurance industry practice. Plaintiffs argument flatly contradicts the factual record, since Hunton acknowledges he inquired about the "For Life" provision he saw in the Policy. Plaintiffs should have read their Policy more closely, especially after one or more significant deviations from Plaintiffs' understanding were discovered. This case is distinct from *Hill* also because there is no evidence that Guardian or Friedman acted in bad faith or willfully to deceive Plaintiffs. Thus, Plaintiffs' arguments for reformation fail as a matter of law.

## V. *PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT*

Plaintiffs seek leave to file a Third Amended Complaint. Plaintiffs move to assert additional theories on their contract claim against Guardian and to assert a claim for promissory estoppel. Guardian opposes the motion. This request is not timely. Moreover, Plaintiffs seek to assert claims that are futile.

Rule 15(a) provides that leave to amend pleadings "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Price v. Pinnacle Brands, Inc.,* 138 F.3d 602, 607-08 (5th Cir. 1998). However, leave to amend is by no means automatic, and the decision to grant or deny leave to amend "lies within the sound discretion of the district court." *Parish v. Frazier,* 195 F.3d 761 (5th Cir. 1999); *Wimm v. Jack Eckerd Corp.,* 3 F.3d 137, 139 (5th Cir. 1993); *Little v. Liquid Air Corp.,* 952 F.2d 841, 845-46 (5th Cir. 1992), *aff'd en banc,* 37 F.3d 1069, 1073 n. 8 (5th Cir. 1994). In

deciding whether to grant leave to file an amended pleading, the district court "may consider such factors as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm,* 3 F.3d at 139 (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)) (leave to amend denied because of bad faith and dilatory motive). However, if the district court lacks a "substantial reason" to deny leave, its discretion is not broad enough to permit denial. *Wimm,* 3 F.3d at 139.

Plaintiffs have unduly delayed in requesting this amendment. This motion was filed three months after the pleadings amendment deadline, months after Guardian's Motion to Dismiss was filed, and weeks after that motion was converted to a summary judgment motion.

The matters Plaintiffs seek to add were (or should have been) known to them years ago. In fact, Plaintiffs seek to add new legal theories they could have asserted at the outset of this case. This Court set June 29, 2001 as the deadline to amend pleadings. *See* Amended Docket Control Order signed September 28, 2001 [Doc. # 24]. The time for amending pleadings has long passed and Plaintiffs provide no probative reason for their delay.[45]

In any event, Plaintiffs' proposed claims are futile. The additional contract theories are claims for ambiguity, reformation, and modification of the Policy. The parties have extensively briefed these issues as part their submissions related to Defendant's Motion and the Court has ruled on each of them. Accordingly, Plaintiffs' motion for leave to amend their complaint to include the new contract theories of ambiguity, reformation, and modification of the Policy is denied.

Page 713

Plaintiffs' assertion of a promissory estoppel claim is similarly futile.[46] Promissory estoppel is a "cause of action available to a promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise." *Ford v. City State Bank of Palacios,* 44 S.W.3d 121, 140 (Tex.App.-Corpus Christi 2001). In Texas, the doctrine of promissory estoppel has four elements: (i) a promise; (ii) foreseeability of reliance thereon by the promisor; (iii) substantial reliance by the promisee to his detriment; and (iv) a definite finding that injustice can be avoided only by the enforcement of the promise. *Zenor v. El Paso Healthcare System, Ltd.,* 176 F.3d 847, 864 (5th Cir. 1999); *Clardy Mfg. Co. v. Marine Midland Bus. Loans, Inc.* 88 F.3d 347, 360 (5th Cir. 1996); *City of Beaumont v. Excavators & Constructors, Inc.* 870 S.W.2d 123, 136-37 (Tex.App.-Beaumont 1993, writ denied). Construing the record in the light most favorable to Plaintiffs, the Court assumes for the purpose of the pending motions that the first three elements of promissory estoppel are satisfied. First, the Court identifies the relevant promises as Friedman's alleged statement that Plaintiffs would have to pay only the premiums listed in the Illustrations and that the Illustrations were part of the contract for insurance. Second, the Court assumes that Friedman could foresee that Plaintiffs would rely on his representations because he knew that Plaintiffs' primary concern was to obtain life insurance that would require fixed premium payments for a limited number of years.[47] Finally, based upon Hunton's affidavits, the Court assumes that Plaintiffs substantially relied upon Friedman's representations when deciding to purchase the Policy.

Nevertheless, the record does not support a finding that injustice could be avoided only by enforcing the promise.

To satisfy the fourth element of promissory estoppel, a promisee must show " *reasonable* or *justified* reliance on the conduct or statement of the [promisor]." *Allied Vista, Inc. v. Holt,* 987 S.W.2d 138, 142 (Tex.App.-Houston [14th Dist.] 1999, pet. denied); *Traco, Inc. v. Arrow Glass Co.,* 814 S.W.2d 186, 190-91 (Tex.App.-San Antonio 1991, writ denied). "[T]he doctrine of estoppel is intended to promote justice, and, therefore, the reliance of the party asserting it must have been in good faith." *Traco, Inc.,* 814 S.W.2d at 191 (internal quotations omitted). Plaintiffs have adduced no evidence to show that their reliance on Friedman's statements was reasonable. The Fifth Circuit examines the context of the promise to determine the reasonableness of reliance. [48] In this case, the express terms of the Policy and Application establish that the terms of the insurance contract are exclusively limited to those printed in those documents.[49] The Policy and Application further state that their terms may not be changed orally by Friedman. Finally, there is nothing about the Illustrations *per se* that should have induced Plaintiffs to reasonably believe that it was a guaranteed premium payment plan.[50]

The Court also concludes that application of the doctrine of promissory estoppel to this case would be inconsistent with the doctrine's underlying policy concerns. Texas courts have held consistently that the promissory estoppel doctrine is "defensive in nature and operates to prevent the loss of an existing right. It does not operate to create liability where it does not otherwise exist." *Excavators & Constructors, Inc.,* 870 S.W.2d at 137; *see also Robbins v. Payne,* 55 S.W.3d 740, at 747 (Tex.App.-Amarillo 2001). Offensive use of the doctrine--as an affirmative cause of action--is disfavored by Texas courts. *Excavators & Constructors,* 870 S.W.2d at 137. Typically, the doctrine may be used offensively "[w]here the promisee has failed to bind the promisor to a legally sufficient contract, but where the promisee has acted in reliance upon a promise to his detriment." *Wheeler v. White,* 398 S.W.2d 93, 97 (Tex.1965).[51]

In this case, in contrast, there is a valid contract for life insurance that unambiguously states that Plaintiffs are responsible for premium payments "For Life." Essentially, Plaintiffs' assertion of promissory estoppel is an attempt to use parol evidence to modify the terms of an unambiguous contract.[52] This Court concludes that

Plaintiffs' theory of promissory estoppel undermines longstanding policies to enforce insurance contracts as they are written. Thus, Plaintiffs' attempt to amend their Complaint to include a promissory estoppel claim is futile, and Plaintiffs' motion for leave to amend is rejected.

## VI. *CONCLUSION*

Prior to the initiation of this suit, the statute of limitations expired on all claims asserted by Plaintiffs in their Second Amended Complaint. Furthermore, Plaintiffs' contract claims fail as a matter of law. Because the Court grants Defendant's Motion, it does not reach Defendant's other arguments in support of its request for summary judgment. The Court also denies Plaintiffs' Motion for Leave to Amend their Complaint as untimely and futile. Accordingly, it is therefore

**ORDERED** that Defendant the Guardian Life Insurance Company of America's Motion to Dismiss Plaintiffs' Second Amended Complaint [Doc. # 14] is **GRANTED.** It is further

**ORDERED** that Plaintiffs' Motion for Leave to Amend Their Complaint [Doc. # 33] is **DENIED.**

---------

Notes:

[1] *See* Plaintiffs' Response to Defendant's Motion to Dismiss [Doc. # 18] ("Response"); Defendant the Guardian Life Insurance Company of American's Reply Memorandum to Plaintiffs' Response to Guardian's Motion to Dismiss [Doc # 20] ("Reply").

[2] *See* Defendant the Guardian Life Insurance Company of America's Supplemental Submission Pursuant to this Court's Order Dated September 19, 2001 [Doc. # 25] ("Defendant's Supplement"); Affidavit of Karen C. Ciotti in Support of Guardian's Supplemental Submission [Doc. # 26] ("Ciotti Aff."); Plaintiffs' Surreply in Support of their Response to Guardian's Motion to Dismiss [Doc. # 27]; Defendant the Guardian Life Insurance Company of America's Reply Memorandum in Further Support of its Motion for Summary Judgment [Doc. # 30]; Plaintiff's Response to Guardian's Motion for Summary Judgment and Supplemental Submission [Doc. # 31] ("Plaintiffs' Supplement").

[3] The Court requested each party to submit an "exemplar" of the life insurance policy at issue in the case. The Court also allowed parties to submit short rebuttals to points raised during oral argument. Plaintiffs submitted the original policy issued to them. Plaintiffs did not file this submission with the Court Clerk, but later filed an affidavit of Richard O. Hunton that attests to the policy's authenticity. Affidavit of Richard O. Hunton, October 18, 2001, at 1 (Exhibit A to Plaintiffs' Supplemental Response to Guardian's Motion for Summary Judgment Following October 12th Hearing [Doc. # 37]) ("Oct. 18, 2001 Hunton Aff."). Defendants submitted an exemplar of the insurance policy. *See* Defendants' Letter in Response to the Court's Request for Certain Information [Doc. # 36]. Plaintiffs also submitted additional materials to the Court. *See* Plaintiffs' Supplemental Response to Guardian's Motion for Summary Judgment Following October 12th Hearing [Doc. # 37] ("Plaintiffs' Supplemental Response"). Defendant objects to this last submission by Plaintiffs, and requests an opportunity to respond. *See* Letter from Karea C. Ciotti to Judge Nancy F. Atlas, October 22, 2001 [No Doc. #]. Because the Court grants Defendant's Motion and because of the already voluminous record, the Court denies Defendant's request to respond.

[4] The Trustee was to be the owner and beneficiary of the Policy.

[5] The Plaintiffs submitted the original Policy (Policy No. 3277486) pursuant to a request made by the Court during the October 12, 2001 oral argument. Plaintiffs did not file this Policy with the Court Clerk. However, Hunton affirms that the document submitted "is the original policy provided to me by Guardian and Friedman." Oct. 18, 2001 Hunton Aff., at 1. Hunton further states: "Admittedly, the Policy has been taken apart on numerous occasions so that copies could be made of the document. Nonetheless, I believe that I have maintained the Policy in the same manner as it was presented to me by Guardian in 1992." *Id.* at 1-2.

[6] In the section entitled "Dividends" under the sub-heading "Paid-up Option," the Policy states: The policy's cash value, including the cash value of any dividend addition and dividends left at interest, may be used to make the policy paid-up. Guardian will so apply the cash value if it equals the net single premium at the attained age for a paid-up policy in the same face amount as this policy. This option may be exercised by written request. Any policy loans will remain outstanding.

Policy, at 6.

[7] The Application is expressly incorporated within the Policy. Application, at 4 ("[T]his Application ... shall form a part of any Policy issued."); Policy, at 11 ("The entire contract consists of this policy and the attached application.").

[8] The schedule pages are marked at the top "page 1 of 6" and "page 2 of 6," and have been inserted at the end of the Policy. The "premium schedule" is titled "Guardian/GIAC Lifeplan Illustrations" ("Illustrations").

[9] Friedman's testimony also contradicted this contention. Friedman testified that he informed Hunton during the negotiations regarding the Policy that the Illustrations were not guaranteed and were not part of the Policy, and that a decrease in dividend payments could extend the years that the Trust would have to pay premiums. Friedman Dep., at 68-71. Nevertheless, Friedman acknowledges that he did not tell Hunton that a decrease in dividend payments could require that the Trust pay premiums for life. Friedman Dep., at 71-72. Friedman also testified that he assured Hunton that the premium payments would vanish because of Guardian's dividend stabilization fund. *Id.*

[10] Hunton alleges that he relied on the advice of an accountant, Lawrence C. Bower, when deciding to purchase the Policy. Oct. 8, 2001 Hunton Aff., at 1-2. Hunton also alleges that he relied on the advice of Friedman, the Guardian agent who sold the Policy to Hunton. *Id.*

[11] Ciotti, a lawyer for Guardian, affirms that Friedman produced these Statements to Guardian in the course of this litigation. Ciotti Aff., at 2. The Statements have been Bates numbered by counsel as "Friedman 000016-000020," and will be referred to in this Memorandum and Order as "Statements, at 16-20." It is clear that Friedman received the Statements, which are marked "Agency Copy." Statements, at 16, 19, 20. For example, the language in the Statements addresses the owner of the Policy: "The Annual Benefit Statement gives *you* an important summary of *your* policy's current cash value and total death benefit protection." *Id.* at 16 (emphasis added).

The Statements contained information which, if properly reviewed and compared to the information contained in the Illustrations, would have informed Plaintiffs that the Policy was not performing as well as projected in the Illustrations. For example, in February 1996, at the end of the fourth year under the Policy, the net cash value of the Policy as reported by the Statements was $183,438.33 while the net cash value projected by the Illustrations was $191,441. Statements, at 19; Illustrations, at 1 of 6. Also in 1996, the current dividends paid to the Policy were reported to be $6,830.30 in the Statements but were projected to be $8,907 in the Illustrations. Statements, at 19; Illustrations, at 1 of 6.

Plaintiffs do not expressly dispute receiving the Statements. Instead, Hunton contends that "Guardian did not provide or otherwise offer any information which would lead [Plaintiffs] to believe that the Trust would owe any premiums other than those agreed to in the Premium Payment Schedule." Oct. 8, 2001 Hunton Aff., at 3.

Guardian also contends that Friedman informed Plaintiffs on several occasions during 1994-1996 that the Policy was not performing according to the Illustrations. Friedman Dep., at 75-78, 103-110, 129-130. Furthermore, Friedman testified that he provided Hunton with updated illustrations

that indicated that additional premiums would have to be paid beyond the originally projected vanish date. *Id.* The Court does not rely in its analysis on these contested matters.

[12] Guardian claimed that Friedman had been fraudulently joined as a defendant to defeat diversity jurisdiction. Plaintiffs allege that they are both Texas citizens. Friedman is also a Texas citizen. Guardian is a New York corporation, with New York City as its principal place of business.

[13] Plaintiffs have moved for leave to amend their complaint to add additional contract claims and a separate claim for promissory estoppel. These claims are discussed in the section of this Memorandum and Order, at pages 42-48

[14] Under Texas law, the statute of limitations for breach of contract claims is four years. TEX. CIV. PRAC. & REM. CODE E § 16.004(a)(3) (Vernon Supp.2001); *Morriss v. Enron Oil & Gas* Co., 948 S.W.2d 858, 869 (Tex.App.-San Antonio 1997, no writ). The statute of limitations for fraud is also four years. TEX. CIV. PRAC. & REM. CODE § 16.004(a)(4) (Vernon Supp.2001); *Williams v. Khalaf,* 802 S.W.2d 651, 656-57 (Tex.1990); *see Martinez Tapia v. Chase Manhattan Bank, N.A.,* 149 F.3d 404, 410-11 (5th Cir. 1998). Plaintiffs' other claims all have two year limitations periods. *See* T EX. BUS. & COM. CODE § 17.565 (Vernon 1987) (two year period for DTPA claims); T EX. INS. CODE art. 21.21, § 16(d) (Vernon Supp.2001) (two year period for Insurance Code claims); *Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1369 (5th Cir. 1994) (two year period for negligent misrepresentation).

[15] Plaintiffs' positions vary in their submissions to the Court. At some points, Plaintiffs argue that premium payments were tied to dividends and that dividends were guaranteed as indicated by the Illustrations because of Guardian's "dividend stabilization fund." Oct. 18, 2001 Hunton Aff., at 2 ("Guardian explained that the Premium Schedule [in the Illustrations] would be met because Guardian enjoyed the benefits of the Dividend Stabilization Fund, which would compensate for or supplement any potential fluctuations in dividends, and in that way, the Dividend Stabilization Fund ensured that the Premium Schedule would be met."). At other points, Plaintiffs argue simply that premium payments made according to the Illustrations were sufficient to pay for the insurance for the remainder of Hunton's life. *Id.* ("Guardian [represented] that the [Illustrations] included in the policy wallet controlled and governed the payment of premiums."). The distinction between these arguments are not material because, as discussed below, both versions of Plaintiffs' arguments are flatly contradicted by the documents relating to the Policy that Plaintiffs completed and received. For instance, as to Plaintiffs' first version, Plaintiffs indicated on the Application that they intended for dividends to be used to purchase "One year term insurance not to exceed Target Face Amount of $ 905,450." Application, at 2. Plaintiffs *did not* choose to apply the dividend payments to premiums, which was another option on the Application form. *Id.* (the option stated: "Vanish Premium-available only if a PUA rider is requested. Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends."). All subsequent Annual Statements submitted to the Court reveal that dividends were being applied to the purchase of one year term insurance, not toward premium payments on the underlying $1 million Policy. Statements, at 18-20 ("Your dividend option is: one year term insurance with target face amount.").

[16] There is some confusion among courts as to whether the discovery rule and the fraudulent

concealment doctrine (i) toll the limitation period after the claim has accrued or (ii) delay the accrual of the claim. *Compare S.V. v. R.V.,* 933 S.W.2d 1, 6 (Tex.1996), *and Computer Assoc. v. Altai,* 918 S.W.2d 453, 455-56 (cause of action for fraud does not accrue until the fraud is discovered or should have been discovered by plaintiff), *with Velsicol Chem. Corp. v. Winograd,* 956 S.W.2d 529, 531 (Tex.1997) ("As with the discovery rule, [the fraudulent concealment] doctrine tolls the statute until the fraud is discovered or could have been discovered with reasonable diligence."), *and Prieto v. John Hancock Mutual Life Ins. Co.,* 132 F.Supp.2d 506, 513 (N.D.Tex.2001) (treating the fraudulent concealment doctrine and the discovery rule as tolling doctrines in vanishing premium life insurance policy case). One court has noted this confusion and suggests that, as a practical matter, the distinction does not alter the burden on plaintiff to meet the requirements of the doctrine; and may not alter the outcome. *Porter v. Charter Medical Corporation,* 957 F.Supp. 1427, 1434 n. 4 (N.D.Tex.1997).

[17] Texas courts generally require that plaintiff must produce "direct, physical evidence" to support the "facts upon which liability [is] asserted." *S.V. v. R.V.,* 933 S.W.2d at 7. An often-cited example of an injury that is "objectively verifiable" is, in the context of a medical malpractice suit, a sponge accidentally left in a patient's body. *Id.; Computer Assoc.,* 918 S.W.2d at 457-58. One court has interpreted the "objective verifiability" prong as requiring a higher evidentiary standard that the ordinary preponderance of the evidence standard. *Prieto,* 132 F.Supp.2d at 514.

[18] Neither Plaintiffs nor Guardian explicitly mentions fraudulent concealment, but nearly all the cases that address the discovery rule also discuss the fraudulent concealment doctrine. Plaintiffs cannot meet the requirements of either doctrine as explained below in the text of this decision.

[19] Plaintiffs also contend that the discovery rule applies to toll the statute of limitations because they did not learn that the Policy was not performing as projected in the Illustrations until they inquired in December 1997. Plaintiffs deny that Guardian provided them with any information before 1997 that should be deemed sufficient to have alerted them that they might have to pay premiums beyond the vanish date in the Illustrations. Examining the record in the light most favorable to Plaintiffs and disregarding any controverted evidence produced by Guardian, the Court concludes that Plaintiffs have failed to meet their burden under the discovery rule. Plaintiffs have not produced evidence that the misrepresentation was "inherently undiscoverable" or that Plaintiffs exercised "reasonable diligence." First, the language of the Policy and the Illustrations themselves placed Plaintiffs on notice that the premium payment schedule in the Illustrations was not guaranteed. Second, Plaintiffs were free at any time to contact Guardian directly regarding the status of the Policy before 1997. Last, and most importantly, Guardian has submitted copies of the Statements produced in discovery by Hunton that reveal Plaintiff Pace was sent annual status reports on the dividends being earned by the Policy and that showed Guardian's dividends were below the projections in the Illustrations. Plaintiffs cannot rely on the Illustrations as creating a binding payment schedule but then ignore the rest of the data on the *same* page that lists the dividend projections. Once the actual dividends as listed in annual status reports deviated from the projected dividends in the Illustrations, and the net value of the Policy dropped below projections on the same spreadsheet, Guardian's alleged misrepresentations should have been apparent to Plaintiffs.

[20] The Application states "that no information acquired by any Representative of [Guardian] shall bind [Guardian] unless it shall have been set out in writing in this Application." Application, at 4. The Application further provides that "only the President, a Vice President, or a Secretary of [Guardian] has the authority to bind [Guardian] by any promise or statement or to waive or modify any of [Guardian's] requirements." *Id.* The Policy itself contains a similar provision:

Only the President, a Vice President, or the Secretary of Guardian may make or modify this policy. No agent has the authority to change this policy or to waive any of Guardian's requirements; no agent may waive an answer to any question in the application. *Guardian will not be bound by any promise or statement made by any agent or other person except as stated above.*

Policy, at 8. Plaintiffs make no contention that Friedman was an officer of Guardian.

[21] Plaintiffs contend that "nothing in the Policy ties dividend performance to the premiums due under the Policy." Plaintiffs' Supplemental Response, at 2. Plaintiffs summarize the relevant issue as whether Guardian guaranteed that the premiums would be paid according to the Illustrations, regardless of dividend performance. *Id.* Plaintiffs' contention fails. Plaintiffs' unsupported conclusory allegations fly in the face of the written record. These types of self-serving and conclusory allegations are insufficient to raise a genuine question of fact in response to a summary judgment motion. The Policy terms clearly tie dividend performance to premium payments. The Policy states:

The policy's cash value, including the cash value of any dividend additions and dividends left at interest, may be used to make the policy paid-up. Guardian will so apply the cash value if it equals the net single premium at the attained age for a paid-up policy in the same face amount as the policy.

Policy, at 6. The Policy also states that premiums are due "For Life." The cover sheet to the policy contains the statements "[p]remiums payable during insured's lifetime" and "annual dividends payable *if earned.* " Policy, at 1 (emphasis added). On page 3 of the Policy, under the heading "policy years payable," the words "For Life" are printed. The Application provides under "Section E: Dividends," the option for Hunton to have "Premiums to be vanished at the end of the first policy year by use of PUA rider additions and future dividends." Application, at 2. The Court notes that Hunton did not select this option on the Application. *Id.* Finally, the Policy and Application state that Friedman did not have the authority to modify any of these terms. Thus, it is clear from the terms of the Policy that Plaintiffs remain responsible for premium payments for life unless and until there is adequate dividend performance.

[22] The Policy states that the "entire contract consists of this policy and the attached application." Policy, at 8. The Application makes reference to "illustrations of benefits, including death benefits and cash values." Application, at 3. However, the Application expressly limits the contract to the terms "set out in writing in this Application," the Policy itself, and any required supplement to the Application. *Id.* at 4. Neither party alleges that the Illustrations are a required "supplement" to the Application. It is noted that attached to the Application is a one-page sheet titled "Amendment to Application," which contains "statements substituted for the answers to the corresponding questions in the application," but makes no reference to the Illustrations or to a guaranteed vanish date for premium payments. Furthermore, unlike the Illustrations, the amendment is stamped "File

in Application." Thus, Plaintiffs have not presented admissible evidence to create a genuine fact issue that the Illustrations are part of the Policy or the Application, and thereby became part of the parties' contract.

[23] Plaintiffs' payment history is not totally consistent with this representation. *See infra* note 31.

[24] Plaintiffs also assert that they relied on Friedman's representations regarding the "Dividend Stabilization Fund" when purchasing the Policy. Plaintiffs claim that Friedman informed Hunton that Guardian would use the "Dividend Stabilization Fund" to ensure that Hunton would not have to pay premiums beyond the vanish date in the Illustrations. Oct. 18, 2001 Hunton Aff., at 2. Plaintiffs' reliance is unreasonable and is contrary to the terms of Policy and Application. Neither the Policy nor Application mentions the "Dividend Stabilization Fund." Accordingly, Plaintiffs could not reasonably consider Friedman's representations regarding the "Dividend Stabilization Fund" to be part of the insurance contract. The absence from the documents of the guarantee that Plaintiffs impute to Friedman renders fraud easily discoverable. Moreover, Plaintiffs lacked diligence in failing to obtain written explanation of this fund from Guardian if they were relying so heavily on it to benefit them.

[25] The second requirement of the discovery rule, that the injury must be "objectively verifiable," also is not satisfied on this record. Plaintiffs have not alleged in their Complaint or produced any evidence that they have "physical or other evidence, such as an objective eyewitness account, to corroborate the existence of the claim." *Coastal Plains,* 179 F.3d at 215. As United States District Judge Lindsay concluded, in a case involving a similar vanishing premium policy, documentary evidence such as the Policy and the Illustrations, coupled with the plaintiff's self-serving allegations are insufficient to meet the "objectively verifiable" requirement. *Prieto,* 132 F.Supp.2d at 514-15.

[26] Plaintiffs cite *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990); *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 515 (Tex.1998).

[27] Plaintiffs also contend that the cause of action for their claims did not accrue because they did not suffer a "legal injury" until they began paying premiums beyond the vanish date. In support of their argument Plaintiffs rely on a New York State Court of Appeals case involving a similar action against Guardian over a vanishing premium policy. The New York State Court of Appeals held that the plaintiff's injuries "occurred when they were first called upon to pay additional premiums beyond the date by which they were led to believe that policy dividends would be sufficient to cover all premium costs." *Gaidon v. Guardian Life Ins. Co.,* 96 N.Y.2d 201, 727 N.Y.S.2d 30, 750 N.E.2d 1078, 1083 (N.Y.2001). This decision is authoritative only to the extent that this Court finds it to be persuasive. The Court notes that the New York Court did not apply Texas law to reach its result. The decision in *Gaidon* also is contrary to established precedent of the Fifth Circuit. In *Martinez Tapia v. Chase Manhattan Bank,* 149 F.3d 404, 409 (5th Cir. 1998), the Fifth Circuit addressed the accrual of a cause of action for misrepresentations related to the purchase of a financial instrument. The Court of Appeals held that if the financial instrument contains terms that are clearly contrary to the alleged misrepresentation, the cause of action accrues at the time the instrument is purchased. *Id.* That court reasoned further that "an investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the

nature of his investment and the associated risks." *Id.; see also Prieto,* 132 F.Supp.2d at 514.

The Court also is unpersuaded by Plaintiffs' characterization of their legal injury. Plaintiffs, under their own theory, suffered a legal injury when they purchased a policy they otherwise would not have purchased but for Guardian's misrepresentations.

[28] Traditionally, Texas courts have applied the discovery rule to negligence actions only in extremely rare and unusual circumstances. *E.g., Gaddis v. Smith,* 417 S.W.2d 577, 580-81 (Tex.1967) (applying discovery rule in medical malpractice claim in which surgeon left a foreign object in patient's body). The Fifth Circuit held, based on the weight of Texas authority at the time the issue was presented in 1994, that the discovery rule does not apply to cases of negligent misrepresentation. *Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp.,* 20 F.3d 1362, 1372-73 (5th Cir. 1994).

[29] The Court is aware of recent Texas intermediate appellate court decisions that apply the discovery rule to negligent misrepresentation actions. *Matthiessen v. Schaefer,* 27 S.W.3d 25, 31 (Tex.App.-San Antonio 2000, pet. denied); *Hendricks v. Thornton,* 973 S.W.2d 348, 365 (Tex.App.-Beamont 1998, pet. denied).

[30] Moreover, these alleged violations were not inherently undiscoverable.

[31] The February 1996 Statement listed the dividend paid as $6,830.30 while the Illustrations projected the dividends to be $8,907. Statements, at 19; Illustrations, at 1 of 6. Also, the net cash value on the 1996 Statement was $183,438.33, not $191,441, as projected in the Illustrations. *Id.* The Court must accept as true Hunton's averment that he did not receive any "annual benefit statements." However, it is noted that Plaintiffs have not submitted any affidavit or evidence from Benny Pace, the owner and addressee for the insured listed on the 1993, 1996 and 1997 Statements in the record. Moreover, Plaintiffs paid monthly the exact amount reflected on Guardian's Annual Statements ($2,809.31), although that figure does not appear on the Illustrations or the Policy. Plaintiffs' payments indicate that one or more of the Plaintiffs may have seen the Statements, if not documents similar to them.

[32] *See supra* note 31.

[33] The Fifth Circuit has regularly held that a "summary assertion made in an affidavit is simply not enough evidence to raise a genuine issue of material fact." *Melton v. Teachers Ins. & Annuity Assoc. of America,* 114 F.3d 557, 559 (5th Cir. 1997); *see also Hibernia Nat'l Bank v. Carner,* 997 F.2d 94, 98 (5th Cir. 1993) ("[A]ffidavits setting forth ultimate or conclusory facts are insufficient to either support or defeat a motion for summary judgment") (internal quotations omitted); *Lechuga v. Southern Pacific Transp. Co.,* 949 F.2d 790, 798 (5th Cir. 1992) ("Conclusory statements in an affidavit do not provide facts that will counter summary judgment evidence, and testimony based on conjecture alone is insufficient to raise an issue to defeat summary judgment.").

[34] Indeed, by Plaintiffs' own admission, they did not inquire as to the status of the Policy until 1997, five years after it was issued.

[35] If Plaintiffs did not understand the mechanics of the Policy and Plaintiffs' premium obligations, Plaintiffs should have obtained further information in writing.

[36] The Policy contains language that indicates that dividends, if sufficient, may be used to pay future premiums. Policy, at 6. However, nothing in the Policy guarantees that dividends will be

paid at all or in sufficient sums to cover the premiums. *Id.* To the contrary, the Policy states in several places that dividends are "payable if earned" and that dividends will "reflect Guardian's mortality, expense, and investment experience." *Id.* at 1, 6. *See also id.* at 4 AQ ("The values shown are computed on the assumption that all premiums to the end of the policy years shown have been paid, that there are no loans, and that dividends are sufficient to cover the cost of one year term insurance.")

[37] Plaintiffs offer Friedman's oral representations and the Illustrations as evidence that the Policy's terms are ambiguous. Oct. 8, 2001 Hunton Aff., at 2-3. Plaintiffs contend that Friedman reviewed the Policy with Hunton upon its delivery to Hunton. *Id.* During this conversation, Friedman told Hunton that the premiums would not be due "For Life" as stated in the Policy, but would be due under the terms of the Illustrations. *Id.*

[38] As discussed in note 24 *supra,* the representations made by Friedman regarding the "Dividend Stabilization Fund" are not part of the insurance contract. Nowhere does the Policy or the Application mention the "Dividend Stabilization Fund." Thus, the Court will not consider this evidence when analyzing Plaintiffs' breach of contract claims.

[39] In 1998, Guardian reported to Plaintiffs that the Policy has not performed as well as had been projected and that Plaintiffs would be required to make dividend payments for the remainder of Hunton's life.

[40] Plaintiffs have introduced Guardian's Annual Report for 2000 and an Internet printout of the S & P 500 and Dow Jones Industrial Averages from February 1992 to June 1999. *See* Exhibits C and D to Plaintiffs' Supplemental Response. Based on these materials, Plaintiffs suggest that Guardian has had a positive investment experience and thus should have paid dividends on the Policy. This contention fails. The decision of a corporation to declare dividends is complex, based on many factors, and subject to business judgment the courts generally do not second-guess. In any event, the Dow Jones and S & P 500 indices are not probative of a single company's (Guardian's) financial performance. Plaintiffs have submitted nothing to create a triable issue of fact that Guardian acted in bad faith in determining that its dividends would be insufficient to make the Plaintiffs premium payments vanish.

[41] The Application, which is part of the Policy, states: "Upon request we will furnish illustrations of benefits, including death benefits and cash values, for (a) the Variable Life Insurance Policy applied for, and (b) a fixed benefit life insurance policy for the same premium." Application, at 3. However, the Application also states that "[i]t is understood that under the Variable Life Insurance Policy the amount of ... the cash value may increase or decrease based on the investment experience of the separate account and are not guaranteed." *Id.* These statements do not expressly incorporate the Illustrations into the Policy. Moreover, if anything, this offer by Guardian emphasizes that the company's investment experience may vary from any illustrations it may issue, and dividends cannot be guaranteed.

[42] Under the terms of the Policy, Plaintiffs (through Hunton's Trust) were required to pay a total of $129,830 in the first year of the Policy, consisting of a premium payment of $26,730.00 for the Basic Policy and a premium payment of $6,000.00 for a "Paid-Up Insurance Rider for a One-Year Term." Policy, at 3. Under the column titled "Policy Years Payable" next to each of these items is

the statement "For Life." *Id.* Plaintiffs also bought a "Single Purchase Paid-Up Additions Rider" which required a single payment of $97,100.00. *Id.* Thus, under the terms of the Policy, Plaintiffs obligated the Trust to pay annually $32,730.00 (the sum of $26,730.00 and $6,000.00) for life, after the initial additional payment of $97,100.00. *Id.*

[43] The parties in *Hill* agreed to a logging contract for eighteen months. *Hill,* 973 S.W.2d at 774-75. When the final logging deed was drafted by the defendant, however, the year that logging was to end was changed from 1995 to 1996, which extended the term of the contract to thirty months. *Id.* The plaintiff in *Hill* read and signed this deed without noticing the mistake. *Id.* When the mistake was discovered, the plaintiff brought suit to have the contract reformed. *Id.* A jury returned a verdict for the plaintiff, which was overturned by the trial court. *Id.* The Court of Appeals reversed the trial court's directed verdict and granted judgment in favor of the plaintiff. *Id.* at 776. The Court of Appeals reasoned that the defendant had originally agreed to the eighteen-month contract and knew of the error in the deed that it had drafted. *Id.* at 775. The Court of Appeals further found that the defendant did not reveal this error to the plaintiff, and that this conduct was inequitable. *Id.* The Texarkana Court in *Hamberlin* came to a similar result. In *Hamberlin,* a purchaser and a bank agreed on the sale of land that the bank had acquired after a foreclosure. The bank drafted a deed that accidentally included additional tracts of land. The purchaser was aware of this mistake but concealed it from the bank's officers. The bank learned of the mistake and requested that a court reform the deed to reflect the parties agreement. The trial court did reform the agreement to delete the additional tracts of land, and the Court of Appeals affirmed this decision. The Court of Appeals found that the purchaser's acceptance of erroneous deed was willful and in bad faith and that it would be inequitable to allow the purchaser to keep the additional tracts of land.

[44] Plaintiffs allege that Friedman used copies of the Illustrations in his promotion of the Policy to Plaintiffs. However, as detailed in earlier sections of this Memorandum, the Application that Plaintiffs signed for the Policy clearly stated that Friedman did not have the authority to alter any terms of the Policy or Application. Application, at 3. Furthermore, the Application stated that the terms of the Policy were limited to those contained in the Application and the Policy form. *Id.* at 4. Finally, the Application stated that "illustrations" were available at Plaintiffs' request but that cash values for Plaintiffs' policy were not guaranteed. *Id.* at 3.
Furthermore, nothing in the Policy suggests that the Illustrations should be construed as part of the Policy *per se* or the parties' agreement. Nowhere does the Policy make reference to the Illustrations. To the contrary, the Policy explicitly states that premiums would be due "For Life." Policy, at 3.

[45] Further, Plaintiffs' requested amendment evidences a "repeated failure to cure deficiencies by amendments previously allowed." This is Plaintiffs' *fourth* attempt to plead viable claims.

[46] It is likely that Plaintiffs' claim for promissory estoppel is barred by the statute of limitations. In Texas, the statute of limitations for promissory estoppel claims is four years. TEX. CIV. PRAC. & REM. CODE § 16.051 (1997); *St. Julian v. Trustees of the Agreement of Trust for Maritime Assoc.-I.L.A. Pension,* 5 F.Supp.2d 469, 473 (S.D.Tex.1998). This Court is not aware of any published Texas state court decision or federal court decision applying Texas law that explains when a cause of action for promissory estoppel accrues. Under the general Texas "legal injury"

rule, however, the latest a cause of action for promissory estoppel could accrue is when the promisor breaches his promise. Plaintiffs assert that Guardian promised that the Illustrations were part of the insurance contract and that all premiums would be paid according to the policy. *See* Plaintiffs' [proposed] Third Amended Complaint, at 10 (attached to Plaintiffs' Motion [Doc. # 33]). Plaintiffs further contend that Guardian breached this promise when it required Plaintiffs to pay premiums after the vanish date in the Illustrations. Plaintiffs take the premium payment schedule out of the context of the sheet on which it is presented. If the Illustrations are deemed part of the insurance contract, Guardian's failure to perform according to *any* of the terms in the Illustrations would breach the promise. Thus, Guardian would have breached the promise when it failed to make dividend payments as specified in the Illustrations or when the Policy's net cash value fell below the net cash value projected in the Illustrations. As discussed above, these events occurred more than four years before Plaintiffs brought the present lawsuit. As also discussed above, Plaintiffs have failed to raise a triable issue of fact that the discovery rule should apply to toll the statute of limitations in this case. Accordingly, the Court notes that it is likely that Plaintiffs' proposed promissory estoppel claim is barred by the statute of limitations.

[47] It is unclear whether, as a matter of law, Guardian could be said to have foreseen Plaintiffs' reliance on the representations of its agent Friedman. However, the Court assumes so for the purposes of the pending motions, based upon Hunton's conclusory assertion in his affidavit that Guardian directed Friedman to make the alleged misrepresentations. Oct. 8, 2001 Hunton Aff., at 2.

[48] *See, e.g., Zenor,* 176 F.3d at 864-65 (examining the circumstances of "atwill" employment to determine whether plaintiff reasonably relied on employer's promise of continued employment, and holding that the plaintiff's reliance was not reasonable).

[49] As the Court has noted above, the Policy terms clearly indicated that the Illustrations were not part of the Policy, that dividend payments were not guaranteed, and that premium payments were required for the life of the insured.

[50] Everything about the Illustrations should have alerted Plaintiffs to the fact that it was not part of the insurance contract. The document is titled "Illustrations" and not "Premium Payment Schedule." The two pages of the Illustrations on which Plaintiffs rely are paginated "1 of 6" and "2 of 6." The Illustrations make express reference to "attached sheets with important footnotes." The additional pages and attached sheets are not in the record before the Court, and there is no indication that Plaintiffs ever requested to see those pages or notes.

[51] *See, e.g., Zenor,* 176 F.3d at 851 (discussing promissory estoppel doctrine in context of atwill employment relationship where employer expressly disclaimed any contractual obligations between employer and employee); *Traco, Inc.,* 814 S.W.2d at 189 (applying promissory estoppel doctrine to construction bid case that did not involve a contract).

[52] The application of promissory estoppel here also would contravene longstanding insurance law that places a premium on the written contract between the parties.

---------

**17 F.3d 729 (5th Cir. 1994)**

**George E. McGILL and John R. Weibel,**

**Plaintiffs-Counter-Defendants-Appellants,**

**v.**

**Myron W. GOFF, Defendant-Counter-Plaintiff-Appellee.**

**No. 93-1339.**

**United States Court of Appeals, Fifth Circuit**

**March 16, 1994**

Page 730

Mary O'Connor, Akin, Gump, Strauss, Hauer & Feld, L.L.P., Dallas, TX, for appellants.

F. Dean Armstrong, Flossmoor, IL, for appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before JONES and DeMOSS, Circuit Judges, and SCHWARTZ [1], District Judge.

DeMOSS, Circuit Judge:

BACKGROUND

This case arises from the formation of a Texas joint venture in June 1985, the purpose of which was to purchase for investment a 51-acre tract of land in Dallas County, Texas. The co-managers of the joint venture

Page 731

are Defendant-Appellee Myron Goff and Harold Tollerup, a non-party to this action. Plaintiffs-Appellants George McGill and John Weibel (collectively referred to as "Appellants") are two of the several investors in the joint venture.

On September 27, 1991, Appellants sued Goff for fraud and breach of fiduciary duty in relation to Goff's solicitation of their participation in the joint venture. Goff asserted a counterclaim for tortious interference with business relations.

On January 13, 1993, Goff moved for summary judgment, alleging that Appellants' claims lacked evidentiary support and that they were otherwise time-barred. Appellants moved to amend their complaint on February 8. The district court referred both parties' motions to a magistrate judge for proposed resolution.

On March 10, the magistrate judge entered his report, concluding that limitations barred Appellants' fraud claim and that there was no evidence of a fiduciary relationship between Goff and Appellants. He also concluded that granting Appellants' motion to amend would be futile in light of the bar posed by the statute of limitations.

On March 11, the district court adopted the magistrate judge's report and entered a "final judgment" dismissing Appellants' case. On March 19, the court entered an order granting Goff's voluntary dismissal of his counterclaim. Thereafter, on April 9, Appellants filed a timely notice of appeal.

DISCUSSION

1. District Court's Adoption of the Magistrate Judge's Report

Appellants first argue that the district court's hasty adoption of the magistrate judge's report precluded them from filing objections to the magistrate judge's recommendations. This they claim violated Federal Rule of Civil Procedure 72 and 28 U.S.C. Sec. 636(b)(1) and constituted reversible error. While we agree that the aforementioned rule and statute contemplate parties being given 10 days to object to any recommendation contained in a magistrate judge's report, and that the better practice for a district court is to refrain from acting on a magistrate judge's report until after the 10-day objection period, we do not agree that the court's abridgment of this rule requires automatic reversal. We conclude from the circumstances of this case that the error is harmless and has otherwise been waived.

First of all, Appellants cannot establish from the record that the district court did not in fact review the magistrate judge's report in accordance with the standards set forth in Rule 72. Thus, the cases relied upon by Appellants are inapposite and do not require reversal of the court's judgment. [2]

Second, the mere fact that the court adopted the magistrate judge's report one day after its entry does not warrant the presumption that the court did so without review. The district court was charged with review of a rather short and simple motion for summary judgment and motion to amend;

Page 732

the evidence presented was brief and the legal issues uncomplicated. We are confident that the court could have reviewed and disposed of these matters within a day.

Third, Appellants have not cited, and we have not found, any case authority for their argument that the district court lacks the power to review the recommendations of a magistrate judge in the absence of their objections. Moreover, we find persuasive the following observations of the Supreme Court concerning the ultimate supervisory authority a district court exercises over cases it refers to a magistrate judge:

The district judge has jurisdiction over the case at all times. He retains full authority to decide whether to refer a case to the magistrate, to review the magistrate's report, and to enter judgment.... [W]hile the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard. Indeed, in the present case, the District Judge made a de novo determination of the petition despite petitioner's failure to suggest that the Magistrate erred. Thomas v. Arn, 474 U.S. 140, 154, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985).

Fourth, we do not agree that in this instance a meaningful review of the magistrate judge's report could not be had in the absence of Appellants' objections to the magistrate judge's recommendations. With the benefit of both parties' written arguments to the magistrate judge, the district court was well able to conduct a satisfactory review of the pros and cons relating to Goff's motion for summary judgment and Appellants' motion to amend. This is especially true with regard to Goff's motion for summary judgment, which the district court and this Court review as a matter of law, according no deference to the magistrate judge's prior disposition of the summary judgment issues. See Fed.R.Civ.P. 72(b); Walker v. Sears, Roebuck & Co., 853 F.2d 355, 358 (5th Cir.1988). For this reason and those mentioned above, we conclude that Appellants were not

prejudiced by the district court's procedural mistake to such a degree as to require reversal.

Moreover, the record demonstrates that Appellants had ample opportunity before the court's judgment became final to bring this error to the court's attention. The judgment did not become final until the district court entered an order dismissing Goff's counterclaim, Fed.R.Civ.P. 54(b)-- some nine days after it had adopted the magistrate judge's recommendations and dismissed Appellants' suit. During these nine days, Appellants could have raised an objection to the district court's precipitate adoption of the magistrate judge's recommendations by motion to reconsider or otherwise. [3] Having failed to do so, Appellants seek correction of this purely ministerial error for the first time on appeal. We hold that Appellants have waived the right to complain on appeal of any error associated with the district court's adoption procedure.

Appellants' remaining points of error concern the merits of the district court's granting of Goff's motion for summary judgment and denial of Appellants' motion to amend. Preliminarily, Goff argues that Appellants waived the right to review of the magistrate judge's recommendations by failing to file objections. Appellants respond by pointing out that the magistrate judge's report did not inform them of the ten-day objection period or of the possible adverse effect of their failure to file timely objections, as required in Nettles v. Wainwright, 677 F.2d 404, 408 (5th Cir.1982) (en banc).

We need not address Nettles or the degree to which Appellants were or should have been aware of the 10-day objection period since we have already concluded that the district court's faulty adoption procedure precluded Appellants from filing objections

Page 733

to the magistrate judge's recommendations. We hold that under these circumstances Appellants are entitled to appellate review of the district court's judgment. [4]

2. Goff's Motion for Summary Judgment

Having reviewed the parties' evidence, we are of the opinion that the district court's judgment granting Goff's motion for summary judgment must be affirmed. The statute of limitations on Appellants' fraud claims is four years from the date Appellants discovered or in the exercise of reasonable diligence could have discovered Goff's alleged fraud. Jackson v. Speer, 974 F.2d 676, 679 (5th Cir.1992). Appellants filed suit on September 27, 1991. Goff's summary judgment evidence indisputably establishes that Appellants were aware of the falsity of Goff's alleged representations in the summer of 1985.

Weibel alleges that in May or June of 1985, he and his wife were approached by Goff and offered the opportunity to invest in a piece of real property in the Dallas, Texas area. According to Weibel, they agreed to invest in the joint venture "based upon representations by Goff that the property would be resold quickly, that the investment would yield a substantial profit to the investors, and that Goff would buy out their investment upon request." (Emphasis added) McGill alleges that in late June or early July 1985, Tollerup solicited his participation in the joint venture. [5] According to McGill, Tollerup represented that "the property would be resold quickly [,] that the investment would yield a substantial profit to its investors[, and] that Tollerup and/or Goff would buy out McGill's interest upon request." (Emphasis added) Appellants testified that they understood "quickly" to mean within a year of their investment.

After investing in the deal, Appellants in August 1985 received and executed a copy of the joint venture agreement. The terms of the agreement are so contrary to Appellants' alleged understanding of the deal that upon review of the document, Appellants would have been put on notice of Goff's alleged fraud. [6] Moreover, at the expiration of the year following their investment, Appellants' interest had not been bought out. Weibel testified that Goff's failure to buy out his investment was the reason he was pursuing the instant litigation. Weibel's wife testified that she was "disappointed" by July of 1986 because Goff had not "ke[pt] his word" and had "lied to [her]" by not buying out their interest within a year. Finally, McGill testified that he had asked Tollerup to buy out

Page 734

his interest as early as 1986 and that when Tollerup failed to do so, he considered Tollerup to have breached his promise. On the strength of this evidence, we hold that Appellants' fraud claims are barred by limitations.

We also hold that Appellants' claims for breach of fiduciary duty are similarly barred. An action for the breach of fiduciary duty is subject to the four-year statute of limitations, Spangler v. Jones, 797 S.W.2d 125, 132 (Tex.App.--Dallas 1990, writ denied), as well as the discovery rule. El Paso Assoc. v. J.R. Thurman & Co., 786 S.W.2d 17, 20 (Tex.App.--El Paso 1990, no writ); Wakefield v. Bevly, 704 S.W.2d 339 (Tex.App.--Corpus Christi 1985, no writ).

Appellants' allege that Goff breached his duties as a fiduciary by failing to disclose that he profited from the sale to the joint venture of the real estate that became the joint venture property. However, the "REPRESENTATIONS AND WARRANTIES OF JOINT VENTURERS" section in the joint venture agreement clearly provides that "[e]ach joint venturer hereby warrants and represents: ... (j) [t]hat he realizes that a profit is being made by Myron Goff on the sale of the Venture Property to the Joint Venture." It is undisputed that Appellants were provided a copy of the agreement to execute and return in August of 1985. Appellants's breach of fiduciary duty claims are therefore barred and the district court's grant of summary judgment is affirmed.

3. Appellants' Motion to Amend

By their third motion to amend, Appellants seek to add new parties and new claims to this litigation. [7] While concluding that Goff would not be unduly prejudiced by Appellants' amended complaint, the magistrate judge nevertheless concluded that allowing the amendments would be futile in light of the limitations bar. Finding no clear error with the magistrate judge's proposed disposition, the district court entered an order adopting the magistrate judge's recommendation and denying Appellants' motion to amend. We affirm the district court's order.

Appellants' amended complaint adds Tollerup and the joint venture as defendants. It also includes new claims for statutory fraud, violations of the Texas Deceptive Trade Practices Act, breach of warranty, and breach of contract. The complaint also requests that any judgment which the joint venture may have or may recover against Appellants for their breach of the joint venture agreement be set off against Appellants' anticipated recoveries in this suit.

The allegations against Tollerup and the joint venture stem from the same misrepresentations and non-disclosures alleged in Appellants' original complaint. Moreover, the claims Appellants seek to add are predicated on the same alleged misrepresentations and non-disclosures of which

this court has already determined Appellants were or in the exercise of reasonable diligence could have been aware in August 1985 and the fall of 1986. We hold, therefore, that allowing Appellants' proposed amendments would be futile in light of the relevant limitation periods, and that the district court did not abuse its discretion in denying Appellants' motion to amend.

CONCLUSION

The judgment of the district court is AFFIRMED in all respects.

-------------------

Notes:

[1]District Judge of the Eastern District of Louisiana, sitting by designation.

[2]In Hernandez v. Estelle, it was demonstrable from the record that the district court did not perform the required de novo review of the magistrate's proceedings because the transcript of the magistrate's three-day evidentiary hearing was not filed with the district court until over six months after the district court had entered its order based on the magistrate's report. 711 F.2d 619, 620 n. 2 (5th Cir.1983). The Sixth Circuit case of Hill v. Duriron Co. Inc., is materially similar to the Hernandez case in that the district court entered an order based on a magistrate's report before the transcript of the evidentiary hearing had been filed in the district court. 656 F.2d 1208, 1215 (6th Cir.1981). Similarly, in Hill v. Jenkins, the court concluded that it was error for the district court to adopt "verbatim" the findings of fact and conclusions of law submitted by a party when it did not have before it either the other party's proposed findings and conclusions or the magistrate's findings and recommendations; thus, the court concluded that "the record in this case compels the conclusion that the district court did not conduct a de novo review of the proceedings held before the magistrate." 603 F.2d 1256, 1258 (7th Cir.1979). Finally, in Coolidge v. Schooner California, the Ninth Circuit reversed judgment because the record "clear[ly]" demonstrated that the district court performed no review of the magistrate's "opinion." 637 F.2d 1321, 1327 (9th Cir.1981). Apparently the district court believed that the magistrate's "opinion" was final and that any objections to its "opinion" were to be entertained by the magistrate. Id.

[3]We do not premise Appellants' waiver on their failure to file a post-judgment motion under Rule 59 or Rule 60. The period critical to Appellants' waiver is the nine days after the court's adoption of the magistrate's recommendations and before its dismissal of Goff's counterclaim. During this period, no final judgment had been entered, and the court's adoption and dismissal order was subject to the court's plenary revision. Fed.R.Civ.P. 54(b).

[4]Certain language in Appellants' brief could be read as an argument that Nettles in some way precludes our holding that Appellants waived the right to complain about the district court's adoption procedure by failing to complain at the trial court level. If Appellants are making this argument, we reject it. The sole issue before the court in Nettles was whether an appellant had waived the right to object on appeal to findings in a magistrate's report by failing to object at the trial court. 677 F.2d at 406-07. The court held that he had, provided the magistrate informed him of his right to file objections to the report. Id. at 410. Nettles has absolutely nothing to do with a party's waiver of the right to complain on appeal about the procedures utilized by the district court in adopting a magistrate's report. Nettles speaks only to the waiver of objections to a magistrate's findings while our holding concerns the waiver of "objections" to a district court's adoption

procedure.

[5]McGill's investment in the joint venture appears to have been solicited exclusively through his contacts with Tollerup. As an alternate ground for summary judgment, Goff argues that there is no evidence to support the existence of an agency relationship between Tollerup and himself. For the purposes of our limitations discussion we will assume without deciding that Tollerup's alleged representations were made with Goff's authorization.

[6]The agreement states that "[a]lthough there is no contractual obligation to do so, the Joint Venturers desire to sell the Venture Property within five (5) years from the date of this agreement." The agreement also expresses several "purpose[s]" of the joint venture, among them, "to own, manage, improve, subdivide, develop, mortgage, lease ... and otherwise deal with the Venture property." Article III of the agreement establishes the "term" of the venture; conspicuously absent from this provision is any definite limitation on the venture's duration. Rather, the venture is to continue until either the venture property is sold (and there is no obligation concerning when that will be) or a "majority [of investors] (in interest, not numbers)" agree to terminate the venture. Between them, Appellants owned only an 8 3/4 percent interest in the joint venture.

[7]Their first motion to amend was "unfiled" by the district court because it had not been filed in compliance with the local rules for the Northern District of Texas. Their second motion to amend was untimely filed and later withdrawn by Appellants' third motion to amend which was itself untimely and filed over three weeks after Goff filed his motion for summary judgment.

----------------